## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION

| | |
|---|---|
| **MATTHEW SCHRIER,** ) | |
| ) | **Case No.:** |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **QATAR ISLAMIC BANK,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

## <u>COMPLAINT</u>

Plaintiff Matthew Schrier alleges the following in support of his claims:

### NATURE OF THE ACTION

1.     While reporting on the Syrian Civil War, Matthew Schrier was kidnapped and imprisoned for 211 days by the Nusra Front, the Syrian Al-Qaeda affiliate.  The Front subjected Mr. Schrier to horrific conditions and extreme psychological and physical abuse.  He was beaten and tortured on at least ten occasions, often by teams of terrorists, threatened multiple times with summary execution, and forced to observe and hear the torture of other prisoners.  He was deprived of water and food, held in rooms that were freezing cold or boiling hot, without light or ventilation, and denied access to bathrooms for days at a time.  He contracted food poisoning and an internal infection, both untreated, and was infested by bed bugs.  He often thought he was going to die in captivity, or wished for death, and described reaching "a place beyond depression."

2.     The Nusra Front handed Mr. Schrier over to its ally, Ahrar al-Sham, for 46 of the 211 days of imprisonment.  The conditions were no better.  Ahrar al-Sham interrogated Mr. Schrier on several occasions.  They deprived him of water, crammed him into a too-small, poorly ventilated cell with other prisoners, and beat other prisoners in front of him.  One night, he heard

shells exploding nearby and wondered whether he would die.

3.     The Nusra Front and Ahrar al-Sham used an international network of donors and charities to fund this and other acts of terrorism, and they relied on defendant Qatar Islamic Bank (QIB) to provide financial services to those donors and financial support to the charities.  This action seeks to hold QIB accountable for its role in financing and supporting the Nusra Front's and Ahrar al-Sham's terrorist activities.

4.     QIB played two substantial roles in supporting the groups that held Mr. Schrier captive.  First, it allowed Qatari national Saad bin Saad al-Kabi to open an account in the name of his minor son (the "al-Kabi QIB account") and to use that account to funnel money from donors in Qatar and elsewhere to the Nusra Front.  Second, it donated a substantial sum to Qatar Charity, a known Al-Qaeda funder and well-publicized supporter of Ahrar al-Sham.

5.     While Mr. Schrier was sitting in a cell, al-Kabi spearheaded a highly visible campaign using U.S.-based social media platforms such as Twitter, Facebook, YouTube, and WhatsApp, to solicit donations for a campaign called Madid (or Madad) Ahl al-Sham ("Madid campaign").  These donations were intended to fund, and ultimately did fund, the Nusra Front.  The campaign advertised the al-Kabi QIB account as the place for donors outside Qatar to wire their donations to support the Nusra Front's terrorism.

6.     The campaign collected enough money to fund hundreds of Nusra Front terrorists.  Some of that money flowed through the al-Kabi QIB account and ultimately to the Nusra Front.

7.     QIB knew what the al-Kabi account was for.  At the time al-Kabi used the account to fundraise for the Nusra Front, QIB had customer due diligence policies designed to prevent its services from being used to finance terrorism.  It also had periodic account monitoring policies to prevent accounts from being used to finance terrorism.

8.     Under those policies, QIB knew, in real time, that its services were being used to raise money for the terrorist groups that kidnapped, imprisoned, and tortured Mr. Schrier.  Yet QIB allowed al-Kabi to use the account to funnel money to the Nusra Front for more than a year.  All the while, al-Kabi directed donors to the Nusra Front to send their money to his minor son's QIB account.

9.     Indeed, this timeline supports the inference that QIB agreed, expressly or tacitly, to allow al-Kabi to use the account to fundraise for terrorists and to disregard suspicious transactions that flowed through the account as part of a conspiracy to enable the Nusra Front's terrorist activities in Syria against Americans including Mr. Schrier.

10.     On top of supporting al-Kabi's fundraising efforts, in 2012 and 2013, QIB made direct donations to Qatar Charity, including a check for 500,000 Qatari riyals in 2013.  Qatar Charity has a long history of funding terrorist groups around the world, from Bangladesh to Mali, and was cited by Osama bin Laden as far back as 1993 as providing financial support for Al-Qaeda.

11.     Just before Mr. Schrier's capture, Qatar Charity provided material support to the Syrian Islamic Front, an umbrella organization of Syrian terrorist groups in Syria.  Ahrar al-Sham was the dominant member of the Syrian Islamic Front.  In December 2012, the Syrian Islamic Front posted a video announcing its formation that juxtaposed its violent acts with its use of Qatar Charity's aid to drum up public support.

12.     Notwithstanding Qatar Charity's longstanding and widely reported support of terrorism and QIB's due diligence and periodic monitoring policies, QIB also allowed Qatar Charity to maintain eight accounts with the bank, further facilitating Qatar Charity's support of terrorism in Syria.

13.     This evidence supports the inference QIB knew its donations would support

terrorism in Syria.

14.     This evidence further supports the inference that QIB agreed, expressly or tacitly, to donate to Qatar Charity as part of a conspiracy to enable Ahrar al-Sham's terrorist activities in Syria against Americans including Mr. Schrier.

15.     QIB's conduct makes it liable to Mr. Schrier under the Anti-Terrorism Act, 18 U.S.C. § 2333(a), for committing acts of international terrorism by providing material support to the Nusra Front and Ahrar al-Sham.  It is also liable under the Anti-Terrorism Act, 18 U.S.C. § 2333(d), for aiding and abetting and conspiring with the Nusra Front, al-Kabi, Qatar Charity, Ahrar al-Sham, and others to commit acts of international terrorism in Syria.

16.     QIB is also liable for aiding and abetting the Nusra Front's and Ahrar al-Sham's torts against Mr. Schrier under applicable state law.

17.     Mr. Schrier brings this action to recover compensatory and punitive damages, statutory treble damages, and attorneys' fees and expenses of litigation for the injuries he suffered at the hands of the Nusra Front and Ahrar al-Sham, the terrorist groups QIB enabled.

**THE PARTIES**

18.     At the time he was kidnapped, Matthew Schrier, a United States national, was an independent photojournalist covering the Syrian Civil War.  He now lives in Florida, within the Southern District of Florida's Fort Lauderdale Division.

19.     Qatar Islamic Bank (QIB) is a Qatar-based financial institution.   QIB maintains accounts with correspondent banks in New York, and has a USA PATRIOT Act registered agent, Global Payments Advisory Group, in New York.  At all times relevant to the allegations in this complaint, the government of Qatar has been a minority investor in QIB, through the Qatar Investment Authority.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over Mr. Schrier's federal-law claims under 28 U.S.C. § 1331 and 18 U.S.C. § 2338, which gives federal district courts exclusive jurisdiction over ATA actions.

21.     This Court has personal jurisdiction over QIB under Federal Rules of Civil 4(k)(1)(A) and/or (C) and 18 U.S.C. § 2334(a), which authorizes nationwide service of process in ATA cases.

22.     Venue is proper in this District under 18 U.S.C. § 2334(a) because Mr. Schrier resides here.

### I.     The Nusra Front's Kidnapping, Imprisonment, and Torture of Mr. Schrier and Ahrar al-Sham's Imprisonment of Mr. Schrier

23.     The Nusra Front formed in 2011 at the outset of the Syrian Civil War as an offshoot of Al-Qaeda.[1]  The Nusra Front sought to replace Syrian dictator Bashar al-Assad's repressive regime with an Islamist state.  The Nusra Front was associated with Salafism, a revivalist movement in the Sunni branch of Islam.

24.     The Nusra Front used terrorism, assassination, hostage taking, and suicide bombings to advance its political goals.  Between December 2011 and June 2013, the Nusra Front claimed responsibility for 57 of the 70 suicide bombings that occurred in Syria.

25.     The Nusra Front still operates today under the name Hay'at Tharir al-Sham.

26.     On December 11, 2012, the U.S. Department of State designated the Nusra Front a foreign terrorist organization pursuant to 8 U.S.C. § 1189 and Executive Order 13224, *Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten To Commit, or*

---

[1] The leader of Al-Qaeda in Iraq (later, the Islamic State of Iraq and Syria (ISIS)), Abu Bakr al-Baghdadi, personally sent one of the Nusra Front's leaders, Abu Mohammad al-Julani, to Syria to found the group.

*Support Terrorism* (Sep. 23, 2001).   The Nusra Front is still designated a foreign terrorist organization as of this filing, under both its original and current names.

27.     Not long after the U.S. State Department designated the Nusra Front a foreign terrorist organization, Mr. Schrier traveled to Syria and embedded with the Free Syrian Army, a group led by Syrian military defectors that opposed Assad.   The Free Syrian Army, the most prominent moderate opposition group, sought to replace the Assad regime with a democratic government.

28.     Mr. Schrier spent eighteen days photographing the Syrian Civil War as it raged through Aleppo, Syria.

29.     On what Mr. Schrier thought would be his last day in Syria, December 31, 2012, he tried to take a taxi from Aleppo to the Turkish border.   He was en route when a Jeep cut off his taxi, blocking the road.

30.     Three men got out of the Jeep, grabbed Mr. Schrier, put him in the Jeep's backseat, and covered his eyes with his ski cap.   One of the men pressed the barrel of a rifle flush against Mr. Schrier's temple.

31.     Mr. Schrier was taken to a former children's hospital, where he learned that he was taken captive by the Nusra Front and that the hospital basement would serve as his prison.

32.     The Nusra Front held Mr. Schrier captive for 211 days, from December 31, 2012 until Mr. Schrier's escape on July 29, 2013.

33.     The Nusra Front's leaders ordered and oversaw Mr. Schrier's kidnapping, imprisonment, and torture.

34.     During this period, the Nusra Front moved Mr. Schrier seven times and held him at six different sites.

35.     From May 5, 2013 to June 20, 2013, the Nusra Front handed Mr. Schrier over to its ally Ahrar al-Sham for continued captivity and torture.  An Ahrar al-Sham terrorist told Mr. Schrier his group was holding Mr. Schrier "in trust for" the Nusra Front.

