IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

Case No. 0:20-cv-60075-RKA

MATTHEW SCHRIER,

       Plaintiff,

v.

QATAR ISLAMIC BANK,

       Defendant.

**PLAINTIFF'S OPPOSITION TO QATAR ISLAMIC BANK'S MOTION TO DISMISS**

**TABLE OF CONTENTS**

I.   This Court has personal jurisdiction over QIB .......................................................................1

    a.   Schrier properly and undisputedly served QIB under Rule 4(f) ......................................1

    b.   New evidence shows QIB's agent accepted the original summons on QIB's
       behalf, thus effecting service under the ATA nationwide service provision ...................1

    c.   This Court can exercise jurisdiction under the Florida long-arm statute .........................1

    d.   This Court can exercise jurisdiction under Rule 4(k)(2) ..................................................4

    e.   The exercise of jurisdiction comports with due process ..................................................5

    f.   Jurisdiction would not be arbitrary or fundamentally unfair under the Fifth
       Amendment......................................................................................................................10

    g.   The Court can exercise pendent personal jurisdiction ...................................................11

II.  Schrier stated ATA claims against QIB................................................................................11

    a.   Schrier properly alleged acts of international terrorism ................................................12

    b.   Schrier stated claims for primary liability under the ATA ............................................14

        i.   Schrier properly alleged that QIB's material support proximately caused his
           injuries.................................................................................................................14

        ii.  Schrier properly alleged QIB's intentional provision of material support ..............15

    c.   Schrier stated claims for secondary liability under the ATA.........................................16

        i.   Schrier properly alleged that QIB aided and abetted acts of terrorism....................16

        ii.  Schrier properly alleged QIB's general awareness of its role in terrorist
           activities .............................................................................................................17

        iii. Schrier was not required to allege QIB's participation in a conspiracy
           proximately caused Schrier's injuries.................................................................17

III. Schrier properly asserts state-law claims against QIB........................................................18

    a.   Schrier properly alleged claims for relief under state law .............................................18

b.   The state-law claims are not time barred ........................................................................18

c.   The Court should exercise supplemental jurisdiction over the state law claims ............19

MOTION FOR SANCTIONS AND BRIEF IN SUPPORT ............................................................19

CONCLUSION ............................................................................................................................20

Local Rule 7.1 Certificate ..........................................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
    368 F.3d 1174 (9th Cir. 2004) .............................................................................................11

*Al Rushaid v. Pictet & Cie*,
    68 N.E.3d 1 (N.Y. 2016)........................................................................................................6

*Anza v. Ideal Steel Corp.*,
    547 U.S. 451 (2006)..............................................................................................................15

*AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*,
    608 F. Supp. 2d 1349 (S.D. Fla. 2009) ..............................................................................2, 3

*Boim v. Holy Land Found.*,
    549 F.3d 685 (7th Cir. 2008) (en banc) ....................................................................7, 12, 14

*Bristol-Myers Squibb Co. v. Super. Ct.*,
    137 S. Ct. 1773 (2017)..........................................................................................................11

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)................................................................................................................8

*Calder v. Jones*,
    465 U.S. 783 (1984)................................................................................................................9

*Charles v. Fla. Foreclosure Placement Ctr., LLC*,
    988 So. 2d 1157 (Fla. 3d DCA 2008) ....................................................................................3

*Craddock v. M/Y The Golden Rule*,
    110 F. Supp. 3d 1267 (S.D. Fla. 2015) ..................................................................................1

*Crowell v. Clay Hyder Trucking Lines, Inc.*,
    700 So. 2d 120 (Fla. 2d DCA 1997) ....................................................................................18

*Cycles, Ltd. v. W.J. Digby, Inc.*,
    889 F.2d 612 (5th Cir. 1989) ..................................................................................................2

*D.J. Simmons, Inc. v. Broaddus*,
    No. 99-1105, 2000 WL 36739814 (D.N.M. June 21, 2000), *aff'd in part,
    rev'd in part on other grounds*, 116 F. App'x 964 (10th Cir. 2004) .....................................20

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
996 F.3d 289 (5th Cir. 2021) (Elrod, J., concurring), *vacated for reh'g en banc*,
2 F.4th 525 (2021)..............................................................................................................10

*eLandia Int'l Inc. v. Ah Koy*,
690 F. Supp. 2d 1317 (S.D. Fla. 2010) ..............................................................................2, 9

*Energy Brands Inc. v. Spiritual Brands, Inc.*,
571 F. Supp. 2d 458 (S.D.N.Y. 2008)...................................................................................8

*Estate of Martin-Torres v. Gamo Outdoor USA, Inc.*,
Case No. 14-cv-22122, 2015 WL 11233089 (S.D. Fla. Mar. 30, 2015)................................18

*Fields v. Twitter, Inc.*,
881 F.3d 739 (9th Cir. 2018) ..............................................................................................15

*Ford Motor Co. v. Montana Eighth Judicial District Court*,
141 S. Ct. 1017 (2021)................................................................................................6, 7, 10

*Gill v. Arab Bank PLC*,
893 F. Supp. 2d 474 (E.D.N.Y. 2012) .................................................................................14

*Grupo Televisa, S.A. v. Telemundo Comm'ns Grp., Inc.*,
485 F.3d 1233 (11th Cir. 2007) ..........................................................................................18

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ..................................................................................9, 16, 17

*Hamilton Grp. Funding, Inc. v. Basel*,
311 F. Supp. 3d 1307 (S.D. Fla. 2018) ..............................................................................6, 7

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)................................................................................................................10

*Hunt v. Aimco Props., L.P.*,
814 F.3d 1213 (11th Cir. 2016) ......................................................................................12, 14

*In re Chiquita Brands Int'l, Inc.*,
690 F. Supp. 2d 1296 (S.D. Fla. 2010) ...............................................................................17

*In re Chiquita Brands Int'l, Inc.*, (*Chiquita II*),
284 F. Supp. 3d 1284 (S.D. Fla. 2018) ........................................................9, 12, 14, 15, 17

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*,
456 U.S. 694 (1982)............................................................................................................20

*Jones v. Blanas*,
　393 F.3d 918 (9th Cir. 2004) ........................................................................18, 19

*Joseph v. Chanin*,
　869 So.2d 738 (Fla. 4th DCA 2004) ....................................................................2

*Kaplan v. Lebanese Canadian Bank, SAL*,
　999 F.3d 842 (2d Cir. 2021)...........................................................12, 13, 16, 17

*Kemper v. Deutsche Bank AG*,
　911 F.3d 383 (7th Cir. 2018) ......................................................................17, 18

*Koch v. Royal Wine Merchants, Ltd.*,
　907 F. Supp. 2d 1332 (S.D. Fla. 2012) ...............................................................3

*Kyko Global, Inc. v. Prithvi Info. Sols. Ltd.*,
　Case No. 2:18-cv-1290, 2020 WL 3654951 (W.D. Pa. July 6, 2020) ...................8

*La Grasta v. First Union Secs., Inc.*,
　358 F.3d 840 (11th Cir. 2004) ............................................................................18

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
　732 F.3d 161 (2d Cir. 2013)..................................................................................5

*Linde v. Arab Bank, PLC*,
　882 F.3d 314 (2d Cir. 2018)........................................................................13, 17

*Louis Vuitton Malletier, S.A. v. Mosseri*,
　736 F.3d 1339 (11th Cir. 2013) ............................................................................5

*Licciardello v. Lovelady*,
　544 F.3d 1280 (11th Cir. 2008) .......................................................................4, 9

*Madden v. Petland Summerville, LLC*,
　Case No. 2:20-cv-2953, 2021 WL 2582214 (D.S.C. June 23, 2021) ...................6

*Managed Care Adv. Grp., LLC v. CIGNA Healthcare, Inc.*,
　939 F.3d 1145 (11th Cir. 2019) ..........................................................................11

*Miller v. Arab Bank PLC*,
　372 F. Supp. 3d 33 (E.D.N.Y. 2019) ..................................................................15

*Mitnor Corp. v. Club Condos.*,
　__ F.R.D. __, 2021 WL 3855819 (N.D. Fla. Aug. 11, 2021) ......................19, 20

v

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992)...................................................................................................6

*Morris v. Khadr*,
   415 F. Supp. 2d 1323 (D. Utah 2006)................................................................9, 10

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005)...............................................................................4, 9

*New World Network Ltd. v. M/V Norwegian Sea*,
   No. 05-cv-22916, 2007 WL 1068124 (S.D. Fla. April 6, 2007)............................20