36.     Like the Nusra Front, Ahrar al-Sham sought to replace the Assad regime with an Islamist state, and the two groups fought together and shared resources.  According to a report by the Combatting Terrorism Center at West Point, Ahrar al-Sham "had an excellent working relationship with al-Qa'ida factions such as Jabhat al-Nusra," or the Nusra Front.

37.     Ahrar al-Sham was the dominant member in the Syrian Islamic Front, a coalition of militant Islamist groups.

38.     The Nusra Front retained control over Mr. Schrier's imprisonment and retook custody of him on June 20, 2013.

39.     All six sites where Mr. Schrier was held lacked adequate ventilation, electricity, sanitation, and heat.

40.     For days at a time, Mr. Schrier was denied access to a bathroom.

41.     On one occasion, Mr. Schrier and his cellmates contracted severe food poisoning. He and his cellmates were forced to defecate in a bucket the size of a beach pail.  Mr. Schrier did not receive medical attention for the week this went on.

42.     Mr. Schrier only rarely had access to a shower, and he was unable to wash his clothes or blankets for long stretches of time.

43.     At one point, he went three full months without bathing.  His skin became severely infected as a result.

44.     In these squalid conditions, Mr. Schrier's bedding and clothes became infested with bed bugs.  He had no means of exterminating them.  One site where he was held was swarming

with rats.  He awoke there one night to find one crawling on him.

45.     Mr. Schrier was beaten and tortured on at least ten occasions, often by teams of terrorists.  He was also forced to observe and listen to the Nusra Front and Ahrar al-Sham torture other prisoners.

46.     One of the first torture sessions came after Mr. Schrier made a failed escape attempt.  The Nusra Front's torturers forced a tire over Mr. Schrier's bent knees and shoved a rod between his knees and the tire to prevent him from moving his legs.  The torturers flipped Mr. Schrier face down and beat the bottoms of his feet 115 times with a thick, black cable.  The beating left him unable to walk.

47.     The Nusra Front's leadership seemed fixated on obtaining proof that Mr. Schrier was an agent of the U.S. government.  On two occasions, the Nusra Front tortured Mr. Schrier to extract a false confession that he was an undercover CIA agent.

48.     The first time, the Nusra Front's torturers whipped Mr. Schrier's back with a strip of garden hose and demanded he admit to being an undercover CIA agent.  Mr. Schrier did not do so.

49.     A few weeks later, the Nusra Front again tried to coerce Mr. Schrier into falsely confessing he was an undercover CIA agent.  Mr. Schrier initially resisted confessing.  But after the Front's torturers lashed his feet and kicked him in the head, Mr. Schrier realized the Front would not stop until he told them what they wanted to hear.  He falsely confessed.

50.     Confession in hand, the Nusra Front made a video of Mr. Schrier falsely confessing to being a CIA agent.

51.     The Nusra Front told Mr. Schrier it intended to use the video to induce the Qatari government to act as an intermediary with the U.S. government to negotiate Mr. Schrier's release.

52.     The Qatari government has acted as an intermediary on other occasions to negotiate ransom payments for the release of Western hostages from the Nusra Front.  Between 2012 and 2015, Qatar negotiated tens of millions of dollars in ransom payments to the Nusra Front in exchange for the release of European nationals.

53.     The Qatari government was also involved in negotiating the 2014 release of Mr. Schrier's American cellmate, Theo Padnos.  Qatar's involvement fueled speculation that Qatar paid a substantial ransom to the Nusra Front for Mr. Padnos's release.

54.     Upon information and belief, the Nusra Front intended to use Mr. Schrier's confession video to pressure the United States to take steps to obtain his release, including pressuring the United States to ask Qatar to pay a ransom to the Nusra Front.

55.     On one occasion, the Nusra Front threatened to force Mr. Schrier to drive a truck loaded with explosives into one of its targets.

56.     On top of the physical and psychological abuse, the Nusra Front stole Mr. Schrier's debit and credit cards and forced him to turn over the PIN numbers and passwords to his online accounts.

57.     Between February and April 2013, the Nusra Front racked up charges to Mr. Schrier's accounts to buy dozens of items for thousands of dollars, most of which had obvious connections to the Nusra Front's terrorist activities.  For example, the Front used Mr. Schrier's accounts to buy and ship the following supplies to the Turkey/Syria border: multiple car parts, over a dozen laptops and tablets, GPS mapping software, "Men's military tactical boots," Ray-Ban "Aviator Shooter" sunglasses, and a "Casio Hunting Timer Men's Watch."

58.     These transactions were paid for using Mr. Schrier's U.S.-based credit card and bank accounts, and many of the sellers were based in the United States.  Two transactions, for

military-style sunglasses and window washer fluid, were with vendors in Florida within this district.

59.      The purchased goods were shipped from the United States and elsewhere to addresses in Quebec and Turkey.

60.      In February 2013, the Nusra Front wired just under $2,000 from Mr. Schrier's United States savings accounts to a recipient outside the United States.

61.      Mr. Schrier was forced for all seven months of his captivity to conceal his Jewish faith, even from his American cellmate Mr. Padnos.  He lived in constant fear that the Nusra Front would discover his faith and kill him for it.

62.      Mr. Schrier pretended to convert to Islam in an effort to improve his chances at release.  He would have been put to death if his captors discovered the false "conversion."

63.      In July 2013, the Nusra Front moved Mr. Schrier and Mr. Padnos to their sixth prison, to a cell with small windows barred by wire.

64.      By standing on Mr. Padnos's back, Mr. Schrier discovered that the wires covering their cell window were poorly attached, and he hatched a plan to remove the wires and escape.

65.      After several days of work and one aborted escape attempt, Mr. Schrier removed all the wires and squeezed through the window.

66.      Mr. Schrier freed himself on July 29, 2013, 211 days after the Front kidnapped him.

67.      Mr. Padnos was not so lucky and was unable to escape.

68.      With the help of sympathetic Free Syrian Army rebels, Mr. Schrier made his way to the Turkish border and from there back to New York City, where he lived following his escape.

**II.      Statutory Background**

69.      Congress has made a concerted effort to crack down on terrorist groups like the

Nusra Front and those that enable them. *See, e.g.*, 18 U.S.C. §§ 2332a; 2339A; 2339B.  As part of that effort, it enacted the Anti-Terrorism Act, which creates a civil cause of action for any United States national "injured in his . . . person [or] property . . . by reason of an act of international terrorism."  18 U.S.C. § 2333(a).

70.     The Anti-Terrorism Act provides that "a suit for recovery of damages under section 2333 of this title" may be "commenced within 10 years after the date the cause of action accrued."  18 U.S.C. § 2335(a).

71.     Congress intended the Anti-Terrorism Act to "provid[e] victims of terrorism with a remedy for a wrong that, by its nature, falls outside the usual jurisdictional categories of wrongs that national legal systems have traditionally addressed."  S. Rep. No. 102-342 at 22 (1992).

72.     Congress understood that terrorist groups rely on financial and material support from terrorist sympathizers to perpetrate their heinous acts.  Congress intended the Anti-Terrorism Act to impose "liability at any point along the causal chain of terrorism" in order to "interrupt, or at least imperil, the flow of money" to terrorist groups.  S. Rep. No. 102-342 at 22.

73.     However, as originally enacted, some courts declined to read the Anti-Terrorism Act to impose aiding and abetting or conspiracy liability on entities that support terrorists.

74.     To clarify its intent, Congress amended the Anti-Terrorism Act in 2016 to expressly impose aiding and abetting and conspiracy liability.  It enacted that amendment, the Justice Against State Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852, over a presidential veto.

75.     JASTA puts it beyond doubt that Anti-Terrorism Act liability extends to "any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such act of international terrorism."  18 U.S.C. § 2333(d)(2).

76.     JASTA's purpose is to provide Anti-Terrorism Act plaintiffs "with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or person that engage in terrorist activities against the United States."  Pub. L. No. 114-222 § 2(b), 130 Stat. at 853.

77.     Congress further found that entities "that knowingly or recklessly contribute material support or resources, directly or indirectly, to persons or organizations that pose a significant risk of committing acts of terrorism that threaten the security of nationals of the United States . . . necessarily direct their conduct at the United States, and should reasonably anticipate being haled into court in the United States to answer for such activities."  JASTA, Pub. L. No. 114-222 § 2(a)(6), 130 Stat. at 852.

78.     Congress directed courts to use *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), as the legal framework for aiding and abetting and conspiracy liability under the ATA. JASTA, Pub. L. No. 114-222, § 2(a)(5), 130 Stat. at 852.

79.     Under *Halberstam*, an entity is liable for aiding and abetting another's tort when (1) the party whom the entity aids performs a wrongful act that causes an injury; (2) the entity is generally aware of its role as part of an overall illegal activity at the time the assistance is provided; and (3) the entity knowingly and substantially assists the principal violation.  *Halberstam*, 705 F.2d at 477.

80.     Under *Halberstam*, an entity is liable for conspiracy when (1) the entity agrees with one or more people; (2) to participate in an unlawful act; (3) an injury results from an unlawful act performed by one of the parties to the agreement; and (4) the overt act was done in furtherance of the common scheme.  *Id.*

### III.     QIB's Support of the Nusra Front

81.     Terrorist groups need money to operate just like any other enterprise.  But unlike legitimate enterprises, terrorist groups rely on creative fundraising strategies and sympathetic financial institutions and individuals to evade anti-terrorism financing laws.

82.     Around the time of Mr. Schrier's captivity, terrorist groups routinely turned to private donors for financial support.

83.     Terrorist supporters in the Persian Gulf, including Qatar, were especially notorious for soliciting donations for terrorist groups in Syria.

84.     The U.S. Department of State's 2013 Country Reports on Terrorism specifically noted that "[p]rivate donations from the Gulf also remained a major source of funding for Sunni terrorist groups, particularly those operating in Syria."

85.     Terrorist supporters used United States-based social media platforms such as Twitter, Facebook, YouTube, and WhatsApp to support their fundraising efforts.

86.     In March 2014, U.S. Treasury Under Secretary for Terrorism and Financial Intelligence David Cohen remarked that Persian Gulf fundraisers often used social media campaigns to solicit domestic and international donors to terrorism.

87.     In August 2014, the U.S. Department of the Treasury designated as Specially Designated Global Terrorists two Kuwait-based individuals who used social media to fundraise for the Nusra Front.