*Oldfield v. Pueblo de Bahia Lora, S.A.*,
   558 F.3d 1210 (11th Cir. 2009) .........................................................4, 5, 10, 11

*Pinson v. JPMorgan Chase Bank, N.A.*,
   942 F.3d 1200 (11th Cir. 2019) .............................................................................12

*Redwood v. Dobson*,
   476 F.3d 462 (7th Cir. 2007) .................................................................................19

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
   119 F.3d 935 (11th Cir. 1997) ...........................................................................1, 5

*Rothstein v. UBS AG*,
   708 F.3d 82 (2d Cir. 2013).....................................................................................15

*Rudersdal v. Harris*,
   Case No. 18-cv-11072, 2021 WL 2209042 (S.D.N.Y. Feb. 27, 2021)................8, 9

*Saunders v. Super. Ct.*,
   27 Cal. App. 4th 832, 846 (1994) ..........................................................................18

*SEC v. Carrillo*,
   115 F.3d 1540 (11th Cir. 1997) ...............................................................................5

*Schansman v. Sberbank of Russia PJSC*,
   __ F. Supp. 3d __, 2021 WL 4482172 (S.D.N.Y. Sept. 30, 2021) ....................3, 14

*Shahar v. Bowers*,
   120 F.3d 211 (11th Cir. 1997) (en banc) .................................................................3

*Steinberg v. A Analyst Ltd.*,
   Case No. 04-60989, 2009 WL 806780 (S.D. Fla. Mar. 26, 2009)...........................8

*Steinberg v. Barclay's Nominees (Branches) Ltd.*,
    Case No. 04-60897, 2008 WL 4601043 (S.D. Fla. Sept. 30, 2008) .........................................8

*United States v. Swiss Am. Bank*,
    191 F.3d 30 (1st Cir. 1999)........................................................................................................4

*United States v. Yousef*,
    327 F.3d 56 (2d Cir. 2003)......................................................................................................10

*Weinstock v. Abu Marzook*,
    No. 17-cv-23202, 2019 WL 1470245 (S.D. Fla. Apr. 3, 2019).................................................4

*Weiss v. Nat'l Westminster Bank PLC*,
    453 F. Supp. 2d 609 (E.D.N.Y. 2006) .......................................................................14, 16, 17

*Wultz v. Islamic Republic of Iran*,
    755 F. Supp. 2d 1 (D.D.C. 2010) .............................................................................................9

**STATUTES**

Cal. Code Civ. Proc. § 335.1 .........................................................................................................18

Federal Rule of Civil Procedure 9(b)..............................................................................................13

Federal Rule of Civil Procedure 12(h)(1) .........................................................................................1

Federal Rule of Civil Procedure 30 ................................................................................................19

Federal Rule of Civil Procedure 30(c) ............................................................................................21

Federal Rule of Civil Procedure 30(d)(2) ..................................................................................19, 20

Federal Rule of Evidence 201 ...........................................................................................................3

Fla. Stat. § 48.193(1)(a)2 .............................................................................................................1, 2

1 U.S.C. § 1...................................................................................................................................16

18 U.S.C. § 1203 ......................................................................................................................12, 15

18 U.S.C. § 2331(1)..................................................................................................................12, 13

18 U.S.C. § 2332 ............................................................................................................................15

18 U.S.C. § 2332(c) ........................................................................................................................12

18 U.S.C. § 2333(a) ........................................................................................................11, 14

18 U.S.C. § 2333(d) .....................................................................................................11. 13, 16

18 U.S.C. § 2333(d)(1) ........................................................................................................16

18 U.S.C. 2334(a) .................................................................................................................1

18 U.S.C. § 2338 ..................................................................................................................4

18 U.S.C. § 2339A ...........................................................................................................3, 15

18 U.S.C. § 2339A(a) .........................................................................................................12

18 U.S.C. § 2339B ...........................................................................................................3, 15

28 U.S.C. § 1367 ................................................................................................................19

28 U.S.C. 1631 ....................................................................................................................5

S. Rep. No. 102-342 ..........................................................................................................14

**OTHER AUTHORITIES**

Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852 (2016)............. *passim*

Rule 4(f)(2) ........................................................................................................................1

Rule 4(f)(3) ......................................................................................................................1, 4

Rule 4(k)(1)(A) ...................................................................................................................5

Rule 4(k)(2)......................................................................................................... *passim*

## RESPONSE TO MOTION TO DISMISS

### I.     This Court has personal jurisdiction over QIB.

Schrier satisfied the three elements required for the Court to exercise personal jurisdiction: he properly served the complaint and summons; Rule 4(k)(2), the Anti-Terrorism Act's (ATA) nationwide service provision, or the Florida long-arm statute "confer jurisdiction over" QIB; and "the exercise of jurisdiction comports with due process." *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997).

#### a.   Schrier properly and undisputedly served QIB under Rule 4(f).

Schrier served QIB in Doha via FedEx twice, once under Rule 4(f)(2), *see* Doc. 79, and once after obtaining a court order allowing FedEx service under Rule 4(f)(3), *see* Doc. 98. QIB expressly reserved the right to challenge Schrier's FedEx service. *See* Doc. 109 at 6–7. But QIB's motion to dismiss does not dispute the validity of service. By "omitting [this defense] from [its] motion," QIB has "waived" any service defense. Fed. R. Civ. P. 12(h)(1).

#### b.   New evidence shows QIB's agent accepted the original summons on QIB's behalf, thus effecting service under the ATA nationwide service provision.

Schrier respects the Court's ruling that service of the complaint and summons on Global Payments Advisory Group (GPAG), QIB's PATRIOT Act agent, did not effect service under the ATA's nationwide service provision, 18 U.S.C. § 2334(a). However, after the Court's ruling, GPAG responded to a subpoena with evidence that it accepted and forwarded the summons to QIB by email and courier, and QIB responded by acknowledging that GPAG "received the summon in discussion on behalf of QIB." Second Amended Complaint (SAC), Doc. 154 ¶¶ 24–25. The email is attached as Ex. A. This evidence shows QIB authorized GPAG to accept the summons, thus creating the agency relationship the Court found missing in its earlier ruling. *See* Doc. 64 at 7:7–13. This "newly discovered evidence … justif[ies] reconsideration." *Craddock v. M/Y The Golden Rule*, 110 F. Supp. 3d 1267, 1271 (S.D. Fla. 2015). If the Court reconsiders, it can exercise jurisdiction based on QIB's "aggregate contacts with the nation as a whole" under the ATA nationwide service statute. *Republic of Panama*, 119 F.3d at 946–47. Jurisdiction would be proper under the same due process analysis as Rule 4(k)(2), discussed below.

#### c.   This Court can exercise jurisdiction under the Florida long-arm statute.

The Florida long-arm statute subjects nonresident defendants to personal jurisdiction for "[c]ommitting a tortious act within th[e] state." Fla. Stat. § 48.193(1)(a)2. "Florida law construes the state's long-arm statute to reach all of the alleged participants in a civil conspiracy, at least one

1

act in furtherance of which is committed in Florida." *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1354 (S.D. Fla. 2009). Schrier alleges (1) the existence of an agreement between QIB, al-Kabi, and the Nusra Front, (2) QIB's participation in the conspiracy by allowing al-Kabi to use its services to fundraise for the Nusra Front, and (3) the Nusra Front's in-forum acts in furtherance of the conspiracy—all the requirements of conspiracy jurisdiction. SAC ¶¶ 73–80, 112–120, 247–259; *eLandia Int'l Inc. v. Ah Koy*, 690 F. Supp. 2d 1317, 1330 (S.D. Fla. 2010) ("If … any member of a conspiracy committed tortious acts in Florida in furtherance of the conspiracy, then all of the conspirators are subject to personal jurisdiction in Florida.").

QIB is subject to jurisdiction here because the Nusra Front would be. The Nusra Front "[c]ommitt[ed] a tortious act within the state"—conversion. Fla. Stat. § 48.193(1)(a)2. "A conversion occurs when a person exercises an unauthorized act of dominion or ownership over the personal property of another." *Cycles, Ltd. v. W.J. Digby, Inc.*, 889 F.2d 612, 619 (5th Cir. 1989). "The conversion is complete when the defendant takes, detains, or disposes of the chattel." *Id.* (quotation omitted). In other words, conversion occurs where the tortfeasor takes unlawful dominion over another's property. *See id.* The Nusra Front stole Schrier's money and used it to make purchases from two vendors in this district. SAC ¶ 75. "The mere purchase of goods" may not by itself confer jurisdiction in Florida, as QIB claims, Doc. 156 at 11 n.5, but committing conversion here suffices. *See Joseph v. Chanin*, 869 So.2d 738, 740 (Fla. 4th DCA 2004).