88.     These fundraising efforts benefited from Qatar turning a blind eye to terrorist fundraising campaigns.

89.     As Under Secretary Cohen remarked in 2014, Qatar was a "permissive jurisdiction" for terrorist fundraising.

90.     The fundraising that QIB's provision of financial services facilitated for the Nusra Front is no exception to these general allegations.

**a.     QIB Opened an Account for Saad bin Saad al-Kabi and Allowed Him to Use the Account to Fundraise for the Nusra Front**

91.     Saad bin Saad al-Kabi is a Qatari national.  In August 2015, the U.S. Department of the Treasury designated him a Specially Designated Global Terrorist pursuant to Executive Order 13224.  The Treasury designation stated: "Since at least late 2012, al-Ka'bi has provided support to [the Nusra Front] in Syria."  The Treasury designation also noted that al-Kabi acted as an intermediary for ransom negotiations with the Nusra Front.

92.     According to the Treasury designation, around the time of Mr. Schrier's imprisonment, the Nusra Front approached al-Kabi to ask him to set up a fundraising campaign to support their violent activities in Syria.

93.     According to the Treasury designation, al-Kabi agreed to do so.

94.     Al-Kabi required financial services to support the campaign.  He used an account at QIB for this purpose.

95.     No later than May 2013, QIB opened an account in the name of al-Kabi's minor son.

96.     Upon information and belief, this account had the account number 200072076.

97.     During the period of Mr. Schrier's imprisonment, al-Kabi used the account to fundraise for the Nusra Front through a coordinated social media campaign under the name Madid (or Madad) Ahl al-Sham ("Madid campaign").

98.     Given QIB's long history of associating with supporters of terrorism, it is not surprising al-Kabi used an account at QIB for terrorism fundraising.

99.     According to QIB's Corporate Governance Reports, open Hamas supporter Sheikh

Yusuf al-Qaradawi chaired QIB's Shari'a Supervisory Board at least through 2010.  The Shari'a Supervisory Board ensures QIB complies with Islamic law.

100.   Al-Qaradawi became one of the most prominent Islamic leaders in the world thanks to his weekly Al Jazeera show, Sharia and Life, which reached millions of viewers.  He used the show to advocate for support of Hamas, including defending suicide bombers in Israel.

101.   The United States designated Hamas as a Specially Designated Terrorist organization in 1995 and as a Foreign Terrorist Organization in 1997.  In 2004, the then-leader of Hamas declared President George W. Bush "the enemy of God" and stated "God declared war against America."

102.   Al-Qaradawi has made a host of vile statements over the years making his support of terrorism abundantly clear.  Among others, he has made the following statements:

    a.   In 2004, al-Qaradawi issued a religious legal opinion sanctioning abductions of and attacks on Americans in Iraq, though he later denied it.

    b.   In 2009, while serving on QIB's Shari'a Supervisory Board, al-Qaradawi went on Al Jazeera and said Allah sent Hitler to "punish" Jewish people "for their corruption."  He added that Hitler "managed to put them in their place."

    c.   In 2013, while Mr. Schrier was being held captive and tortured, al-Qaradawi publicly encouraged Muslim Brotherhood followers to support Sunni terrorist groups, while Mr. Schrier was imprisoned and tortured by such groups.

103.   Al-Qaradawi chairs an organization that funds terror.

104.   Al-Qaradawi currently chairs the Union of Good, a Hamas-founded group that

funnels money from charities to Hamas.  The U.S. Department of the Treasury designated the Union of Good as a terrorist supporter in 2008.

105.    Al-Qaradawi's influence over QIB due to his chairmanship of the Sharia Advisory Board is troubling in light of his open support of terrorism and his public disregard of anti-terrorism financing laws.

106.    QIB also maintained correspondent banking relationships with banks known to finance terrorism, including Al-Rajhi Bank and Islami Bank Bangladesh Limited.

107.    QIB had other ties to Al-Rajhi Bank, too.  For example, according to a QIB "Investor Presentation, Financial Year 2014," QIB hired at least two senior executives from Al-Rajhi Bank, strengthening the links between the two banks.

108.    A Report by the U.S. Senate's Permanent Subcommittee on Investigations, issued on July 17, 2012, identified numerous links between Al-Rajhi Bank and Islami Bank Bangladesh Limited and Al-Qaeda.

109.    In response to the substantial evidence of Al-Rajhi Bank's connections to Al-Qaeda and other terrorist groups, many reputable banks severed ties with Al-Rajhi Bank.  QIB did not follow suit.

### b.    The Madid Ahl al-Sham Campaign and the al-Kabi QIB Account

110.    Starting around May 2013, a Twitter campaign coordinated by al-Kabi using the name Madid Ahl al-Sham began soliciting donations to fund Syrian militant Islamist groups fighting in the Syrian Civil War, including the Nusra Front.

111.    Upon information and belief, the Madid campaign did not have the approval of the Qatari Ministry of Social Affairs.

112.    Publicly available social media posts confirm al-Kabi and his associates used the

QIB account to fundraise for the Nusra Front.

113.   Upon information and belief, at least some of the Madid campaign social media posts and communications used United States-based data centers for Twitter, Facebook, YouTube, and WhatsApp.

114.   The allegations that follow represent a sample of Madid campaign social media postings.  U.S.-based social media companies likely have information about other, now-deleted or non-public posts in their possession.

115.   On June 12, 2013, while Mr. Schrier remained in captivity, Twitter user "@mohamed1234321" posted a tweet that expressly connected the Madid campaign and al-Kabi with the Nusra Front:



116.    The tweet translates as, "#Nusra_Front People of Qatar who wanted to support the true mujahedeen, they must join Madid Ahl Al-Sham campaign under the supervision of Saad al-Kabi.  Retweet, dear lovers."

117.    The yellow note in the tweet translates as, "Collect donations to our brothers mujahedeen with weapons in Al-Qusair under the supervision of Saad al-Kabi 55858529 Twitter: @saadsaadalkabi, and with the assistance of Brother Abdul Latif al-Kuwari 66530050."[2]

118.    "Mujahedeen" is an Arabic word referring to soldiers fighting in a jihad.  Here, it refers to the militant Islamist opposition to the Assad regime.

_____

[2] Al-Qusair was the site of a battle between Assad and opposition forces from mid-May to early June 2013.  The Nusra Front was involved in the battle.

119.    Abdul Latif al-Kuwari (or al-Kawari) was arrested and detained by Qatar—upon information and belief for ties to extremists—in the mid-2000s.

120.    Upon information and belief, based on al-Kawari's long association with Al-Qaeda, QIB knew of al-Kawari's association with terrorism.  Andrew Weinberg, an expert in Qatari terrorist fundraising, stated that Al-Kawari "should have been a known quantity in Qatar" as a terrorist and fundraiser at the time of the Madid campaign.

121.    The U.S. Department of the Treasury designated al-Kawari as a Specially Designated Global Terrorist pursuant to Executive Order 13224 in August 2015, at the same time it designated al-Kabi a Specially Designated Global Terrorist.  Al-Kawari was designated both for providing funds to Al-Qaeda and for his historical and current membership in the group, as an "al-Qaida security official."

122.    Other tweets explicitly link the Madid campaign and the al-Kabi QIB account.

123.    On June 2, 2013, a Twitter account associated with the handle "@q6r0" tweeted:



ٱمَلَ ٱلۡصيـد q6r ⚡
@q6r0

Follow ⌄

6/7 الإسلامي A/C : 200072076 SOFT : QISBQAQA HAZZA SAAD SAAD ALKAABI
صفحة الفيس بوك @Saadsaadalkabi تويتر:
انشر facebook.com/RadywWtlfzywnA...

2:12 AM - 3 Jun 2013

124.    The now-deleted tweet translates as, "6/7 al-Islami A/C: 200072076 SOFT: QISBQAQA HAZZA SAAD SAAD AL KAABI Twitter: @Saadsaadalkabi Facebook page share

facebook.com/RadywWtlfzywnA…"

125.     The code QISBQAQA is the Bank Identification Code (BIC) for QIB.

126.     Upon information and belief, and as alleged in paragraph 96, QIB account number 200072076 is the account al-Kabi opened in his minor son's name and used for the purpose of raising money for the Nusra Front.

127.     The Facebook link was to a page associated with the Madid campaign.  The page has since been deleted.

128.     These tweets are not isolated.  More than 15 publicly available tweets identify the director of the Madid campaign as Saad al-Kabi, the same al-Kabi who opened the QIB account.

129.     For example, on May 30, 2013, while Mr. Schrier was being held by the Nusra Front's ally Ahrar al-Sham, a Twitter account with the handle "@fatomsafe" tweeted:



130.     The tweet translates as, "A fundraising campaign in Qatar to buy weapons for mujahedeen in Al-Qusair.  Saad al-Kabi 0097455858529. The campaign of Madid Ahl al-Sham funds Al-Qusair."

131.    The Madid campaign also solicited donations from outside Qatar.

132.    Electronic "fliers" circulated on Twitter directed donors from outside Qatar to send donations to the al-Kabi QIB account.

133.    On August 13, 2013, a Twitter account with the handle "@sutoalfajer" tweeted:



134.    The tweet translates as, "#Madid Ahl al-Sham Campaign @mdd_sham in #Qatar,

protector.  In charge of it are honest Qatari youth, may God bless them."

135.    The flier, which depicts masked men holding weapons, translates as: "The Messenger of Allah peace be upon him, as saying: 'The place of the assembly of Muslims at the time of war will be in a land called al-Ghutah.' [Hadith] Grade: Sahih (Al-Albani).  Madid Ahl al-Sham Campaign.  Support for Eastern Ghouta."  The flier lists phone numbers for Saad al-Kabi, Fahd al-Kabi, and Um Fadl al-Kabi.  The flier directs women donors to contact Um Fadl al-Kabi.

136.    The bottom of the flier translates as: "Readying Fighters: 5500 Riyals.

To donate from outside Qatar: Qatar Islamic Bank (QIB)

A/C: 2000072076

SOFT: QISBQAQA

HAZZA SAAD SAAD ALKAABI"

137.    The text next to the check marks translates as: "Armament Feeding Medical Care"

138.    Eastern Ghouta was the site of a five-year siege, lasting from April 2013 to April 2018.  The Nusra Front and Ahrar al-Sham were part of the fighting.