QIB disputes that the Nusra Front was behind the conversion, apparently faulting Schrier for not knowing the identity of the individual who made the purchases. Doc. 156 at 11. QIB skips over the fact that Schrier was in a cell when the conversion happened, and not in a position to monitor his accounts for fraud. And QIB ignores that the Nusra Front forced Schrier to hand over his account login and passwords. SAC ¶ 73. This fact defeats QIB's speculation that "someone other than the Nusra Front" made these two purchases. Doc. 156 at 11 n.3. The plain inference is that the Nusra Front terrorists who stole Schrier's passwords, not some unknown party, converted his accounts. QIB's argument that no vendors sold to the Nusra Front from this district is likewise unsubstantiated. The PayPal spreadsheet that QIB attached provides Florida IP addresses for two vendors, █████████████████████████████████████ *See* QIB Ex. H; *see* Decl. of M. Sellers, ¶ 11.[1]

---

[1] Where appropriate, Schrier refers to QIB's exhibits rather than attaching the same documents to this brief.

Schrier properly alleged a conspiracy as well.  "A civil conspiracy requires … an agreement between two or more parties … to do an unlawful act or to do a lawful act by unlawful means." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008). Schrier alleges, and QIB does not dispute, that QIB agreed with Nusra Front fundraiser Saad bin Saad al-Kabi to provide financial services to the Nusra Front with the goal of enabling the Nusra Front's acts of terrorism.  SAC ¶¶ 247–59.  Financing terrorism was and is unlawful in the U.S. and Qatar.  *See* 18 U.S.C. §§ 2339A, 2339B; SAC ¶¶ 239, 259.

QIB disputes that the Nusra Front's conversion was in furtherance of this conspiracy.  Doc. 156 at 11–12.  But Schrier alleges that the goods purchased with converted funds were shipped from the U.S. and elsewhere to Turkey, and from there on to the Nusra Front for use by the group. SAC ¶¶ 76–77.  Schrier added the allegation that the Front received the goods since his original complaint; QIB is wrong to say Schrier did not supplement his allegations.  Doc. 156 at 12.  This allegation is plausible and supported by the evidence.  The PayPal spreadsheet shows the goods were shipped to ███████████, Turkey.  *See* QIB Ex. H.  Both cities sit on the Turkey-Syria border, and both are just an hour and a half from Aleppo.[2]  The converted goods have "obvious connections" to the conspiracy's object, which is to support the Nusra Front's terrorism in Syria. SAC ¶ 74.  Sunglasses and window washer fluid are the sort of materiel a terrorist force needs to carry out its violent operations.  The conversion is, therefore, of a piece with QIB's terrorism financing.  Both were part and parcel of the conspiracy's goal of sustaining the Nusra Front.

The conspiracy imputes all the Nusra Front's contacts to QIB—even those that pre-date QIB joining.  *See Koch v. Royal Wine Merchants, Ltd.*, 907 F. Supp. 2d 1332, 1346–47 (S.D. Fla. 2012) ("In a conspiracy, every act and declaration of each member … is … the act and declaration of them all, even with respect to actions that took place before a conspirator joined.") (quotation omitted); *Charles*, 988 So. 2d at 1159.  The Court may exercise jurisdiction notwithstanding that QIB's Florida contacts are via a co-conspirator.  "Florida courts may exercise personal jurisdiction over parties to a Florida civil conspiracy even if the alleged civil conspirator otherwise has no connection to the state."  *Infinity*, 608 F. Supp. 2d at 1354.  Subjecting QIB to jurisdiction on this basis satisfies due process, too, because an "[i]ntentional tort" creates "a substantial connection

---

[2] The Court may take notice of these cities' location.  Fed. R. Evid. 201; *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997) (en banc) ("matters of geography" appropriate for judicial notice).

with the forum." *Liccardello v. Lovelady*, 544 F.3d 1280, 1285 (11th Cir. 2008) (quotation omitted). Schrier discusses due process in detail below.

### d.  This Court can exercise jurisdiction under Rule 4(k)(2).

Rule 4(k)(2) authorizes the court to exercise jurisdiction over federal law claims where (1) "the defendant is not subject to jurisdiction in any state's courts" and (2) "exercising jurisdiction is consistent with the United States Constitution and laws." Schrier's service under Rule 4(f)(3) allows him to invoke Rule 4(k)(2). *See Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005). Schrier's ATA claims arise under federal law; no state court has jurisdiction; and jurisdiction comports with due process. The Court may exercise personal jurisdiction under Rule 4(k)(2).

The ATA vests "exclusive jurisdiction" over ATA claims in the federal district courts. 18 U.S.C. § 2338. No state court can have jurisdiction over Schrier's ATA claims, and the Court may thus rely on Rule 4(k)(2).[3]

Moreover, QIB disregards its burden under Rule 4(k)(2) to identify a forum where it is subject to jurisdiction. "[T]o defeat the assertion of jurisdiction under Rule 4(k)(2), the *defendant* bears [the] burden to show that [it] *is* subject to jurisdiction in another state's courts of general jurisdiction." *Weinstock v. Abu Marzook*, No. 17-cv-23202, 2019 WL 1470245, at *2 (S.D. Fla. Apr. 3, 2019) (first emphasis added). "[I]f the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2)." *Oldfield v. Pueblo de Bahia Lora, S.A.*, 558 F.3d 1210, 1218 n.22 (11th Cir. 2009). This procedure "avoid[s] th[e] daunting task" of "traips[ing] through the 50 states, asking whether each could entertain the suit." *Mwani*, 417 F.3d at 11 (quotation omitted).

QIB refuses to identify a forum with jurisdiction. Though it concedes its contacts with New York, it maintains it is not subject to jurisdiction there. Doc. 156 at 12–13. The Court may thus rely on Rule 4(k)(2) under *Oldfield*'s burden-shifting rule. 558 F.3d at 1218 n.22. QIB cannot dispute the application of Rule 4(k)(2) if it will not identify a forum with jurisdiction. *See id.* None of QIB's footnoted authority bars reliance on Rule 4(k)(2) where QIB will not identify a forum with jurisdiction. Doc. 156 at 7 n.7. In those cases, due process was not satisfied under *any*

---

[3] The First Circuit has interpreted Rule 4(k)(2) to require the defendant not be subject to *personal* jurisdiction in any state court. *United States v. Swiss Am. Bank*, 191 F.3d 30, 39 (1st Cir. 1999). But the Rule uses the word "jurisdiction" unmodified, and the Court should not gloss the Rules with modifications the drafters did not include.

4

statutory basis for jurisdiction.  Moreover, contra QIB, Schrier *does* allege contacts beyond QIB's correspondent accounts: torts in this district and the nationwide effect that these acts of terrorism caused, both imputed to QIB by virtue of its conspiracy with the terrorists that harmed Schrier. SAC ¶¶ 58–77, 247–59.  These contacts satisfy due process, as discussed below.

If the Court declines to use Rule 4(k)(2) because it concludes New York state courts would have jurisdiction, the Court should transfer this action to the Southern District of New York under 28 U.S.C. § 1631.  Jurisdiction would be proper there under Rule 4(k)(1)(A) and the New York long-arm statute, which creates jurisdiction over defendants who "transact[] business within the state."  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013).

### e.  The exercise of jurisdiction comports with due process.

QIB has "established certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Oldfield*, 558 F.3d at 1220 (quotation omitted).  Under the state long-arm statute, the forum is Florida. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (quotation omitted). Under "Rule 4(k)(2), the applicable forum for the minimum contacts analysis is the United States." *Oldfield*, 558 F.3d at 1220 (quotation omitted).  The nationwide analysis also applies if the Court reconsiders its ruling about service under the ATA.  *See BCCI Holdings*, 119 F.3d at 942.  QIB's contacts fall into three categories: (1) transactions involving its New York correspondent accounts; (2) torts committed in this district and elsewhere by terrorists with whom QIB conspired; and (3) the effects in this country of the acts of terrorism at issue.  These contacts satisfy the three-part test for specific personal jurisdiction: QIB "purposefully availed [itself] of the privilege of conducting activities within the forum state;" Schrier's claims "arise out of or relate to at least one of the defendant's contacts with the forum;" and "the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice."  *Mosseri*, 736 F.3d at 1355.