139.    Donors from inside and outside Qatar donated to the Madid campaign.

140.    On May 29, 2013, a Twitter account associated with the handle "@shooshoosaad" tweeted:



141.    The tweet translates as, "A man of good will from outside Qatar donated 7,000

Qatari riyals.  God bless his wealth.  #Qatar #Madid_Ahl_al-

Sham_with_money_campaign_in_al-Qusair #Syria"

142.    According to the flier detailed in paragraphs 133 to 137, 7,000 riyals is more than

enough to fund one Nusra Front terrorist.

143.    On June 5, 2013, a Twitter account associated with the handle "@qatarislam,"

which used a photo of Osama bin Laden as its profile image, tweeted:



ناصر الشهراني
@qatarislam

Follow

#مدد_أهل_الشام  الله اكبر ولله الحمد
تبرع فاعل خير بمبلغ 10000 للمجاهدين في الشام
اسأل الله ان يبارك في ماله واهله
((نصر او شهادة))

🌐 Translate Tweet

3:34 PM - 5 Jun 2013

144.    The tweet translates as:

"Naser Al-Shahrani

@qatqrislam

#Madid_Ahl_al-Sham.  God is the greatest.  Praise be to God.

A benefactor donated 10,000 to the fighters in Syria.

May God bless his money and family.

((Victory or martyrdom!)) [We'll fight to the end]"[3]

145.    On May 28, 2013, while Mr. Schrier was being held captive and tortured, the same Twitter account, "@qatarislam," publicly advocated kidnapping Americans in the Gulf States.

146.    Upon information and belief, and based on the still-available social media history for al-Kabi and the Madid campaign, al-Kabi's QIB account was the only means for donors to the Madid campaign from outside Qatar to make donations to the campaign.

---

[3] The Levant is another name for Syria.

147.    Upon information and belief, donors from inside and outside Qatar sent money to the Madid campaign via the al-Kabi QIB account.

148.    Other Madid campaign tweets associated al-Kabi and the Madid campaign with militant Salafist clerics known to support terrorist groups.

149.    On June 1, 2013, the Twitter account with the handle @mohamed1234321 tweeted:



150.    The yellow note is translated in paragraph 117.

151.     The tweet translates as, "Madid Ahl al-Sham campaign in Qatar is one of the most trusted campaigns in Qatar and has been authorized by Sheikhs, Wagdy Ghoneim, Hamed Hamad al-Ali, so hurry up."

152.     Wagdy Ghoneim is an Egyptian Salafist cleric.  In the mid-2000s, he was arrested in the United States by immigration authorities for violating the terms of his visa, denied bail over concerns about his support of terrorist organizations such as Hamas, and deported from the United States to Qatar.

153.     Ghoneim is known for making anti-American statements and anti-Semitic speeches encouraging violence.  He has been banned from entering the United Kingdom due to concerns he sought to "provoke others to commit terrorist acts."

154.     Hamed Hamad al-Ali is a Kuwaiti Islamic cleric.  The U.S. Department of the Treasury designated him a Specially Designated Global Terrorist in August 2014 for his support of the Nusra Front.

155.     The Treasury designation said al-Ali "referred to himself as an al-Qaida commando," "raised tens of thousands of dollars to help [the Nusra Front] purchase weapons and supplies," and "directed donors in Kuwait to send financial and material support to" the Nusra Front.  The Treasury designation also said al-Ali couriered money to the Nusra Front, arranged for others to do so, and facilitated travel to Syria for individuals wishing to join the Nusra Front.

156.     Al-Ali traveled to Qatar in June 2013 to preach in the Grand Mosque in Doha.  In his speech, which was recorded and uploaded to YouTube, al-Ali urged Qataris to donate to the Madid campaign and told the crowd that "the mujahedeen internally speak well of [the campaign's] work in terms of what they provide in support."  At the end of his speech, viewers were given a QIB account number to donate to.  Upon information and belief, the video has since been removed

1834428.1

from YouTube.

157.    Al-Kabi later tweeted to encourage contributions to the campaign: "Your brothers are in dire need of weapons and ammunition more than food."  Upon information and belief, the tweet has since been deleted or made non-public.

158.    Social media posts for the Madid campaign also included the names and contact information for other individuals who openly supported the Nusra Front.

159.    On March 29, 2013, while Mr. Schrier was held captive and tortured by the Nusra Front, Um al-Fadl al-Kabi, Saad al-Kabi's sister and the Madid campaign coordinator for women donors as alleged in paragraph 135, tweeted:



160.    This post shows a heavily armed Nusra Front terrorist killed while fighting, with the Nusra Front flag behind him.    Al-Kabi's sister wrote: "May God accept #Omar_Mohammad_alHazaa' as a martyr and place him in the highest places in heaven and may he intercede for him on behalf of his family."

161.    In August 2013, Abd al-Aziz bin Khalifa al-Attiyah, a prominent, wealthy Qatari national, appeared in a video endorsing the Madid campaign.  Al-Attiyah was arrested in Lebanon for trying to pass money to Nusra Front terrorists in Lebanon but was released after Qatari protests.

162.    The Madid campaign's fundraising for terrorist groups was an immediate success.

163.    On June 4, 2013, a few days after the Madid campaign's support of Syrian terrorist groups was announced, a Twitter account with the handle "@haddad14351" tweeted:



164.    The tweet translates as, "Praise be to God.  A lot of people from Qatar and outside of Qatar got involved and helped us reach over 4 million Qatari riyal.  The campaign continues until the victory #Madid_Ahl_al-Sham."

165.    According to the Madid campaign fliers that circulated on Twitter, four million Qatari riyals is enough to equip more than seven hundred terrorists.

166.    Four million Qatari riyals would suffice to pay the Nusra Front terrorists who held and tortured Mr. Schrier many times over.

167.    On June 12, 2013, six days before the Nusra Front's partner Ahrar Ahl al-Sham returned Mr. Schrier to the Nusra Front, the Front made a YouTube video thanking the Madid campaign for the money it raised.  The video can be found here, with the Nusra Front flag visible in the background:

https://www.youtube.com/watch?time_continue=3&v=r_E4vhVhBUY

168.    The video translates as, "In the name of Allah the Merciful.  Those who believe,

emigrate and strove in the way of Allah with their own money and themselves have the greatest degree to Allah, and those are the winners.  (A verse from the Holy Quran.)  And to raise the banner of no god but Allah, Muhammad is the Messenger of God.  I am Captain Yadi Tuf.  I would like to thank the association of the people of Madid Ahl al-Sham in Qatar and especially the brother Saad bin Saad al-Kabi for supporting us in the way to defeat the party of the devil and al-Assad criminal band in the city of Taran."

169.    Two days later, the Twitter account with the handle "@alkaabi_group" shared the video and specifically thanked the Madid campaign and al-Kabi for their financial support:



170.    The tweet translates as, "Special thanks to Saad al-Kabi your friendship evangelization to the mujahedeen of Syria 'Battalion Imam Ibn Katheer' Special thanks to the people of Madid Ahl al-Sham."

171.     The Twitter "bio" for the account "@alkaabi_group" states: "The tribe of Bani Ka'b is interested in the tribe's events and everything that pertains to it."

172.     Two months after al-Ali's speech in the Doha Grand Mosque, the Madid campaign posted a video of fighters next to anti-aircraft artillery thanking Qatari donors who supported the purchase of the artillery.

173.     In December 2013, the Washington Post reported that the Nusra Front specifically thanked the Madid campaign in August 2013 for raising money for its activities and cited the campaign as one of its preferred means of receiving donations.

174.     The Madid campaign continued to raise money for the Nusra Front for more than a year after Mr. Schrier's escape in July 2013.

175.     In June 2014, CNN reported that Saad al-Kabi was still using the U.S.-based WhatsApp platform to solicit donations to the Madid campaign using the same fliers that appeared on Twitter no later than August of 2013, including the QIB account information, as alleged in paragraph 133.

176.     Those fliers continued to direct donors outside Qatar to send money to al-Kabi's QIB account.

177.     Upon information and belief, the QIB account was still open and accepting donations intended for the Nusra Front at the time CNN reported on al-Kabi in June 2014.

178.     In late 2014, the Qatar government finally shut down the Madid campaign.  Two Qatari government officials—the Qatari ambassador to France and its Minister of Foreign Affairs (Khaled al-Attiyah)—told the French press that Qatar shut down the Madid campaign because it was "known for financing extremists in Syria."

179.     Qatar's action came too late for Mr. Schrier.  Mr. Schrier escaped well before the

campaign was shut down, but after significant sums flowed from the Madid campaign to the Nusra Front.

180.     Upon information and belief, a substantial portion of the Madid campaign's donations to the Nusra Front flowed through al-Kabi's QIB account.

181.     Upon information and belief, some of the money the Madid campaign raised was used for the Nusra Front's acts of international terrorism.

182.     In addition, due to money's fungibility, the Madid campaign augmented the Nusra Front's resources and thus enabled it to commit further acts of terrorism.

183.     In June 2014, a CNN reporter showed clips of a conversation she had with al-Kabi about the Madid campaign, focusing on the campaign's flyer detailing the cost of arming Syrian militants and promoting al-Kabi's QIB account, to the then-Chairman of the U.S. House of Representatives Committee on Homeland Security, Michael McCaul.  She asked whether he agreed that "money coming out of Qatar could end up being used to fuel the ambition, the dream, of attacks against the United States directly."  Chairman McCaul agreed with that statement.

**c.     QIB's Use of the U.S. Financial System for the Madid Campaign**

184.     Because QIB does not have a full-time, brick-and-mortar branch office in the United States, it uses correspondent banks to access the U.S. financial system.

185.     A correspondent bank is a financial institution that establishes an account for another financial institution to receive deposits from, or to make payments or other payments on behalf of, that other financial institution, or to handle other financial transactions related to that other financial institution.   Foreign banks commonly use correspondent bank accounts to access the correspondent bank's domestic financial system.

186.     Correspondent banks also serve as intermediaries between banks that do not have

relationships with one another but which share a relationship with the correspondent bank.