QIB maintained three U.S. correspondent accounts, and it used or tried to use each one to settle transactions related to Schrier's claims during or shortly after Schrier's captivity.  SAC ¶¶ 223–25, 230, 300–306; Doc. 156 at 9–10.  "The applicable case law unequivocally establishes that maintaining bank accounts in the forum for purposes of carrying out the subject transactions constitutes purposeful availment and invocation of the benefits of the forum's law's."  *SEC v. Carrillo*, 115 F.3d 1540, 1546 (11th Cir. 1997).  QIB concedes it maintained these accounts to give its customers access to the dollar and facilitate cross-border payments.  *See* QIB 30(b)(6) Dep.

5

at 36:21–37:15, 46:16–47:7, attached as Ex. B.   That is the essence of QIB availing itself of the privilege of conducting activities in the United States.  *See Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 9 (N.Y. 2016) ("[D]eliberate use" of a correspondent account "that is approved by the foreign bank on behalf and for the benefit of a customer … demonstrates volitional activity constituting transaction of business.").  The correspondent transactions amount to purposeful availment.

The transactions relate to Schrier's claims.  In *Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017 (2021), the Supreme Court sanctioned "a relatively expansive approach" to determine whether a claim "relates to" a defendant's contacts.  *Madden v. Petland Summerville, LLC*, Case No. 2:20-cv-2953, 2021 WL 2582214, at *3 (D.S.C. June 23, 2021).  "[R]elate to" "does not mean anything goes," *Ford*, 141 S. Ct. at 1026, but the phrase clearly has a "broad" meaning, *id.* at 1033 (Alito, J., concurring in the judgment).  The Supreme Court has interpreted "relate to" to mean "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992) (quotation omitted).  Under *Ford*, then, Schrier must only show that the transactions "stand in some relation" to or have some "association or connection with" his claims.

The correspondent transactions meet this standard.  One transaction involved a ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SAC ¶¶ 111– 18, 230–31; QIB Exs. F, I.  Schrier alleged, and QIB does not dispute, that the purpose of ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, and that the purpose of the Madid campaign was to fund the Nusra Front's terrorism. *Id.* ¶¶ 111–18, 135–36, 232–33.  Schrier also alleged that ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.* at ¶ 232.  Two other transactions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ SAC ¶¶ 300–06; QIB Exs. D, E.  QIB's own exhibits show QIB used its correspondent accounts to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  QIB Exs. A, B, C.  Schrier alleged that these transactions ▮▮▮▮▮▮▮▮▮▮▮, SAC ¶¶ 232, 301, 304, 306, based on QIB's refusal to answer questions about them at its deposition.[4] QIB 30(b)(6) Dep., Ex. C at 105:11–111:25; *see Hamilton Grp. Funding, Inc. v. Basel* 311 F.

---

[4] Schrier moves to file this deposition excerpt under seal, as it contains information about the substance of transactions.  Schrier also seeks sanctions related to QIB's refusal to answer these questions, but the Court may draw this inference based on the refusal with or without sanctions.

Supp. 3d 1307, 1315–16 (S.D. Fla. 2018) (inferring defendant would have given unfavorable testimony based on refusal to answer). Transactions that supported the terrorists who kidnapped, tortured, and imprisoned Schrier relate to Schrier's ATA claims and thus support jurisdiction.

QIB disputes that these transactions relate to Schrier's claims on the basis that the transaction documents do not say the money was for Syrian terrorism. Doc. 156 at 16. QIB has changed its tune since jurisdictional discovery, where it argued the only question relevant to jurisdiction was "*whether* there was a transaction." Doc. 126 at 6. Obviously there were transactions. In any event, the notion transaction documents would say "for Schrier's torture" or "guns for the Nusra Front" is ludicrous. Including such information would raise obvious red flags. The Court can readily infer that ███████████████████████████████████████ ████████████████ was intended to support terrorism. And QIB's refusal to testify ████████ ██████████████████████████████████████████████ SAC ¶¶ 300– 06; Ex. C at 105:11–111:25; *see Hamilton*, 311 F. Supp. 3d at 1315–16. These inferences are more plausible than QIB's, which would require the Court to accept that terrorism supporters would have brazenly announced their intent to finance terrorism in the memo line.

QIB's challenges to the relatedness of the transactions also ignore *Ford*'s impact. Due process does not require Schrier to show that any money that came through QIB's correspondent accounts actually financed his captivity or torture, as QIB claims. *Ford* rejected that due process requires any "causal showing" to establish jurisdiction. 141 S. Ct. at 1026. Regardless, Schrier did allege that these transactions ███████████████████████████████████████████. SAC ¶¶ 232–33, 302, 304. Even if no dollar financed Schrier's captivity, money is fungible. *See Boim v. Holy Land Found.*, 549 F.3d 685, 698 (7th Cir. 2008) (en banc). All funds augmented the Nusra Front and Ahrar al-Sham's resources, which enabled them to hold Schrier. *See id.* Funds that increased the resources available to the Nusra Front and Ahrar al-Sham during Schrier's captivity thus sufficiently relate to his claims to support jurisdiction.

QIB also wrongly claims that post-escape transactions cannot support jurisdiction. Doc. 156 at 16. Here again, it ignores *Ford*, which expressly rejected the need for a "causal connection" to establish jurisdiction. 141 S. Ct. at 1026. To claim, as QIB does, that a transaction had to precede Schrier's escape to support jurisdiction is to claim that the transaction had to cause Schrier's captivity. *Ford* forecloses that argument. Under *Ford*, the transactions suffice for jurisdiction despite having settled after Schrier's escape. This is particularly true of the ███████

████████. That transaction supported the same fundraising campaign that began during Schrier's captivity and financed his captors. SAC ¶¶ 229, 232–33. It continued QIB's pattern of misconduct in financing Schrier's terrorist captors and thus relates to Schrier's claims.

Jurisdiction is proper even if the Court only considers the ████████████ related to Schrier's claims. "So long as it creates a substantial connection with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985). In *Steinberg v. A Analyst Ltd.*, this Court took jurisdiction over a defendant that used a New York correspondent account to receive a single fraudulent transfer. Case No. 04-60989, 2009 WL 806780, at *7 (S.D. Fla. Mar. 26, 2009); *see also Steinberg v. Barclay's Nominees (Branches) Ltd.*, Case No. 04-60897, 2008 WL 4601043, at *6 (S.D. Fla. Sept. 30, 2008) (exercising jurisdiction based on two transactions through correspondent account). In *Energy Brands Inc. v. Spiritual Brands, Inc.*, a New York district court asserted jurisdiction over a trademark infringement case where the infringer earned just $158.53 from New York sales. 571 F. Supp. 2d 458, 472 (S.D.N.Y. 2008). The ████████████ was much more substantial than that, especially given the Syrian pound's weakness. The ████████████, like the one in *Steinberg*, involves the "use of the New York bank accounts for the very transactions upon which [Schrier's] claims are based." 2009 WL 806780, at *5. The transaction flowed to ████████████████████████. It supplies a proper basis for jurisdiction standing alone.

Beyond these transactions, Schrier also alleged a conspiracy between QIB and the terrorists that held him hostage, and the Court may assert conspiracy jurisdiction consistent with due process. QIB suggests conspiracy jurisdiction is not available under Rule 4(k)(2), but the Rule permits "exercising jurisdiction … consistent with the United States Constitution and laws." "[F]ederal courts considering the federal constitutionality of conspiracy jurisdiction" under state long-arm statutes "have found the doctrine to be completely in line with" due process. *Kyko Global, Inc. v. Prithvi Info. Sols. Ltd.*, Case No. 2:18-cv-1290, 2020 WL 3654951, at *15 (W.D. Pa. July 6, 2020). QIB never explains how a Rule that by its terms allows jurisdiction to the extent of the Constitution would forbid conspiracy jurisdiction. This is particularly so where Congress intended the ATA to "provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against" terrorism supporters "wherever acting and wherever they may be found." Justice Against Sponsors of Terrorism Act, Pub. L. 114-222, 130 Stat. 852, 853 (2016) [hereinafter "JASTA"]. Unlike *Rudersdal v. Harris*, cited by QIB, Schrier

8

has a federal law conspiracy claim under the ATA.  Case No. 18-cv-11072, 2021 WL 2209042, at *17–18 (S.D.N.Y. Feb. 27, 2021).  The ATA conspiracy standard is identical to the Florida law standard.  *Compare Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983), *with eLandia*, 690 F. Supp. 2d at 1330.  The Court may exercise conspiracy jurisdiction.