187.    A bank outside of Qatar can identify and locate QIB using its "SWIFT" code, assigned by the Society for Worldwide Interbank Financial Telecommunication (SWIFT) network. The SWIFT network maintains information about banks that have correspondent relationships with each other.

188.    QIB's SWIFT code is QISBQAQA.  This code appears in Twitter posts and on the flier circulated to solicit donations to the Madid campaign from outside Qatar, as alleged in paragraphs 124, 133, and 136.

189.    Foreign banks without a permanent, full-service presence in the United States routinely use U.S.-based correspondent banks to facilitate financial transactions that originate or are completed outside the United States.

190.    During the entire period of Mr. Schrier's captivity with the Nusra Front, QIB maintained a correspondent account with Faisal Islamic Bank of Egypt, which in turn cleared U.S. dollar transactions through three New York banks: Deutsche Bank, JP Morgan, and Bank of New York Mellon.

191.    During the entire period of Mr. Schrier's captivity, QIB maintained a correspondent account with JPMorgan Chase Bank in New York.

192.    From at least June 2013 to the end of Mr. Schrier's captivity, QIB maintained a correspondent account with Standard Chartered Bank in New York.

193.    QIB's correspondent accounts in New York allowed it to access the U.S. financial system, complete transactions in U.S. dollars and other currencies, and benefit from the stability and predictability of New York's banking laws.

194.    Upon information and belief, QIB used one or more of its correspondent accounts

in New York to process Madid campaign donations to the al-Kabi account originating outside Qatar.

### IV.    QIB's Knowledge of the Purpose of the al-Kabi Account

195.    QIB was not a passive conduit for the Madid campaign's fundraising.

196.    Qatari law and QIB policy required customer due diligence at the time al-Kabi opened the account and continuous monitoring to detect suspicious transactions and prevent the account from being used to fund terrorism.

197.    At all relevant times, QIB had anti-terrorism financing policies designed to make it aware when its services were used to finance terrorism.

198.    In compliance with these policies, QIB would have known of al-Kabi's use of the QIB account to finance the Nusra Front.

199.    Terrorist finance expert David Andrew Weinberg has explained that the Madid campaign "was not simply a one-off effort by one or two radical extremists to fundraise for jihadi fighters in Syria.  Rather, the organization was at one point arguably the most visible public fundraising campaign for Syrian relief in Qatar."

### a.    QIB Anti-Terrorism Financing Policies Provided QIB with Knowledge of the Purpose of the al-Kabi Account

200.    At the time al-Kabi used the QIB account to fundraise for the Madid campaign, QIB had anti-terrorism financing policies in place.

201.    QIB's "Anti-Money Laundering & Terrorism Financing Policy & Procedures," which were reviewed by multiple expert consultants and adopted by QIB's Board of Directors, broadly stated that: "These policies and procedures are intended to prevent QIB's operations and activities from being used for unlawful purposes.  To this end, it is imperative that QIB accepts only those customers whose identity and source of wealth and funds can be established as

legitimate."

202.    Among the guiding principles of QIB's anti-money laundering and anti-terrorism financing policies and procedures was that "QIB has an obligation to know its customers.  This applies to all types of customers regardless of who they are, their personal status or the type of accounts/ services they require."

203.    QIB's policies and procedures included:

a.    Prior to opening an account, QIB policy required branch managers to verify the identity of the person opening the account, the business of the person opening the account, the purpose of the account, the expected source of funds for the account, and the expected level of transactions for the account.

b.    QIB policy prohibited opening accounts for minors without verifying the identity of the parent, "in addition to carrying out the normal due diligence procedures."

c.    QIB policy prohibited opening accounts for "charitable societies" unless the non-profit had the approval of the Qatari Ministry of Social Affairs. Further, QIB's policies provided that "Board of directors' approval is required in order to enter into/ accept this type of business."

d.    QIB policy prohibited accepting customers "whose funds appear to be the proceeds of or involved in an illegal activity as described by the Qatari [Anti-Money Laundering] Law no (4) for 2010."  Qatari Anti-Money Laundering Law (4) of 2010 prohibits collecting funds to support terrorism and requires banks to implement procedures to combat terrorism financing.

e.    QIB policy required periodic monitoring of accounts to detect unusual

transactions or unusual patterns of transactions and suspend unusual or suspicious transactions. QIB used an automated system to monitor accounts and assess unusual transactions in light of the declared purpose of the account.

f.    QIB policy required heightened due diligence measures at any time a customer made a "significant transaction," defined as one-off or occasional transactions greater than 55,000 Qatari riyals or equivalent or wire transfers above a prescribed limit of 4,000 Qatari riyals or equivalent.

g.    QIB policy required heightened due diligence for customers with a "higher risk profile," defined to include "[n]on-governmental organisations such as charitable organisations."

h.    QIB policy required assessing customer risk of financing terrorism at the time an account was opened or whenever major profiling changes occurred as QIB identified them through public announcements, sanctions, or local and international media reports.

i.    QIB policy required frequent monitoring when account activities differed from the declared purpose of the account at the start of the business relationship.

**b.    The Circumstances Suggest an Agreement between QIB, al-Kabi, and the Nusra Front**

204.   According to the U.S. Treasury designation of al-Kabi as a Specially Designated Global Terrorist, prior to 2014, the Nusra Front asked al-Kabi to set up donation campaigns in Qatar to raise money for the Front.

205.   According to the U.S. Treasury designation, al-Kabi agreed to the Nusra Front

request.

206.     Upon information and belief, al-Kabi's organization and supervision of the Madid campaign was spurred by the Nusra Front's request.

207.     Upon information and belief, QIB expressly and tacitly agreed to assist al-Kabi and the Nusra Front by providing financial services to facilitate their fundraising efforts.

208.     QIB's due diligence policies and the information they yielded provide circumstantial evidence that QIB expressly and tacitly agreed with al-Kabi to allow him to use the QIB account to fundraise for the Nusra Front.

209.     QIB's due diligence policies and the information they yielded provide circumstantial evidence that QIB expressly or tacitly agreed with al-Kabi to disregard suspicious transactions flowing through the account to the Nusra Front, in violation of United States and Qatari anti-terrorism financing laws and regulations.

210.     QIB's failure to close the account for more than a year after it was publicly and repeatedly advertised as the preferred conduit for donations to the Nusra Front provides circumstantial evidence that it agreed with al-Kabi and the Nusra Front to disregard suspicious transactions and allow them unrestricted access to the account.

211.     QIB also allowed al-Kabi, the Madid campaign, and the Nusra Front to use and benefit from QIB's good name and reputation in Qatar and the Middle East, which provided assurance to potential donors to the Madid campaign that their funds would be held with a seemingly legitimate institution.

212.     Upon information and belief, QIB knew based on its due diligence policies and the information they yielded that the essential goal of the conspiracy between itself, al-Kabi, and the Nusra Front was to commit acts of international terrorism in Syria.

1834428.1

213.     Allowing the al-Kabi account to be used for Nusra Front fundraising and disregarding suspicious transactions that flowed through it furthered that essential goal by providing financial resources to the Nusra Front.

214.     Allowing al-Kabi to use the QIB account in this way and disregarding suspicious transactions that flowed through it violated United States and Qatari anti-terrorism financing laws.

**V.      QIB's Support of Ahrar al-Sham**

215.     In addition to individual donors, terrorist groups routinely turned to prominent charities to finance their operations around the time of Mr. Schrier's capture.

216.     Again, Qatar-based charities were especially notorious for supporting terrorist groups, including Al-Qaeda.

217.     Just as the Madid campaign took advantage of Qatar's permissive terrorism financing environment, others did too.

218.     Qatar Charity's activities fit the pattern of these general allegations.

219.     Qatar Charity was founded in 1992 under the name Qatar Charitable Society and quickly became a preferred funding source for terrorists.

220.     Osama bin Laden cited Qatar Charity as an Al-Qaeda funder in 1993.

221.     Based on evidence and testimony before the House Committee on Financial Services Subcommittee on Oversight and Investigations, Qatar Charity "served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to bin Laden and his sympathetic patrons in the Arabian Gulf" and by "helping to move funds to areas where Al-Qaeda was carrying out operations."

222.     Qatar Charity also supported Al-Qaeda linked terrorist organizations around the globe.

223.    Qatar Charity funded Jamatul-ul-Mujahedeen Bangladesh, an Islamist terror organization.

224.    Jamatul-ul-Mujahedeen Bangladesh has perpetrated a host of terroristic acts, including multiple bombings and the assassination of Bangladeshi judges.

225.    Qatar Charity also supported Al-Qaeda affiliates in northern Mali in 2012 and 2013, when that part of the country was overrun by Islamist terrorists.

226.    Qatar Charity actively supported Nusra Front ally Ahrar al-Sham, the group that held Mr. Schrier "in trust" for the Nusra Front from May 5 to June 20, 2013.

227.    In late December 2012, the Syrian Islamic Front, a coalition of militant Islamist groups of which Ahrar al-Sham was the dominant member, made a video announcing its formation that demonstrates the links between Ahrar al-Sham and Qatar Charity.

228.    The video opens with Syrian Islamic Front fighters reading a statement that makes clear the group used purported humanitarian assistance to drum up public support: "The Front pursues its goals through a variety of tools, including military mobilization aimed at toppling the regime, as well as the expansion of security and community mobilization in its different guises, including political, missionary, educational, and humanitarian relief, in conformity with Islamic law."

229.    The video then shows Syrian Islamic Front fighters blowing up buildings, buses, and cars, and brandishing automatic weapons and rocket-propelled grenades.  Following this montage, the video shows Syrian Islamic Front Members in front of what appears to be bags of food and boxes of supplies, holding a banner that reads "Qatar Charity" and "Syria Relief 2012," including the Qatar Charity logo.  The video describes this as "community mobilization."  A narrator says, "Thanks to the Qatar Charity foundation and to the foundations associated with it

for the aid and assistance that reached [unintelligible]."

230.     Taken as a whole, the Syrian Islamic Front video displays the group's extreme violence and disregard for human life, makes clear that the group's supervision of "humanitarian" efforts is a tool to mobilize community support for the group, and thanks Qatar Charity and Qatar Charity's donors for assisting such mobilization efforts.  This was the "Syria Relief" effort QIB openly supported with money and free publicity in the bank's own publications.