As noted, conspiracy jurisdiction allows the Court to impute the Nusra Front's conversion in this district to QIB based on the conspiracy described above.  These "intentional tort[s]" "create[d] a substantial connection with" Florida, such that jurisdiction is proper.  *Lovelady*, 544 F.3d at 1285 (quotation omitted).  A bank that conspires with terrorists should foresee that its co-conspirators will take actions with effects in the U.S.  *See eLandia*, 690 F. Supp. 2d at 1338–39; *see also In re Chiquita Brands Int'l, Inc.*, (*Chiquita II*), 284 F. Supp. 3d 1284, 1307 (S.D. Fla. 2018) ("[A] material support violation … by definition would foreseeably enhance the ability of a known terrorist group to inflict more terror.").  And under the ATA or Rule 4(k)(2), the Court can consider the numerous further conversions the Nusra Front committed in this country for other fighting equipment: car parts, electronics, mapping software, sunglasses, tactical boots, and a watch.  SAC ¶ 74. Those transactions are listed in the PayPal transaction spreadsheet.  *See* QIB Ex. H.  Aggregating all those torts from across the country supports the exercise of jurisdiction.

Finally, jurisdiction comports with due process because QIB knowingly supporting anti-American terrorist groups that targeted U.S. nationals.  This conduct was "aimed at or ha[d] an effect in the forum."  *Mwani*, 417 F.3d at 12–13; *see also Calder v. Jones*, 465 U.S. 783, 790 (1984) (jurisdiction proper based on "the effects of their Florida conduct in California").  These effects are distinct from the in-forum intentional torts the Court can impute to QIB based on the conspiracy.  Terrorist attacks abroad that target Americans are designed to "cause pain and sow terror in the [victim's] home country, the United States."  *Mwani*, 417 F.3d at 13.  Indeed, the acts of terrorism against Schrier in fact caused such effects: the U.S. government opened a criminal investigation, and his friends and family "feared the worst."  SAC ¶¶ 62–72.  By supporting the terrorists that targeted Americans, QIB aligned itself with conduct that was purposefully directed at the United States.  *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 35 (D.D.C. 2010); *Morris v. Khadr*, 415 F. Supp. 2d 1323, 1336 (D. Utah 2006) (holding that conduct giving rise to terrorism victim's injuries, including "financing," subjects the defendant to personal jurisdiction).

QIB's role as the terrorists' banker does not excuse it from answering for its misconduct in this country.  "Personal" participation in a terrorist attack is not required to assert jurisdiction under

the effects test.  "The effects doctrine … creates personal jurisdiction even when a defendant did not personally participate in the attack itself."  *Morris*, 415 F. Supp. 2d at 1336.  Attacks obviously "require more than a triggerman—they also require financing, planning, and coordinating."  *Id.* QIB provided direct financial services to the Nusra Front through the Front's agent, al-Kabi, and it knew what it was doing.  SAC ¶¶ 111–23, 247–59.  QIB became, in effect, the Nusra Front's bank.  Providing direct financial services satisfies the effects test even if QIB did not personally participate in any terrorist attacks.

QIB's argument also ignores the findings Congress made when it amended the ATA with the Justice Against Sponsors of Terrorism Act (JASTA).  Congress made express findings that entities "necessarily direct their conduct at the United States" when they provide anti-American terrorists with "resources, directly *or indirectly*," and "should reasonably anticipate being brought to court in the United States to answer for such activities."  JASTA, § 2(a)(6).  Those factual findings and the national security judgment they embody are entitled to deference.  *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34–35 (2010).  JASTA, coupled with QIB's knowing support of terrorism, authorizes this Court to exercise personal jurisdiction.

For all these reasons, the Court can and should exercise jurisdiction.

### f.  Jurisdiction would not be arbitrary or fundamentally unfair under the Fifth Amendment.

Alternatively, the exercise of jurisdiction under the ATA or Rule 4(k)(2) comports with the Fifth Amendment because it would not be "arbitrary or fundamentally unfair."  *United States v. Yousef*, 327 F.3d 56, 111–12 (2d Cir. 2003).  The Fifth Amendment due process clause should not require the same analysis as the Fourteenth Amendment due process clause.  *But see Oldfield*, 558 F.3d at 1220.  Whereas "federalism concerns animate … the Supreme Court's jurisprudence on the jurisdictional limitations of the Fourteenth Amendment," those concerns "are irrelevant in the Fifth Amendment context."  *Douglass v. Nippon Yusen Kabushiki Kaisha*, 996 F.3d 289, 301 (5th Cir. 2021) (Elrod, J., concurring), *vacated for reh'g en banc*, 2 F.4th 525 (5th Cir. 2021).  A federal court's exercise of jurisdiction under the Fifth Amendment does not risk "encroach[ing] on States more affected by the controversy."  *Ford*, 141 S. Ct. at 1025.  "All that matters is the sovereign authority of the United States itself."  *Douglass*, 996 F.3d at 301.  When the Fifth Amendment provides the due process limitation, the Court should ask whether the exercise of jurisdiction would be "arbitrary or fundamentally unfair," the Fifth Amendment standard used to determine jurisdiction in criminal proceedings involving extraterritorial crimes.  *Yousef*, 327 F.3d at 111–12.

10

Jurisdiction would not be arbitrary or fundamentally unfair in this case.  The ATA has an obvious nexus to the American sovereign interest in combatting terrorism.  Indeed, Congress has found that "[i]nternational terrorism … threatens the vital interests of the United States."  JASTA, § 2(a)(1).  The ATA's purpose "is to provide civil litigants with the *broadest possible basis*, consistent with the Constitution of the United States, to seek relief" against terrorist supporters "wherever acting and wherever they may be found."  JASTA, § 2(b).  There is nothing arbitrary about the United States exercising its sovereignty to give relief to its citizens injured by terrorism.  Nor would jurisdiction be fundamentally unfair.  QIB has shown itself perfectly capable of defending itself in this forum, and it does not assert any inconvenience that would rise to the level of a constitutional concern or that puts it at any disadvantage in this forum.  *See Managed Care Adv. Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1158 (11th Cir. 2019) ("It is only in highly unusual cases that inconvenience will rise to a level of constitutional concern.").

Schrier recognizes the Eleventh Circuit has applied the minimum contacts analysis under the Fifth Amendment.  *E.g.*, *Oldfield*, 558 F.3d at 1220.  But the Supreme Court has never endorsed that approach.  To the contrary, it has expressly left "open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court" as the Fourteenth Amendment imposes on state courts.  *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773, 1784 (2017).  Schrier submits that the Fourteenth Amendment minimum contacts approach has no place in the Fifth Amendment analysis.  Jurisdiction would not be arbitrary or unfair, and this Court should exercise it for this reason.

### g.  The Court can exercise pendent personal jurisdiction.

If the Court concludes it has jurisdiction over any claim, it can exercise pendent jurisdiction over a claim that "arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) (collecting authority).  All Schrier's claims arise out of the same nucleus of operative facts, and the Court may exercise jurisdiction over them.

## II.     Schrier stated ATA claims against QIB.

The ATA creates primary liability for the perpetrators of an "act of international terrorism." 18 U.S.C. § 2333(a).  It also creates secondary liability for those who "aid and abet[]" or "conspire[] with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d).  On a motion to dismiss for failure to state a claim, the Court must "accept[] the

allegations … as true and constru[e] them in the light most favorable to the plaintiff." *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016).  A complaint must simply state "[a] plausible claim, supported by enough factual allegations for a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Pinson v. JPMorgan Chase Bank, N.A.*, 942 F.3d 1200, 1215 (11th Cir. 2019).  By that standard, Schrier alleged plausible claims for primary and secondary liability against QIB.

### a.  Schrier properly alleged acts of international terrorism.

An act of international terrorism must: (1) "involve violent acts or acts dangerous to human life" that violate a U.S. or state criminal law or would do so if committed here; (2) "appear to be intended to intimidate or coerce a civilian population," influence a government "by intimidation or coercion," or affect government conduct by "kidnapping;" and (3) happen primarily outside the United States.  18 U.S.C. § 2331(1).

Counts One and Two allege that QIB's material support of the Nusra Front and Ahrar al-Sham were acts of international terrorism.  Financial support of terrorists can constitute an act of terrorism "by a chain of explicit statutory incorporations by reference." *Boim*, 549 F.3d at 690. "Giving money to [a terrorist group], like giving a loaded gun to a child … is an act dangerous to human life." *Id.* at 690.  It also violates a criminal statute, 18 U.S.C. § 2339A(a), which prohibits providing material support knowing or intending the support will be used to commit hostage taking (18 U.S.C. § 1203) or assaulting a U.S. national outside the U.S. (18 U.S.C. § 2332(c)).  QIB ensured that money flowed to the Nusra Front via the al-Kabi account, and it donated to Qatar Charity despite knowing of its association with Ahrar al-Sham.  SAC ¶¶ 4–14.  This Court agrees with *Boim* that "a material support violation … , by definition, would foreseeably enhance the ability of a known terrorist group to inflict more terror, and would, for this reason alone, satisfy the 'appear to be intended' requirement." *Chiquita II*, 284 F. Supp. 2d at 1307.