231.     The video also highlights the collaboration between Qatar Charity and the Turkish Humanitarian Relief Foundation ("IHH"), whose banners appear next to Qatar Charity's in the video.  These organizations continued to partner to support the Syrian Islamic Front and Ahrar al-Sham, for example by supporting field hospitals to treat and provide non-medical services to wounded Ahrar al-Sham, Nusra Front and Syrian Islamic Front fighters.

232.      Qatar Charity's collaboration with IHH is troubling because of IHH's influence in Syria and its ties to Ahrar al-Sham.  As a spokesman for the human rights group Violations Documentation Centre explained in 2016, "IHH controls everything in Syria and is really close to Ahrar al Sham."

233.     Terrorist groups gain supporters and legitimacy from doing "humanitarian" work.

234.     A 2016 report in the *International Business Times* stated that Ahrar al-Sham and the Nusra Front "continue to recruit from the local population not only because of their military successes but also because of the social services they provide. . . .  Meanwhile, 'societal development' is also one of the main clauses of the Syrian Islamic Front's Charter."

235.     In January 2011, press reports stated that the Israel Money Laundering and Terror Financing Prohibition Authority blacklisted both Qatar Charity and IHH as entities contaminated with funds related to terrorism.

1834428.1

40

236.     Notwithstanding Qatar Charity's blatant pattern of funding terrorism, QIB donated large sums to it before and during Mr. Schrier's captivity.

237.     According to QIB's 2012 Corporate Social Responsibility Report, QIB gave Qatar Charity a "sizeable donation" to fund its work in Somalia.  QIB's 2012 Corporate Social Responsibility Report stated that Qatar Charity's "Public Relation Manager" "thanked QIB for their cooperation and constant support for Qatar Charity's activities."

238.     According to QIB's 2013 Corporate Social Responsibility Report, QIB gave Qatar Charity 500,000 Qatari riyals to fund its work in Syria.

239.     Upon information and belief, some of this money reached Ahrar al-Sham, either in the form of cash or supplies.

240.     In addition, due to money's fungibility, QIB's donations augmented Qatar Charity's resources and thus enabled it to support Ahrar al-Sham.

241.     Upon information and belief, and given Qatar Charity's open support of Syrian terrorist groups, QIB knew its donations to Qatar Charity would support Ahrar al-Sham and the Syrian Islamic Front.

242.     QIB also maintained eight bank accounts for Qatar Charity.

243.     QIB knew based on its due diligence policies and the information they yielded that Qatar Charity funded terrorist groups around the world.

244.     This evidence supports the inference that QIB agreed, expressly or tacitly, with Qatar Charity and Ahrar al-Sham to bring about acts of international terrorism in Syria.

245.     QIB's donations furthered that essential goal by providing financial support to Ahrar al-Sham.

## CLAIMS FOR RELIEF

### Count One

### Violation of the Anti-Terrorism Act, 18 U.S.C. §§ 2333(a), 2339B
### (Primary Liability—Material Support of the Nusra Front)

246.    Mr. Schrier incorporates the allegations in paragraphs 1 through 245 as if fully set forth herein.

247.    QIB knowingly provided and conspired with Saad bin Saad al-Kabi to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B, a United States criminal statute, by allowing al-Kabi to use his minor son's QIB account to funnel donations from the Madid Ahl al-Sham campaign to the Nusra Front, a designated foreign terrorist organization.

248.    QIB knew or recklessly disregarded a substantial risk that al-Kabi was using the account to funnel donations from the Madid Ahl al-Sham campaign to the Nusra Front.

249.    In addition, QIB knowingly provided and conspired with Qatar Charity to provide material support to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B, a United States criminal statute, by making a donation to Qatar Charity to support Ahrar al-Sham and the Syrian Islamic Front, which fought alongside and shared resources with the Nusra Front, a designated foreign terrorist organization.

250.    Upon information and belief, Ahrar al-Sham's and the Nusra Front's alliance was such that support of Ahrar al-Sham also supported the Nusra Front.

251.    QIB knew or recklessly disregarded a substantial risk that its donation to Qatar Charity would support Ahrar al-Sham, and thereby support the Nusra Front.

252.    QIB knew the Nusra Front was a terrorist organization that at all times targeted Americans in Syria.

253.    QIB's material support of the Nusra Front involved acts dangerous to human life in that QIB knew or recklessly disregarded a substantial risk that donations to the Nusra Front would augment the Nusra Front's resources and thereby enable the Nusra Front to kill, harm, or kidnap people in Syria.

254.    QIB's material support of the Nusra Front objectively appears to have been intended to (a) intimidate and coerce the civilian populations of Syria and the United States, (b) influence the policy of the Syrian and United States governments by intimidation and coercion, and (c) affect the conduct of the Syrian and United States governments by mass destruction, assassination, and kidnapping.

255.    QIB's material support of the Nusra Front occurred primarily outside the territorial jurisdiction of the United States.

256.    QIB's material support of the Nusra Front was an act of international terrorism as defined in 18 U.S.C. § 2331(1).

257.    Mr. Schrier, a United States national, was injured in his person and property by reason of QIB's material support of the Nusra Front.

258.    QIB's material support of the Nusra Front proximately caused Mr. Schrier's injuries, and Mr. Schrier's injuries were a reasonably foreseeable result of QIB's conduct.

259.    Mr. Schrier suffered physical, emotional, and economic injuries proximately caused by QIB's material support of the Nusra Front.  Mr. Schrier also suffered injury to his property proximately caused by QIB's material support of the Nusra Front.

260.    Mr. Schrier is entitled to recover economic and non-economic damages from QIB for its violation of 18 U.S.C. §§ 2333(a) and 2339B.

**Count Two**

**Violation of the Anti-Terrorism Act, 18 U.S.C. §§ 2333(a), 2339A
(Primary Liability—Material Support of Ahrar al-Sham)**

261.    Mr. Schrier incorporates the allegations in paragraphs 1 to 245 as if fully alleged herein.

262.    QIB provided material support and conspired with Qatar Charity to provide material support to Ahrar al-Sham knowing or intending the material support would be used to violate 18 U.S.C. §§ 1203 and 2332b, in violation of 18 U.S.C. § 2339A, a United States criminal statute.

263.    QIB provided material support and conspired with Qatar Charity to provide material support to Ahrar al-Sham by giving Qatar Charity 500,000 Qatari riyals.

264.    QIB knew or intended some of the money it gave Qatar Charity would reach Ahrar al-Sham and would be used by Ahrar al-Sham to violate 18 U.S.C. §§ 1203 and 2332b.

265.    QIB's providing and conspiring with Qatar Charity to provide material support involved acts dangerous to human life in that QIB knew or recklessly disregarded a substantial risk that donations to Ahrar al-Sham would augment Ahrar al-Sham's resources and thereby enable Ahrar al-Sham to kill, maim, or kidnap people in Syria.

266.    QIB's material support of Ahrar al-Sham occurred primarily outside the territorial jurisdiction of the United States.

267.    QIB's material support of Ahrar al-Sham was an act of international terrorism as defined in 18 U.S.C. § 2331(1).

268.    Mr. Schrier, a United States national, was injured in his person and property by reason of QIB's material support of Ahrar al-Sham.

269.    QIB's material support of Ahrar al-Sham proximately caused Mr. Schrier's injuries, and Mr. Schrier's injuries were a reasonably foreseeable result of QIB's conduct.

270.    Mr. Schrier suffered physical, emotional, and mental injuries proximately caused by QIB's material support of Ahrar al-Sham.

271.    Mr. Schrier is entitled to recover economic and non-economic damages from QIB for its violation of 18 U.S.C. §§ 2333(a) and 2339A.

**Allegations Common to Aiding and Abetting and Conspiring with the Nusra Front in Violation of the Anti-Terrorism Act (Counts Three and Four)**

272.    Mr. Schrier incorporates the allegations in paragraphs 1 through 245 as if fully set forth herein.

273.    The Nusra Front's kidnapping, hostage taking, torture, assault, battery, and extortion of Mr. Schrier involved violent acts and acts dangerous to human life that violated the criminal laws of the United States or of any State, or would have violated those laws if committed within the jurisdiction of the United States or of any State.  In particular, kidnapping violates 18 U.S.C. § 1201 and Fla. Stat. § 787.01; hostage taking violates 18 U.S.C. § 1203; torture violates 18 U.S.C. § 2340A; assault violates 18 U.S.C. § 113 and Fla. Stat. §§ 784.011, 784.021; battery violates 18 U.S.C. § 113 and Fla. Stat. §§ 784.03, 784.045; and extortion violates Fla. Stat. § 863.05.  The Nusra Front's kidnapping further constitutes attempted kidnapping of an officer of the United States, in violation of 18 U.S.C. §§ 1114, 1201(a)(5), in that the Nusra Front believed Mr. Schrier was a CIA agent.

274.    The Nusra Front's kidnapping, hostage taking, torture, assault, battery, and extortion of Mr. Schrier appear to have been intended to (a) intimidate or coerce the civilian population of the United States, (b) influence the policy of the Qatari and United States governments by intimidation and coercion, and (c) affect the conduct of the Qatari and United

States governments by kidnapping.  In particular, and among other things, the Nusra Front's kidnapping, torture, and false imprisonment of Mr. Schrier appears to have been intended to (a) intimidate United States civilians who sought to report on the Syrian Civil War, (b) influence the Qatari government's policy of paying ransom for Western hostages and the United States government's policy of refusing to pay ransom to terrorists, and (c) affect the conduct of the Qatari and United States governments by inducing them to pay ransom for Mr. Schrier.

275.    The Nusra Front's kidnapping, hostage taking, torture, assault, battery, and extortion of Mr. Schrier occurred primarily outside the territorial jurisdiction of the United States.

276.    The Nusra Front's kidnapping, hostage taking, torture, battery, and extortion of Mr. Schrier were acts of international terrorism as defined in 18 U.S.C. § 2331(1).

277.    Mr. Schrier was injured in his person and property by reason of the Nusra Front's acts of international terrorism.  He suffered economic, physical, and emotional injuries proximately caused by the Nusra Front's acts of international terrorism.  He also suffered injury to his property proximately caused by the Nusra Front's acts of international terrorism.