QIB claims not to have known it provided material support to the Nusra Front and Ahrar al-Sham.  But QIB had due diligence policies in place.  SAC ¶¶ 243–46.  And al-Kabi's and Qatar Charity's support of terrorism was no secret.  Al-Kabi was publicly associated with the Madid campaign, which openly fundraised for the Nusra Front. *Id.* ¶¶ 135–214.  And Qatar Charity was a long-time supporter of terrorism with public links to Ahrar al-Sham beginning in December 2012. *Id.* at ¶¶ 264–83.  These allegations are sufficient.  "[A] plaintiff realistically cannot be expected to plead a defendant's actual state of mind." *Kaplan v. Lebanese Canadian Bank, SAL*,

999 F.3d 842, 864 (2d Cir. 2021) (quotation omitted). As the Court observed at the last motion to dismiss hearing, Schrier sufficiently "lay[s] out the factual predicate" for "all of the different checks that this bank has in place to make sure that these transactions do not go to terrorist organizations" in addition to "the very obvious clues that would have led anyone" to realize what was going on, and these allegations suffice for knowledge. Doc. 64 at 19–20. Even under Rule 9's heightened pleading standard, which does *not* apply in this case, a party may allege "intent, knowledge, and other conditions of a person's mind … generally." Fed. R. Civ. P. 9(b).

QIB also wrongly claims it provided "routine" banking services. Schrier alleges QIB "violated banking regulations and disregarded its own internal policies in order to grant its" terrorist-supporting customers the ability to finance Syrian terrorist groups. *Kaplan*, 999 F.3d at 858; *see* SAC ¶¶ 247–259, 284–307. Illegal banking services are not "routine." *Kaplan*, 999 F.3d at 858. And regardless, whether banking services are "routine" "raises questions of fact for a jury to decide." *Linde*, 882 F.3d at 327. Not only is QIB's position inconsistent with the allegations, it would thwart the ATA's purpose of imposing liability on "entities … that have provided material support, directly *or indirectly*" to terrorists. JASTA, § 2(b) (emphasis added).

Separately, Schrier properly alleged acts of international terrorism for Counts Three through Six, which charge QIB with secondary liability for aiding and abetting and conspiring with the Nusra Front and Ahrar al-Sham. SAC ¶¶ 337–390. QIB's contrary argument confuses and conflates primary and secondary liability under the ATA. For secondary liability, Schrier need not allege that QIB itself committed an act of international terrorism. QIB faces secondary liability because it "aided and abetted acts of terrorism *by others*, which acts caused [Schrier's] injuries." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 331 (2d Cir. 2018) (emphasis added); *see also* 18 U.S.C. § 2333(d) (imposing ATA liability on "any person who aids and abets … or who conspires with the person who committed such an act of international terrorism").

Schrier clearly alleges the Nusra Front and Ahrar al-Sham committed acts of international terrorism. QIB does not contend otherwise, nor could it. Schrier's kidnapping, detention, and torture "involve[d] violent acts or acts dangerous to human life." 18 U.S.C. § 2331(1). Those acts violate a host of U.S. and state criminal laws, including kidnapping, hostage taking, torture, assault, and battery. SAC ¶¶ 338, 372. These acts "appear to be intended" to "influence the policy" and "affect the conduct of" the U.S. government"—the Nusra Front believed Schrier was a CIA agent, and it wanted a ransom. SAC ¶¶ 58–62, 318, 330, 339, 373. The Nusra Front's acts did affect the

U.S. government's conduct.  The government opened an investigation.  SAC ¶ 69.  Ahrar al-Sham shared the Nusra Front's goals and acted under the Nusra Front's direction when it held Schrier "in trust" for a month and a half.  *Id.* ¶ 45–48.  These facts establish that the Nusra Front and Ahrar al-Sham committed acts of terrorism, which is all that's needed for QIB's secondary liability.

### b.  Schrier stated claims for primary liability under the ATA.

QIB faces primary liability for the acts of international terrorism described above.  Schrier sufficiently alleged proximate cause and QIB's intent.  QIB is wrong to argue otherwise.

### i.  Schrier properly alleged that QIB's material support proximately caused his injuries.

Schrier was injured "by reason of" QIB's own acts of international terrorism, as the ATA requires for primary liability.  18 U.S.C. § 2333(a).  Courts interpret the "by reason of" language to require proximate cause.  *Chiquita II*, 284 F. Supp. 3d at 1309–10.  An act of terrorism proximately caused an injury if it was a "substantial factor" in bringing about the injury, considering such factors as the magnitude of the support and the temporal proximity of the injury.  *Id.* at 1311.  QIB's material support of the Nusra Front meets that standard.  QIB provided financial services that enabled the Nusra Front to raise 4 million Qatari riyal—enough to provision more than seven hundred terrorists—in the month prior to Schrier's escape.  SAC ¶¶ 111–23, 194–95.  QIB donated 500,000 riyals—enough to fund 90 terrorists—to Qatar Charity to support Ahrar al-Sham.  SAC ¶¶ 327–28.  To be sure, Schrier does not allege when the donation happened, but the Court must draw all reasonable inferences in Schrier's favor.  *Hunt*, 814 F.3d at 1221.  The Court may infer the donation happened during Schrier's captivity.

Schrier was *not* required to allege a single riyal was specifically spent on his confinement, as QIB claims.  "Congress intended [the ATA] to impose liability 'at any point along the causal chain of terrorism.'"  *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 631 (E.D.N.Y. 2006) (quoting S. Rep. No. 102-342).  Plaintiffs "are not required to trace specific dollars to specific attacks to satisfy the proximate cause standard.  Such a task would be impossible and would make the ATA practically dead letter because 'money is fungible.'"  *Schansman v. Sberbank of Russia PJSC*, __ F. Supp. 3d __, 2021 WL 4482172, at *8 (S.D.N.Y. Sept. 30, 2021) (quotation omitted).  The "fungibility of money" means that "money from other sources could be redistributed to make up for the shortfall."  *Gill v. Arab Bank PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012); *see also Boim*, 549 F.3d at 697–98.  The allegations show large donations made using QIB's services while Schrier was in captivity.  SAC ¶ 194.  "[M]aintain[ing] accounts for

14

terrorist organizations, and rout[ing] payments to terrorist organizations" establishes proximate cause.  *Miller v. Arab Bank PLC*, 372 F. Supp. 3d 33, 46 (E.D.N.Y. 2019).  At this stage, these donations satisfy *Chiquita II*'s magnitude and temporal proximity factors.

QIB relies on inapposite authority to argue otherwise.  This Court has rejected the RICO proximate cause standard from *Anza v. Ideal Steel Corp.*, 547 U.S. 451 (2006), noting that the "motivating principles" behind RICO causation are not "applicable to an ATA predicate material support violation involving personal injury."  *Chiquita II*, 284 F. Supp. 3d at 1314 n.29.  Unlike *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018), where a social media company provided general messaging services, QIB intended to and did funnel resources to Syrian terrorist organization, and those resources played a substantial role in Schrier's injuries.  SAC ¶¶ 210–13, 238–59.  And unlike *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013), where the bank was alleged to have provided services to the Iranian government, which has "many legitimate agencies, operations, and programs to fund," neither the Nusra Front nor Ahrar al-Sham had legitimate operations.  They are terrorist organizations committing to using violence, and they provide social services as a means of drumming up support for their violent activities.  SAC ¶¶ 272–79.

### ii.  Schrier properly alleged QIB's intentional provision of material support.

QIB's acts of international terrorism—providing material support to the Nusra Front in violation of 18 U.S.C. § 2339B (Count One), and to Ahrar al-Sham in violation of 18 U.S.C. § 2339A (Count Two)—both require knowing provision of material support.

Section 2339B requires "knowing[] provi[sion] [of] material support or resources to a designated foreign terrorist organization."  18 U.S.C. § 2339B.  The State Department designated the Nusra Front a terrorist organization in December 2012.  SAC ¶ 36.  QIB monitored international blacklists, and it undoubtedly knew the Nusra Front was a designated terrorist organization.  SAC ¶ 246.  But it nonetheless provided financial services to al-Kabi, knowing he would use them to fundraise for the Front.  SAC ¶¶ 111–23, 238–59.  These allegations establish knowing provision of material support to the Nusra Front.  Contrary to what QIB says, Schrier *does* allege QIB had direct contact with the Nusra Front—via its agent al-Kabi.  SAC ¶ 120.