278.    At all times relevant to the complaint, the Nusra Front was designated a foreign terrorist organization under 8 U.S.C. § 1189, as alleged in paragraph 26.

279.    Mr. Schrier is a United States national and was a United States national at the time the Nusra Front kidnapped and tortured him.

280.    QIB is liable under the Anti-Terrorism Act for the Nusra Front's acts of international terrorism because QIB aided and abetted the Nusra Front's acts of international terrorism and conspired with the Nusra Front to commit acts of international terrorism.

**Count Three**

**Violation of the Anti-Terrorism Act, 18 U.S.C. § 2333(d)**
**(Aiding and Abetting Liability—Nusra Front)**

281.    Mr. Schrier incorporates the allegations in paragraphs 1 to 245 and paragraphs 272 to 280 as if fully alleged herein.

282.    QIB aided and abetted and knowingly provided substantial assistance to the Nusra Front by allowing Saad bin Saad al-Kabi to use its financial services to fundraise for the Nusra Front.

283.    QIB further aided and abetted and knowingly provided substantial assistance to the Nusra Front by donating to Qatar Charity to support Ahrar al-Sham and the Syrian Islamic Front, which fought alongside and shared resources with the Nusra Front.

284.    Upon information and belief, Ahrar al-Sham's and the Nusra Front's alliance was such that support of Ahrar al-Sham also supported the Nusra Front.

285.    QIB was generally aware of and knew of its role in financing the Nusra Front's acts of international terrorism.

286.    QIB knowingly and substantially assisted the Nusra Front's acts of international terrorism by offering financial services to supporters of the Nusra Front's terrorism operations over a period beginning at least in May 2013 and continuing through late 2014.

287.    Mr. Schrier is entitled to recover economic and non-economic damages from QIB for QIB's violation of 18 U.S.C. § 2333(d).

**Count Four**

**Violation of the Anti-Terrorism Act, 18 U.S.C. § 2333(d)**
**(Conspiracy Liability – Nusra Front)**

288.    Mr. Schrier incorporates the allegations in paragraphs 1 to 245 and paragraphs 270 to 282 as if fully alleged herein.

289.    QIB conspired with the Nusra Front, Saad bin Saad al-Kabi, Qatar Charity, Ahrar al-Sham, and others to bring about acts of international terrorism in Syria, including kidnapping Americans.

290.    Al-Kabi joined the conspiracy by agreeing, expressly or tacitly, with a representative of the Nusra Front to raise funds for the Nusra Front's acts of international terrorism.

291.    QIB joined the conspiracy by agreeing, expressly or tacitly, to allow al-Kabi to use an account in his minor son's name for the purpose of funneling donations to support the Nusra Front in violation of 18 U.S.C. § 2339B, Qatari anti-terrorism financing laws, and its own policies.

292.    QIB also agreed, expressly or tacitly, to disregard suspicious transactions in the al-Kabi account in order to facilitate the flow of money from the account to the Nusra Front in violation of 18 U.S.C. § 2339B, Qatari anti-terrorism financing laws, and its own policies.

293.    QIB knew that by agreeing to allow al-Kabi to use this account for terrorism fundraising and disregard suspicious transactions it was joining a conspiracy with al-Kabi and the Nusra Front that had the essential goal of committing acts of international terrorism, including kidnapping Americans.

294.    QIB's association with al-Kabi connected it to the conspiracy involving the Nusra Front.

295.    QIB's allowing al-Kabi to use the account for terrorist fundraising furthered the conspiracy's goals by facilitating donations to the Nusra Front to fund its acts of international

terrorism, including kidnapping Americans.

296.    QIB's disregarding suspicious transactions that flowed through the al-Kabi account furthered the conspiracy's goals by shielding al-Kabi and the Nusra Front's fundraising efforts from scrutiny by the authorities.

297.    Qatar Charity joined the conspiracy by agreeing, expressly or tacitly, to supply Ahrar al-Sham and the Syrian Islamic Front, which fought alongside and shared resources with the Nusra Front.

298.    Upon information and belief, Ahrar al-Sham's and the Nusra Front's alliance was such that support of Ahrar al-Sham also supported the Nusra Front.

299.    QIB also joined the conspiracy by agreeing, expressly or tacitly, to donate funds for Qatar Charity to use to supply Ahrar al-Sham and the Syrian Islamic Front, and, by extension, the Nusra Front.

300.    QIB knew that by donating to Qatar Charity it was joining a conspiracy that had the essential goal of committing acts of international terrorism, including kidnapping Americans.

301.    QIB's association with Qatar Charity further connected it to the conspiracy involving the Nusra Front.

302.    QIB's donation furthered the conspiracy's goals by enabling Qatar Charity to supply Ahrar al-Sham and the Syrian Islamic Front, and, by extension, the Nusra Front.

303.    QIB remained part of the conspiracy at least through late 2014 by leaving the al-Kabi account open and available to funnel donations to the Nusra Front.

304.    The acts of international terrorism the Nusra Front committed against Mr. Schrier were overt acts done in furtherance of the conspiracy between QIB, the Nusra Front, al-Kabi, Qatar Charity, and Ahrar al-Sham to bring about acts of international terrorism in Syria.

305.     Mr. Schrier is entitled to recover economic and non-economic damages from QIB for its violation of 18 U.S.C. § 2333(d).

**Allegations Common to Aiding and Abetting and Conspiring with Ahrar al-Sham in Violation of the Anti-Terrorism Act (Counts Five and Six)**

306.     Mr. Schrier incorporates paragraphs 1 through 245 as if fully set forth herein.

307.     Ahrar al-Sham's kidnapping and hostage taking of Mr. Schrier involved violent acts and acts dangerous to human life that violated the criminal laws of the United States or of any State, or would have violated those laws if committed within the jurisdiction of the United States or of any State.  In particular, kidnapping violates 18 U.S.C. § 1201 and Fla. Stat. § 787.01, and hostage taking violates 18 U.S.C. § 1203.  Ahrar al-Sham's kidnapping further constitutes attempted kidnapping of an officer of the United States, in violation of 18 U.S.C. §§ 1114, 1201(a)(5), in that Ahrar al-Sham believed Mr. Schrier was a CIA agent.

308.     Ahrar al-Sham's kidnapping and hostage taking of Mr. Schrier appear to have been intended to (a) intimidate or coerce the civilian population of the United States; (b) influence the policy of the Qatari and United States governments by intimidation and coercion; (c) affect the conduct of the Qatari and United States governments by kidnapping.  In particular, Ahrar al-Sham's kidnapping and hostage taking appears to have been intended to (a) intimidate United States civilians who sought to report on the Syrian Civil War, (b) influence the Qatari government's policy of paying ransom for Western hostages and the United States government's policy of refusing to pay ransom to terrorists, and (c) affect the conduct of the Qatari and United States governments by inducing them to pay ransom for Mr. Schrier.

309.     Ahrar al-Sham's kidnapping and hostage taking of Mr. Schrier occurred primarily outside the territorial jurisdiction of the United States.

310.     Ahrar al-Sham's kidnapping and hostage taking were acts of international terrorism

as defined in 18 U.S.C. § 2331(1).

311.     Mr. Schrier was injured in his person and property by reason of Ahrar al-Sham acts of international terrorism.  He suffered economic, physical, and emotional injuries proximately caused by the Ahrar al-Sham acts of international terrorism.

312.     Ahrar al-Sham's acts of international terrorism were planned and/or authorized by the Nusra Front, a designated foreign terrorist organization under 8 U.S.C. § 1189, as alleged in paragraph 26.

## Count Five

### Violation of the Anti-Terrorism Act, 18 U.S.C. § 2333(d)
### (Aiding and Abetting Liability—Ahrar al-Sham)

313.     Mr. Schrier incorporates the allegations in paragraphs 1 to 245 and paragraphs 306 to 312 as if fully alleged herein.

314.     QIB aided and abetted and knowingly provided substantial assistance to Ahrar al-Sham's acts of international terrorism.

315.     QIB was generally aware of and knew of its role in financing Ahrar al-Sham's acts of international terrorism.

316.     QIB knowingly and substantially assisted Ahrar al-Sham's acts of international terrorism by, among other things, donating 500,000 Qatari riyals to Qatar Charity in 2013 knowing or intending the money would support Ahrar al-Sham.

317.     Mr. Schrier is entitled to recover economic and non-economic damages from QIB for QIB's violation of 18 U.S.C. § 2333(d).

## Count Six

### Violation of the Anti-Terrorism Act (Conspiracy Liability—Ahrar al-Sham)

318.     Mr. Schrier incorporates the allegations in paragraphs 1 to 245 and paragraphs 306

to 312 as if fully alleged herein.

319.    QIB conspired with Qatar Charity, Ahrar al-Sham, the Nusra Front, and others to bring about acts of international terrorism in Syria, including kidnapping Americans.

320.    QIB joined the conspiracy by agreeing, expressly or tacitly, to donate 500,000 Qatari riyals to Qatar Charity for the purpose of supporting Ahrar al-Sham in violation of 18 U.S.C. § 2339A, Qatari anti-terrorism financing laws, and its own policies.

321.    QIB knew that by agreeing to donate 500,000 Qatari riyals to Qatar Charity that it was joining a conspiracy with Qatar Charity, Ahrar al-Sham, the Nusra Front, and others that had the essential goal of committing acts of international terrorism, including kidnapping Americans.

322.    QIB's association with Qatar Charity connected it to the conspiracy involving Ahrar al-Sham.

323.    QIB's furthered the conspiracy's goals by donating 500,000 Qatari riyals for Qatar Charity to fund Ahrar al-Sham's acts of international terrorism, including kidnapping Americans.

324.    The acts of international terrorism Ahrar al-Sham committed against Mr. Schrier were overt acts done in furtherance of the conspiracy between QIB, Ahrar al-Sham, the Nusra Front, and others to bring about acts of international terrorism in Syria.

325.    Mr. Schrier is entitled to recover economic and non-economic damages from QIB for QIB's violation of 18 U.S.C. § 2333(d).