Section 2339A requires knowledge that the material support will be used "in preparation for, or in carrying out," the crime of hostage taking or assaulting a U.S. national outside the U.S., among other things.  18 U.S.C. § 2339A (incorporating 18 U.S.C. §§ 1203, 2332).  Schrier alleged that QIB knew, based on due diligence, Qatar Charity's long support of terrorism, and public media

tying Qatar Charity to Ahrar al-Sham, that QIB's Syria donation would reach and support Ahrar al-Sham.  SAC ¶¶ 265–95.  Ahrar al-Sham's ties to Qatar Charity were broadcast in a video posted in December 2012, juxtaposing Qatar Charity's aid with Ahrar al-Sham fighters brandishing guns and setting off explosives.  SAC ¶¶ 272–74.  These allegations establish the intent required for Section 2339A at the pleading stage.  Again, "a plaintiff realistically cannot be expected to plead a defendant's actual state of mind."  *Kaplan*, 999 F.3d at 864.  Schrier alleged a factual predicate that QIB knew what its misconduct would bring about in Syria.

### c.  Schrier stated claims for secondary liability under the ATA.

Congress instructed courts to use the framework from *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), to assess aiding and abetting and conspiracy liability under the ATA.  JASTA, § 2(a)(5).  Under *Halberstam*, a bank aids and abets a tortfeasor when (1) the party whom the bank aids performs a wrongful act that causes injury; (2) the bank is generally aware of its role as part of an overall illegal activity at the time assistance is provided; and (3) the bank knowingly and substantially assists the principal violation.  705 F.2d at 477.  A bank conspires with a tortfeasor when it agrees to participate in an unlawful act, or to do a lawful act in an unlawful manner, and an act in furtherance of the conspiracy causes injury.  *Id.*  Schrier sufficiently alleged that QIB aided and abetted and conspired with the terrorists that injured Schrier.

### i.  Schrier properly alleged that QIB aided and abetted acts of terrorism.

Schrier alleges that QIB aided and abetted the Nusra Front and Ahrar al-Sham, the organizations that "committed … act[s] of international terrorism" against him.  18 U.S.C. § 2333(d).  QIB claims it aided and abetted "persons" who authorized terrorist acts, rather than the "person" who committed them, and should thus escape liability.  Doc. 156 at 23.  But the ATA defines "person" to include "corporations, companies, associations, firms, partnerships, societies, and stock companies."  18 U.S.C. § 2333(d)(1) (incorporating 1 U.S.C. § 1).  The Nusra Front and Ahrar al-Sham, as organization, are persons under the statute.  *Weiss*, cited by QIB, does not require a different result.  There, the plaintiffs had no evidence that a terrorist *organization* committed an attack, as opposed to authorizing it.  278 F. Supp. 3d at 647–48.  Here, by contrast, there is no dispute that the Nusra Front and Ahrar al-Sham as organizations committed acts of international terrorism against Schrier.  QIB is liable for having aided and abetted and conspired with them.  Moreover, QIB is wrong to say it had no direct contact with the Nusra Front or Ahrar al-Sham.  As noted, Schrier alleges that QIB provided services directly to the Nusra Front through

its agent, al-Kabi.  SAC ¶¶ 111–23.  Schrier also alleged QIB knew its donation would go to Ahrar al-Sham.  SAC ¶ 295.  And again, Congress intended to extend liability to anyone who supported terrorism, "directly *or indirectly*."  JASTA, § 2(b).  Direct contact is not necessary for liability.

### ii.    Schrier properly alleged QIB's general awareness of its role in terrorist activities.

Aiding and abetting's "general awareness" requirement is satisfied by showing a bank is aware it is "playing a 'role' in" a terrorist organization's "violent or life-endangering activities." *Linde*, 882 F.3d at 329.  General awareness does "*not* require proof of the specific intent demanded for criminal aiding and abetting culpability." *Kaplan*, 999 F.3d at 859 (emphasis added).  Schrier alleged more than simply the provision of material support to terrorists.  QIB violated its own policies and Qatari law by providing financial services to al-Kabi knowing that al-Kabi was fundraising for the Nusra Front, a designated terrorist organization.  SAC ¶¶ 111–23, 247–59.  QIB knew of Qatar Charity's long history of supporting terrorism, sanctions by the Israeli government, and its association with Ahrar al-Sham.  SAC ¶¶ 264–84, *see also Weiss*, 453 F. Supp. 2d at 626–27 (holding that bank knew organizations supported terrorism based on Israeli sanctions list). These allegations plausibly demonstrate QIB's "general awareness" that banking for al-Kabi and donating to Qatar Charity would play a role in supporting Syrian terrorism.  *Linde* 882 F.3d at 329. This Court has held that "atypical practices," such as routing payments to terrorists through third parties, is "within the mainstream of aiding and abetting liability."  *In re Chiquita Brands Int'l, Inc.*, 690 F. Supp. 2d 1296, 1310–11 (S.D. Fla. 2010).  It should reach the same conclusion here.

### iii.   Schrier was not required to allege QIB's participation in a conspiracy proximately caused Schrier's injuries.

QIB's sole challenge to Schrier's ATA conspiracy claims, Counts Four and Six, is that Schrier did not allege QIB was a proximate cause of his injuries.  But Schrier did not have to allege proximate cause to state a secondary liability claim.  Under *Halberstam*, "all [a conspiracy's] members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy." 705 F.2d at 481; *see also Linde*, 882 F.3d at 331.  QIB is responsible for what the Nusra Front and Ahrar al-Sham did, regardless of whether its part in the conspiracy proximately caused the harm.

QIB's reliance on *Kemper v. Deutsche Bank AG* is misplaced.  911 F.3d 383 (7th Cir. 2018).  *Kemper* was a *primary* liability case.  *Id.* at 396.  Proximate cause is required for primary liability.  *See Chiquita II*, 284 F. Supp. 3d at 1309.  It is not required for secondary liability under JASTA.  *See Linde*, 882 F.3d at 331.  *Kemper* is factually distinguishable, too.  Deutsche Bank

provided services to Iranian banks and shipping lines, which in turn provided services to Iranian supporters of terrorism. 911 F.3d at 392. Deutsche Bank was one step removed. Here, Schrier alleges QIB provided funds and services *directly* to agents and supporters of the terrorists that kidnapped and tortured him. SAC ¶¶ 247–59, 284, 296.

### III. Schrier correctly asserts state-law claims against QIB.

#### a. Schrier properly alleged claims for relief under state law.

Schrier did *not* concede there was no legal basis for his state-law claims, as QIB accuses. Doc. 156 at 25 n.14. Schrier argued that the choice-of-law analysis will involve factual issues not suited to a motion to dismiss. Doc. 38 at 26. That remains true. But state tort law affords Schrier relief. To identify applicable law, this Court applies Florida choice-of-law rules. *See Grupo Televisa, S.A. v. Telemundo Comm'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). In Florida, the law of the state with the "most significant relationship" governs tort claims. *Id.* Florida determines the "most significant relationship" by considering the location of injury, the location of the injury-causing conduct, the parties' domicile, and the "place where the relationship, if any, between the parties, is centered." *Crowell v. Clay Hyder Trucking Lines, Inc.*, 700 So.2d 120, 122 (Fla. 2d DCA 1997).

These factors point to California, where Schrier lived before his ordeal. Schrier's injuries occurred in Syria; QIB's conduct was centered in Qatar and New York, where it maintained its U.S. correspondent accounts, while co-conspirators committed conversion in Florida and elsewhere; QIB was domiciled in Qatar; and Schrier lived in California prior to his captivity. SAC ¶¶ 19, 39–88, 223–25. The parties have no relationship. California's interest in providing relief to its citizens may well carry the day. *See, e.g.*, *Estate of Martin-Torres v. Gamo Outdoor USA, Inc.*, Case No. 14-cv-22122, 2015 WL 11233089, at *7 (S.D. Fla. Mar. 30, 2015) (applying law of state of domicile to tort claim). California recognizes a cause of action for aiding and abetting a tort. *See Saunders v. Super. Ct.*, 27 Cal. App. 4th 832, 846 (1994). The Court should allow factual development of the choice of law issue rather than dismissing the state-law claims.