**Count Seven**

**Aiding and Abetting False Imprisonment (State Law—Nusra Front)**

326.    Mr. Schrier incorporates the allegations of paragraphs 1 to 245 as if fully alleged herein.

327.    The Nusra Front intentionally confined Mr. Schrier for 211 days, including 46 days when Ahrar al-Sham held him for the Nusra front.

328.    Mr. Schrier was conscious of the confinement and did not consent to it; the Nusra Front did not have a privilege to confine Mr. Schrier; and the confinement was otherwise unwarranted or unreasonable under the circumstances.

329.    QIB knew or should have known the Nusra Front was falsely imprisoning Americans in Syria.  QIB acted willfully, wantonly, recklessly, or with deliberate disregard to the Nusra Front's false imprisonment of Americans in Syria, including Mr. Schrier.

330.    QIB substantially assisted and encouraged the Nusra Front's false imprisonment of Americans, including Mr. Schrier.

331.    As a result of the false imprisonment, Mr. Schrier suffered physical injury, fear, terror, anxiety, emotional and psychological distress, and loss of liberty.

332.    Mr. Schrier did not and could not have known with the exercise of reasonable diligence of QIB's wrongdoing or that QIB caused his injuries within the applicable statute of limitations.

333.    Mr. Schrier is entitled to recover economic and non-economic damages, including punitive damages, from QIB for QIB's aiding and abetting the Nusra Front's false imprisonment.

**Count Eight**

**Aiding and Abetting False Imprisonment (State Law—Ahrar al-Sham)**

334.    Mr. Schrier incorporates the allegations of paragraphs 1 to 245 as if fully alleged herein.

335.    Ahrar al-Sham intentionally confined Mr. Schrier for 46 days.

336.    Mr. Schrier was conscious of the confinement and did not consent to it; Ahrar al-Sham did not have a privilege to confine Mr. Schrier; and the confinement was otherwise unwarranted and unreasonable under the circumstances.

337.    QIB knew or should have known Ahrar al-Sham was falsely imprisoning Americans in Syria. QIB acted willfully, wantonly, recklessly, or with deliberate disregard to Ahrar al-Sham's false imprisonment of Americans in Syria, including Mr. Schrier.

338.    QIB substantially assisted and encouraged Ahrar al-Sham's false imprisonment of Americans, including Mr. Schrier.

339.    As a result of the false imprisonment, Mr. Schrier suffered physical injury, fear, terror, anxiety, emotional and psychological distress, and loss of liberty.

340.    Mr. Schrier did not and could not have known with the exercise of reasonable diligence of QIB's wrongdoing or that QIB caused his injuries within the applicable statute of limitations.

341.    Mr. Schrier is entitled to recover economic and non-economic damages, including punitive damages, from QIB for QIB's aiding and abetting Ahrar al-Sham's false imprisonment.

**Count Nine**

**Aiding and Abetting Intentional Infliction of Emotional Distress (State Law—Nusra Front)**

342.    Mr. Schrier incorporates the allegations of paragraphs 1 to 245 as if fully alleged

herein.

343.    The Nusra Front engaged in extreme and outrageous conduct with the intent to cause Mr. Schrier severe emotional distress by, among other things, torturing him, depriving him of food and water, and confining him in facilities without adequate ventilation, heat, light, water, or bathrooms.

344.    Mr. Schrier suffered severe emotional distress due to the Nusra Front's extreme and outrageous conduct.

345.    QIB knew or should have known the Nusra Front was intentionally inflicting emotional distress on Americans in Syria.  QIB acted willfully, wantonly, recklessly, or with deliberate disregard to the Nusra Front's intentional infliction of emotional distress on Americans in Syria, including Mr. Schrier.

346.    QIB substantially assisted and encouraged the Nusra Front's intentional infliction of emotional distress on Americans, including Mr. Schrier.

347.    Mr. Schrier did not and could not have known with the exercise of reasonable diligence of QIB's wrongdoing or that QIB caused his injuries within the applicable statute of limitations.

348.    Mr. Schrier is entitled to recover economic and non-economic damages, including punitive damages, from QIB for QIB's aiding and abetting the Nusra Front's intentional infliction of emotional distress.

## Count Ten

### Aiding and Abetting Intentional Infliction of Emotional Distress
### (State Law—Ahrar al-Sham)

349.    Mr. Schrier incorporates the allegations of paragraphs 1 to 245 as if fully alleged herein.

1834428.1

350.    Ahrar al-Sham terrorists engaged in extreme and outrageous conduct with the intent to cause Mr. Schrier severe emotional distress by, among other things, confining him in facilities without adequate ventilation, heat, light, water, or bathrooms.

351.    Mr. Schrier suffered severe emotional distress due to Ahrar al-Sham's extreme and outrageous conduct.

352.    QIB knew or should have known Ahrar al-Sham was intentionally inflicting emotional distress on Americans in Syria.  QIB acted willfully, wantonly, recklessly, or with deliberate disregard to Ahrar al-Sham's intentional infliction of emotional distress on Americans in Syria, including Mr. Schrier.

353.    QIB substantially assisted and encouraged Ahrar al-Sham's intentional infliction of emotional distress of Americans, including Mr. Schrier.

354.    Mr. Schrier did not and could not have known with the exercise of reasonable diligence of QIB's wrongdoing or that QIB caused his injuries within the applicable statute of limitations.

355.    Mr. Schrier is entitled to recover economic and non-economic damages, including punitive damages, from QIB for QIB's aiding and abetting Ahrar al-Sham's intentional infliction of emotional distress.

### Count Eleven

### Aiding and Abetting Battery (State Law—Nusra Front)

356.    Mr. Schrier incorporates the allegations of paragraphs 1 to 245 as if fully alleged herein.

357.    The Nusra Front intentionally made offensive bodily contact with Mr. Schrier by torturing him.

1834428.1

358.    QIB knew or should have known the Nusra Front was battering Americans in Syria by torturing them.  QIB acted willfully, wantonly, recklessly, or with deliberate disregard to the Nusra Front's battery of Americans in Syria, including Mr. Schrier.

359.    QIB substantially assisted and encouraged the Nusra Front's battery of Americans, including Mr. Schrier.

360.    As a result of the battery, Mr. Schrier suffered physical injury, fear, terror, anxiety, and emotional and psychological distress.

361.    Mr. Schrier did not and could not have known with the exercise of reasonable diligence of QIB's wrongdoing or that QIB caused his injuries within the applicable statute of limitations.

362.    Mr. Schrier is entitled to recover economic and non-economic damages, including punitive damages, from QIB for QIB's aiding and abetting the Nusra Front's battery.

## Count Twelve

### Aiding and Abetting Assault
### (State Law—Nusra Front)

363.    Mr. Schrier incorporates the allegations of paragraphs 1 to 245 as if fully alleged herein.

364.    The Nusra Front intentionally put Mr. Schrier in apprehension of imminent harmful or offensive contact by torturing him.

365.    QIB knew or should have known the Nusra Front was assaulting Americans in Syria by torturing them.  QIB acted willfully, wantonly, recklessly, or with deliberate disregard to the Nusra Front's assault on Americans in Syria, including Mr. Schrier.

366.    QIB substantially assisted and encouraged the Nusra Front's assault on Americans, including Mr. Schrier.

367.    As a result of the assault, Mr. Schrier suffered physical injury, fear, terror, anxiety, and emotional and psychological distress.

368.    Mr. Schrier did not and could not have known with the exercise of reasonable diligence of QIB's wrongdoing or that QIB caused his injuries within the applicable statute of limitations.

369.    Mr. Schrier is entitled to recover economic and non-economic damages, including punitive damages, from QIB for QIB's aiding and abetting the Nusra Front's assault.

## JURY DEMAND

Per Federal Rule of Civil Procedure 38(b), Mr. Schrier demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Mr. Schrier respectfully prays this Court grant relief against QIB and in his favor as follows:

(a)    Enter judgment against QIB finding it liable under the Anti-Terrorism Act, 18 U.S.C. § 2333, and applicable state law;

(b)    Award Mr. Schrier compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(c)    Award Mr. Schrier his litigation expenses, including reasonable attorneys' fees and costs of investigation and litigation incurred in this matter pursuant to 18 U.S.C. § 2333(a);

(d)    Award Mr. Schrier pre-judgment and post-judgment interest; and

(e)    Grant Mr. Schrier such other and further relief as may be just and proper.

Dated:  January 13, 2020                    Respectfully submitted,

                                            */s/John D. Couriel*
                                            John D. Couriel
                                            Florida Bar No. 831271
                                            G. Scott Hulsey
                                            District of Columbia Bar No. 449040 (*pro hac vice
                                            application forthcoming*)
                                            Carrie A. Tendler
                                            New York Bar No. 4400842 (*pro hac vice application
                                            forthcoming*)
                                            john.couriel@kobrekim.com
                                            scott.hulsey@kobrekim.com
                                            carrie.tendler@kobrekim.com
                                            **KOBRE & KIM**
                                            1919 M Street, N.W.
                                            Washington, DC 20036
                                            Telephone: (202) 664-1904
                                            Facsimile: (202) 664 1920

                                            John H. Rains IV
                                            Georgia Bar No. 556052, Florida Bar No. 56859
                                            Kamal Ghali
                                            Georgia Bar No. 805055 (*pro hac vice application
                                            forthcoming*)
                                            Matthew R. Sellers
                                            Georgia Bar No. 691202 (*pro hac vice application
                                            forthcoming*)
                                            rains@bmelaw.com
                                            ghali@bmelaw.com
                                            sellers@bmelaw.com
                                            **BONDURANT, MIXSON & ELMORE, LLP**
                                            1201 West Peachtree Street, N.W., Suite 3900
                                            Atlanta, Georgia 30309
                                            Telephone: (404) 881-4100
                                            Facsimile: (404) 881-4111

                                            Kevin T. Carroll
                                            District of Columbia Bar No. 1020479 (*pro hac vice
                                            application forthcoming*)
                                            New York Bar No. 4075339
                                            kcarroll@wiggin.com
                                            **WIGGIN AND DANA LLP**
                                            800 17th Street, N.W., Suite 520
                                            Washington, DC 20006
                                            Telephone: (202) 800-2475
                                            Facsimile: (212) 551-2888

1834428.1

*Attorneys for Plaintiff Matthew Schrier*