#### b. The state-law claims are not time barred.

"[D]ismissal on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Secs., Inc.*, 358 F.3d 840, 846 (11th Cir. 2004). The California limitations period for assault and battery is two years. Cal. Code Civ. Proc. § 335.1. California recognizes equitable tolling. *See Jones v. Blanas*, 393

18

F.3d 918, 928 (9th Cir. 2004).  "Application of California's equitable tolling doctrine requires a balancing of the injustice to the plaintiff occasioned by the bar of his claim against the effect upon the important public interest or policy expressed by the limitations statute."  *Id.* (quotation omitted).  Schrier could not with diligence have discovered QIB's role in causing his injuries.  He is not an expert in terrorism finance and does not read Arabic.  *See* Pl.'s Obj. & Resp. to Def.'s Interrogatories, attached as Ex. D, at 3.  He cannot read the Madid campaign tweets that reveal QIB's role in causing his injuries.  Assuming California law applies, the claims could be timely.  Again, the Court should allow further fact development.

### c.  The Court should exercise supplemental jurisdiction over the state law claims.

The Court should exercise supplemental jurisdiction over the state law claims, which "form part of the same case or controversy" against QIB.  *See* 28 U.S.C. § 1367.

## MOTION FOR SANCTIONS AND BRIEF IN SUPPORT

Under Federal Rule of Civil Procedure 30(d)(2), Schrier moves for sanctions against QIB for deposition misconduct.  At its deposition, QIB refused to answer plainly relevant questions about whether certain transactions financed the Nusra Front or Ahrar al-Sham. Ex. C at 105:11–111:25.  As a sanction, Schrier requests that the Court infer that QIB would have testified that these transactions financed the Nusra Front and Ahrar al-Sham.  This motion is intertwined with Schrier's opposition to the motion to dismiss, so Schrier presents it here and requests the Court consider it along with QIB's motion to dismiss.

"Rule 30(c)(2) provides *only* three justifications for instructing a deponent not to answer question: to preserve a privilege; to enforce a limitation imposed by the court; or to present a Rule 30(d)(3) motion."  *Mitnor Corp. v. Club Condos.*, __ F.R.D. __, 2021 WL 3855819, at *4 (N.D. Fla. Aug. 11, 2021) (quotation omitted and emphasis added); *see Redwood v. Dobson*, 476 F.3d 462, 467–68 (7th Cir. 2007).  QIB blew right past Rule 30.  It refused to testify whether several U.S. correspondent transactions that occurred during and shortly after Schrier's detention—a period QIB *agrees to be discoverable*—benefited the Nusra Front or Ahrar al-Sham or supported Schrier's detention.

QIB's refusal is especially egregious given QIB's repeated argument that jurisdiction depends on whether U.S. correspondent account transactions relate to Schrier's claims.  *E.g.*, Doc. 126 at 6 (Def.'s Resp. to Plaintiff's Mot. to Compel).  It is hard to imagine questions seeking more clearly relevant testimony on that issue than the questions QIB refused to answer.  And now, after

obstructing inquiry into the relationship between the transactions and Schrier's claims, QIB claims that Schrier has not established that any transactions were sufficiently related.

Worse yet, QIB claimed to be enforcing this Court's order with its refusal to answer. *See* Ex. B at 26:4–24, 33:5–34:2. The Court's order does not forbid asking whether correspondent account transactions financed the Syrian terrorist groups that kidnapped Schrier. *See id.* The purpose of these transactions is obviously relevant to jurisdiction. Further, after instructing a witness not to answer, objecting counsel "must *immediately* seek a protective order from the relevant court." *Mitnor Corp.*, 2021 WL 3855819, at *5 (collecting authority). QIB never sought a protective order or asked this Court to review its refusal to answer.

Rule 30(d)(2) authorizes the Court to "impose an appropriate sanction—including the reasonable expense and attorney's fees incurred by any party—on a person who impedes, delays, or frustrates the fair examination of the deponent." Schrier requests the Court sanction QIB by inferring that the transactions QIB refused to testify about supported the Nusra Front and Ahrar al-Sham and financed Schrier's captivity. This sanction is within the Court's discretion. The Supreme Court has upheld the assertion of personal jurisdiction as a discovery sanction, as have lower courts. *See Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 704 (1982); *D.J. Simmons, Inc. v. Broaddus*, No. 99-1105, 2000 WL 36739814, at *9–10 (D.N.M. June 21, 2000), *aff'd in part, rev'd in part on other grounds* 116 F. App'x 964 (10th Cir. 2004). This sanction comports with due process because "the requirement of personal jurisdiction may be intentionally waived, or for various reasons a defendant may be estopped from raising the issue," including for discovery misconduct. *Compagnie des Bauxites*, 456 U.S. at 704.

Notably, Schrier requests a far less severe sanction that *Compagnie des Bauxites*. Schrier does not ask that the Court take personal jurisdiction, only that the Court draw an inference. QIB may argue that personal jurisdiction is not proper and assert merits defenses. But this sanction is needed to ensure QIB adheres to Rule 30's clear requirement that deponents respond to deposition questions. Any lesser sanction would be a return to the bad old days when "deposition bullies masquerading as members of the bar" "simply instruct[ed] a witness not to answer questions that the party's lawyer unilaterally deems irrelevant." *New World Network Ltd. v. M/V Norwegian Sea*, No. 05-cv-22916, 2007 WL 1068124, at *4 (S.D. Fla. April 6, 2007).

## CONCLUSION

The Court should sanction QIB for deposition misconduct and deny the motion to dismiss.

**Local Rule 7.1 Certificate**

The parties have conferred and were unable to resolve the issues raised by Schrier's motion for sanctions.  At the conclusion of the September 23 deposition, QIB proposed to keep the deposition "open" and confer about which questions QIB would answer.  Ex. B at 122:14–15. Schrier noted QIB's violation of Rule 30(c) but agreed to do so.  In a September 29 letter, Schrier again noted QIB's violation of Rule 30(c) and identified questions QIB improperly refused to answer.  *See* Ltr. from M. Sellers to M. Guiffre, attached as Ex. E.  QIB responded in a September 30 letter recommending a conferral after the Court's ruling on pending discovery motions.  *See* Ltr. from M. Guiffre to M. Sellers, attached as Ex. F. The parties conferred by phone on October 1, and QIB again asked to revisit the issue after the Court's rulings.  After the Court's rulings of October 5 and 13, Schrier wrote to QIB on October 19 and demanded that QIB supplement its testimony.  *See* Ltr. from M. Sellers to M. Guiffre, attached as Ex. G.  QIB responded by letter of October 20 refusing to testify orally or to allow any follow up questions beyond those asked at the deposition.  *See* Ltr. from M. Guiffre to M. Sellers, attached as Ex. H.  Schrier refused QIB's unreasonable demand.  *See* Email from M. Sellers to M. Guiffre, attached as Ex. I.

Respectfully submitted this 8th day of November, 2021.

*/s/ John H. Rains IV*
John H. Rains IV
Georgia Bar No. 556052, Florida Bar No. 56859
Kamal Ghali
Georgia Bar No. 805055 (admitted *pro hac vice*)
Matthew R. Sellers
Georgia Bar No. 691202 (admitted *pro hac vice*)
rains@bmelaw.com
ghali@bmelaw.com
sellers@bmelaw.com
**BONDURANT, MIXSON & ELMORE, LLP**
1201 West Peachtree Street, N.W., Suite 3900
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111

G. Scott Hulsey
District of Columbia Bar No. 449040 (admitted *pro hac vice*)
Carrie A. Tendler
New York Bar No. 4400842 (admitted *pro hac vice*)
scott.hulsey@kobrekim.com
carrie.tendler@kobrekim.com
**KOBRE & KIM**
1919 M Street, N.W.
Washington, DC 20036
Telephone: (202) 664-1904
Facsimile: (202) 664 1920

Kevin T. Carroll
District of Columbia Bar No. 1020479
New York Bar No. 4075339 (admitted *pro hac vice*)
kcarroll@wiggin.com
**WIGGIN AND DANA LLP**
800 17th Street, N.W., Suite 520
Washington, DC 20006
Telephone: (202) 800-2475
Facsimile: (212) 551-2888

***Attorneys for Plaintiff Matthew Schrier***

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I have filed a true and correct copy of the foregoing **PLAINTIFF'S**

**OPPOSITION TO QATAR ISLAMIC BANK'S MOTION TO DISMISS** using the CM/ECF

filing system which will cause copies to be served on counsel of record.

This 8th day of November, 2021.

*/s/ John H. Rains IV*
John H. Rains IV
Georgia Bar No. 556052
Florida Bar No. 56859