UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-60075-CIV-ALTMAN/Hunt

MATTHEW SCHRIER,

     *Plaintiff,*

*v.*

QATAR ISLAMIC BANK,

     *Defendant.*

_____/

## ORDER[1]

On December 31, 2012, our Plaintiff—Matthew Schrier, an American journalist—was kidnapped in Syria. For the next 211 days, he was held captive and tortured by several groups of Islamist terrorists. After he escaped through a window, he made his way to the Turkish border and, from there, to the United States. Now home, Schrier came to suspect that the Qatar Islamic Bank (QIB)—a Qatar-based financial institution (and our Defendant)—was complicit in the fundraising efforts of the groups that tortured him. Seeking redress, Schrier sued QIB for providing financial services to clients it knew, or should've known, were supporting terrorist activities—including, as relevant here, the groups that kidnapped him. Now, after months of jurisdictional discovery, Schrier has identified six transactions on QIB's U.S.-based correspondent accounts and several credit-card purchases his captors made in the United States—including two in this District. Based on these transactions, Schrier asks us to exercise personal jurisdiction over QIB.

---

[1] With the Court's permission, the parties have submitted some of their filings under seal. Those filings shall remain under seal until further order of the Court. But, recognizing that "proceedings in the United States District Court are public and Court filings are matters of public record," *see* S.D. FLA. L.R. 5.4(a), we have decided to file this Order publicly.

QIB disagrees and has filed a motion to dismiss under Rules 12(b)(2) and 12(b)(6).[2] On the record before us, we conclude that Schrier has failed to justify the exercise of personal jurisdiction over QIB. After careful review, in short, we **DISMISS** Schrier's Complaint.

THE FACTS[3]

### I.  Schrier's Kidnapping and Captivity

Matthew Schrier is an independent photojournalist who, in 2012, travelled to Syria to document the civil war that was raging there. *See* SAC ¶¶ 2, 38–39. Schrier embedded himself with the Free Syrian Army—a moderate opposition group that, at the time, was fighting to replace the "repressive regime" of President Bashar al-Assad with a democratic government. *Id.* ¶¶ 33, 37. Schrier spent eighteen days with the group, photographing the war in and around Aleppo. *Id.* ¶ 38. He was supposed to leave Syria on December 31, 2012. *Id.* ¶ 39. But, as he made his way on that day from Aleppo to the Turkish border, a Jeep intercepted his taxi. *Ibid.* Three men got out, grabbed him, and stuffed him in the backseat of the Jeep. *Id.* ¶ 40. They covered his eyes with his ski cap and held a rifle flush against his temple. *Ibid.* As he'd come to discover later, Schrier had been kidnapped by the Nusra Front.[4] *Id.* ¶¶ 41–42.

The Nusra Front is a terrorist organization formed in 2011 as an offshoot of Al-Qaeda. *Id.* ¶¶ 32, 36–37. At the start of the Syrian Civil War, the leader of the group we now know as the Islamic State of Iraq and Syria ("ISIS")[5] sent a delegate to establish the Nusra Front. *Id.* ¶ 32. The Front is associated with a revivalist movement of the Sunni branch of Islam and seeks to replace the secular

---

[2] The motion is now ripe for resolution. *See* MTD [ECF No. 156]; Response [ECF No. 158]; Reply [ECF No. 163]; *see also* Sealed MTD [ECF No. 169]; Sealed Response [ECF No. 170]; Sealed Reply [ECF No. 171].

[3] We take these facts from Schrier's operative Second Amended Complaint ("SAC") [ECF No. 149].

[4] For the sake of simplicity, we adopt the parties' transliterations of foreign-language names. The Nusra Front currently operates as Hay'at Tharir al-Sham, SAC ¶ 35, and the U.S. State Department refers to it as a terrorist organization—under both its current and former names, *id.* ¶ 36.

[5] ISIS was once known as Al-Qaeda in Iraq. SAC ¶ 32.

Syrian government with a fundamentalist Islamic state. *Id.* ¶ 33. The Nusra Front carries out terrorist activities, assassinations, hostage takings, and suicide bombings to advance its political goals. *Id.* ¶ 34. It, in fact, has claimed responsibility for 57 of the 70 suicide bombings that rocked Syria between December 2011 and June 2013. *Ibid.*

The Nusra Front held Schrier captive for 211 days—from December 31, 2012, to July 29, 2013. *Id.* ¶ 42. During his captivity, Schrier was moved seven times and held in six different places. *Id.* ¶ 44. As relevant here, between May 5, 2013, and June 20, 2013, Schrier was held "in trust" for the Nusra Front by Ahrar al-Sham—another Islamist militant group that frequently collaborated with the Nusra Front and which likewise sought to replace the Assad regime with an Islamist state.[6] *Id.* ¶¶ 44–47. The Nusra Front took Schrier back on June 20, 2013. *Id.* ¶ 48.

Schrier was held in "squalid" conditions—at all times "lack[ing] adequate ventilation, electricity, sanitation and heat." *Id.* ¶¶ 54, 49. For days, he was denied access to a bathroom, and he wasn't permitted to shower or wash his clothes (or his blankets) for long stretches of time. *Id.* ¶¶ 50, 53. On one occasion, Schrier developed a severe skin infection because he wasn't allowed to bathe for three months. *Id.* ¶ 53. On another, he and his cellmates "contracted severe food poisoning" and, rather than receive any medical attention, "were forced to defecate in a bucket the size of a beach pail." *Id.* ¶ 51. There were also vermin: Schrier's bedding and clothing were infected with bed bugs, and one of his prison cells "was swarming with rats." *Id.* ¶ 54.

Schrier was tortured and threatened with violent death. *Id.* ¶¶ 55–60. He "was beaten and threatened on at least ten occasions" and was "forced to observe and listen to the Nusra Front and Ahrar al-Sham torture other prisoners." *Id.* ¶ 55. After he tried (and failed) to escape, his torturers beat him so severely that, for a time, he was unable to walk. *Id.* ¶ 57. He was lashed and whipped with a

---

[6] "According to a report by Combating Terrorism at West Point, Ahrar al-Sham 'had an excellent working relationship with al-Qa'ida factions such as Jabbat al-Nusra,' or the Nusra Front." SAC ¶ 46.

cable or a strip of garden hose. *Id.* ¶¶ 57, 59. The Nusra Front once "threatened to force Mr. Schrier to drive a truck loaded with explosives into one of its targets." *Id.* ¶ 55. Once, his captors beat him so long and hard that, to make them stop, he falsely told them he was an undercover CIA spy. *Id.* ¶¶ 58–61. The Nusra Front recorded the false confession and used it to negotiate with the U.S. Government and to "sow pain and terror in the United States." *Id.* ¶¶ 62, 66, 71; *see also id.* ¶¶ 63–65, 68 (noting that the Nusra Front took a similar approach with Theo Padnos, Schrier's American cellmate); *id.* ¶ 72 ("[The Nusra Front] viewed the kidnappings as evidence of their ability to detain the citizen of a superpower and as retribution for American military action in the Middle East."). Because he was scared that the Nusra Front would kill him if they discovered he was Jewish, Schrier hid his beliefs and pretended to convert to Islam. *Id.* ¶¶ 81–82.

"On top of the physical and psychological abuse, the Nusra Front stole Mr. Schrier's debit and credit cards and forced him to turn over the PIN numbers and passwords to his online accounts." *Id.* ¶ 73. In the Spring of 2013, the Nusra Front charged thousands of dollars to Schrier's accounts for the purchase of dozens of items from the United States—including car parts, laptops and tablets, GPS-mapping software, men's military tactical boots, aviator sunglasses, and a watch. *Id.* ¶ 74. Schrier believes that these supplies "ha[ve] obvious connections to the Nusra Front's terrorist activities" and that the goods "were ultimately sent on to Syria for use by the group." *Id.* ¶¶ 74, 77. The Nusra Front also wired money from Schrier's savings account to someone outside the United States. *Id.* ¶ 78. Schrier thinks the Nusra Front's "acts of identity theft and conversion were in furtherance of the goal of bringing about further acts of terrorism in Syria." *Id.* ¶ 80.

Schrier finally escaped on July 29, 2013. *Id.* ¶ 84. When they were placed in a new cell with small windows that were barred by wire, Schrier and his cellmate realized that the wires were poorly attached. *Ibid.* After several days and one failed escape attempt, Schrier was able to remove the wires

4

and squeeze through the window to escape.[7] *Id.* ¶ 85. Free Syrian Army rebels helped Schrier reach

the Turkish border. *Id.* ¶ 88. From there, Schrier made his way back to the United Stated. *Ibid.*

## II. Terrorism Funding and QIB

Terrorist groups usually "rely on creative fundraising strategies and sympathetic financial

institutions and individuals to evade anti-terrorism financing laws." *Id.* ¶ 101. During Schrier's

captivity, terrorist groups largely relied on private donors for financial support, and many of those

supporters were in the Persian Gulf, including in Qatar. *Id.* ¶¶ 102–03. "The U.S. Department of

State's 2013 Country Report on Terrorism specifically noted that '[p]rivate donations from the Gulf

also remained a main source of funding for Sunni terrorist groups, particularly those operating in

Syria.'" *Id.* ¶ 104. Terrorism supporters—including those in Qatar and other parts of the Persian

Gulf—regularly use social-media platforms as an integral part of their fundraising efforts. *See id.* ¶¶

105–09. Qatar tends to look the other way on these fundraising efforts, and the U.S. Treasury's Under

Secretary for Terrorism and Financial Intelligence, David Cohen, has noted that Qatar was a

"permissive jurisdiction" for terrorist funding. *Id.* ¶¶ 108–09.

Schrier believes that QIB has long been involved in these fundraising efforts by providing

financial services to known agents of terrorist organizations—among these, the Nusra Front. *See*

*generally id.* ¶¶ 111–309 (allegations regarding QIB's connections to Saad bin Saad al-Kabi, the Madid

Campaign, Qatar Charity, and the Nusra Front). One of QIB's clients is Saad bin Saad al-Kabi. *See id.*

¶¶ 114–17 (identifying al-Kabi's QIB accounts). Al-Kabi is a Qatari national who (Schrier alleges) has

acted as an intermediary in ransom negotiations, supports the Nusra Front, and has been designated

as a Specially Designated Global Terrorist by the U.S. Treasury Department. *Id.* ¶ 111. Around the

time of Schrier's kidnapping, the Nusra Front asked al-Kabi (and he agreed) to set up a fundraising

campaign to support the group's activities in Syria. *Id.* ¶¶ 112, 113, 247–48. Schrier believes that al-

---

[7] Unfortunately, Padnos wasn't able to escape with Schrier that day. SAC ¶ 87.

Kabi's willingness to fundraise for the Nusra Front makes him a member and agent of the Nusra Front. *See id.* ¶¶ 118–20, 249. And he claims that "QIB provided financial services directly to the Nusra Front through al-Kabi." *Id.* ¶ 120. According to Schrier, QIB has a "long history of associating with supporters of terrorism," *id.* ¶124, and—given its due-diligence policies—QIB knew (or should have known) about al-Kabi's terrorist associations, *id.* ¶¶ 121–22; *see also id.* ¶¶ 238–42 (alleging that both Qatari law and QIB's internal due-diligence requirements would have led QIB to know that al-Kabi's account supported the Nusra Front); *id.* ¶¶ 251–54 (averring that QIB's failure to act, despite what it learned about al-Kabi from its due diligence, suggests an express or tacit agreement between QIB and al-Kabi to help Nusra Front in its fundraising efforts).[8]

Around May 2013, al-Kabi established the Madid Ahl al-Sham Campaign (the "Madid Campaign"), a social-media campaign aimed at raising money for Syrian militant groups—including the Nusra Front. *Id.* ¶ 135. The Madid Campaign involved actors from across the world and wasn't approved by the Qatari Ministry of Social Affairs.[9] *Id.* ¶¶ 136–37. According to terrorism-finance expert David Andrew Weinberg, the Madid Campaign "was not simply a one-off effort by one or two radical extremists to fundraise for jihadi fighters in Syria"; it "was at one point arguably the most visible public fundraising campaign for Syrian relief in Qatar." *Id.* ¶ 242.

---

[8] Schrier also alleges that QIB has other ties to terrorist organizations. For example, Sheik Yusuf al-Qaradawi chaired QIB's Shari'a Supervisory Board—which "ensures QIB complies with Islamic law"—through at least 2010. *See* SAC ¶¶ 125, 130. Al-Qaradawi is a Hamas supporter who has, among other things, (1) issued a religious opinion sanctioning abductions and attacks on Americans in Iraq; (2) said that Allah sent Hitler to punish the Jews; and (3) encouraged members of the Muslim Brotherhood to join Sunni terrorist groups. *Id.* ¶ 128. Al-Qaradawi now leads a group that funnels money from charities to Hamas. *Id.* ¶ 129. The United States has designated Hamas as both a Specially Designated Terrorist Organization and a Foreign Terrorist Organization. *Id.* ¶ 127. QIB has also maintained banking relationships with "banks known to finance terrorism," even when "many reputable banks have severed ties" with those institutions. *Id.* ¶¶ 131–34.

[9] In fact, "QIB policy prohibited accounts for 'charitable societies' unless the non-profit had the approval of the Qatari Ministry of Social Affairs." SAC ¶ 246(c).

The SAC includes reproductions of various Madid Campaign social-media posts that seem to connect al-Kabi's QIB account with funding for the "Mujahedeen"—Islamic militants fighting in the jihad. *See id.* ¶¶ 144–45, 156, 159; *see also id.* ¶ 185 (noting that, in a speech at the Grand Mosque in Doha, a Kuwaiti Islamic cleric and Specially Designated Global Terrorist "urged Qataris to donate to the Madid campaign and told the crowd that 'the mujahedeen internally speak well of the [campaign's] work in terms of what they provide in support,'" and that, "at the end of his speech, viewers were given a QIB account number to donate to"). One of the posts specifically connected the Madid Campaign and al-Kabi with the Nusra Front. *Id.* ¶¶ 142–43. Some of the posts thanked donors for their contributions or celebrated the success of the campaign. *See id.* ¶¶ 170, 173, 194, 197–98, 202.

The Madid Campaign continued to raise funds for Islamist extremists in Syria until late 2014, when the Qatari government "finally" shut it down. *Id.* ¶¶ 203–08. Two Qatari government officials told French press that Qatar shut down the Madid Campaign because it was "known for financing extremists in Syria." *Id.* ¶ 208. According to Schrier, "[a] substantial portion of the Madid [C]ampaign's donations to the Nusra Front flowed through al-Kabi's QIB account." *Id.* ¶ 210. And, although most of the campaign occurred after Schrier's escape, "[d]ue to money's fungibility, the Madid [C]ampaign augmented the Nusra Front's resources and thus enabled it to divert resources to provision the terrorists that held Mr. Schrier captive and otherwise fund Mr. Schrier's kidnapping, detention, and torture." *Id.* ¶ 213. "At all relevant times, QIB had anti-terrorism financing policies designed to make it aware when its services were used to finance terrorism." *Id.* ¶ 240.

Schrier alleges that QIB used the U.S. financial system to support the Madid Campaign. *See generally id.* ¶¶ 215–37. In support of this assertion, Schrier identifies three New York banks—JPMorgan Chase, Standard Chartered Bank, and Deutsche Bank—where QIB maintained correspondent accounts during his captivity. *Id.* ¶¶ 223–25. Foreign banks—like QIB—often use correspondent bank accounts to (1) "access the U.S. financial system," (2) "complete transactions that

originate and/or are completed outside the United States," and (3) "exchange currencies." *Id.* ¶¶ 216–17. "QIB's correspondent accounts in New York allowed it to access the U.S. financial system, complete transactions in U.S. dollars and other currencies, and benefit from the stability and predictability of New York's banking law." *Id.* ¶ 226. And "QIB used its U.S. correspondent accounts to process one or more donations to the Madid [C]ampaign." *Id.* ¶ 229. Put a pin in this allegation because it *really* is the only time in the SAC that Schrier *specifically* ties the Madid Campaign to QIB's U.S. accounts. As we'll see, QIB has challenged this allegation with competent proof, and Schrier has failed to rebut QIB's challenge with *evidence* of his own.

Back to our story: Because of the Madid Campaign's international reach[10]—and given that "[a]ccepting donations from outside Qatar was not a simple matter of moving funds from one account to another"—QIB's "use of U.S. correspondent accounts was necessary" to the Campaign's success. *Id.* ¶ 236. QIB thus used the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") network to coordinate international exchanges. *Ibid.*; *see also id.* ¶ 220 (explaining how SWIFT works). According to Schrier, "QIB maintained U.S. correspondent accounts for the very purpose of facilitating international transactions like those involved in the Madid [C]ampaign." *Id.* ¶ 237.

Schrier also claims that QIB supported the terrorists who imprisoned him through its support of Qatar Charity. *See generally id.* ¶¶ 260–309 (allegations regarding Qatar Charity and Ahrar al-Sham). In 1992, Osama bin Laden cited Qatar Charity as an important Al-Qaeda funder. *Id.* ¶¶ 264–65. The Charity has "served a critical role in the Arab-Afghan terrorist infrastructure by laundering money originating from bank accounts belonging to bin Laden and his sympathetic patrons in the Arabian Gulf and by helping to move funds to areas where Al-Qaeda was carrying out operations." *Id.* ¶ 266

---

[10] *See* SAC ¶ 136 (identifying social-media posts supporting the Madid Campaign from Qatar, Saudi Arabia, Bahrain, Jordan, Syria, Yemen, Austria, the United Kingdom, and the United States).

(quoting evidence presented to the U.S. Congress's House Committee on Financial Services Subcommittee on Oversight and Investigations).

Qatar Charity has funded Al-Qaeda-aligned terrorist groups throughout the world. *Id.* ¶¶ 267–70. One of these is Ahrar al-Sham, the Nusra Front-collaborator that held Schrier "in trust" in May and June of 2013. *Id.* ¶ 271. Qatar Charity also has a wide range of connections to the Nusra Front. *Id.* ¶ 281. For instance, Qatar Charity's coordinator for Syrian relief, Mohammad Jassim al-Sulaiti, worked with al-Kabi to fundraise for the Nusra Front. *Id.* ¶ 282. QIB has donated large sums of money to Qatar Charity—both before and during Schrier's captivity. *Id.* ¶¶ 284–86. Schrier believes that "[s]ome of this money reached Ahrar al-Sham, either in the form of cash or supplies." *Id.* ¶ 293. And (again) he says that, "[d]ue to money's fungibility, QIB's donations augmented Qatar Charity's resources and thus enabled it to support Ahrar al-Sham's acts of international terrorism." *Id.* ¶ 294. "QIB also maintained eight bank accounts for Qatar Charity." *Id.* ¶ 296. As with the Madid Campaign, Schrier alleges that QIB used correspondent accounts in the United States to facilitate international transactions that ultimately supported Qatar Charity's terrorist activities. *Id.* ¶¶ 298–99. Again, QIB has challenged this assertion with competent evidence, and Schrier has failed to rebut that challenge with proof of his own.

### PROCEDURAL HISTORY

Schrier first sued QIB on January 13, 2020, *see* Compl. [ECF No. 1], and QIB promptly moved to dismiss, *see* First MTD [ECF No. 17]. After a telephonic hearing and a subsequent telephonic conference, we granted the First MTD without prejudice and with leave to amend. *See* Paperless Minutes, Aug. 12, 2020 Hr'g [ECF No. 61]; *see also* Paperless Minutes, Sept. 29, 2020 Hr'g [ECF No. 73]; Order Denying as Moot Motion to Compel and Granting Motion to Dismiss ("Order Granting MTD") [ECF No. 74]. At the MTD hearing, Schrier made an *ore tenus* request for jurisdictional discovery, which we granted over QIB's objection. *See* Order Granting MTD at 1. We gave the parties

60 days to conduct jurisdictional discovery (beginning on the day Schrier filed his first amended complaint) and ordered Schrier to file a second amended complaint fourteen days after the close of jurisdictional discovery. *Id.* at 2. A week later, Schrier filed his First Amended Complaint ("FAC") [ECF No. 76], and the parties' jurisdictional discovery began. The parties then spent the better part of a *year* sparring over service and discovery obligations before Schrier filed his SAC. QIB then moved (again) to dismiss, *see* MTD, which is the motion we resolve today.

## THE LAW

Under Federal Rule of Civil Procedure 12(b), a complaint may be dismissed for one of seven defects. Two such defects are relevant here: lack of personal jurisdiction (12(b)(2)) and insufficient service of process (12(b)(5)). Rule 12(b)(2) permits a defendant to move to dismiss a claim for lack of personal jurisdiction. "The determination of personal jurisdiction over a nonresident defendant requires a two-part analysis by the federal courts." *Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 855 (11th Cir. 1990). *First*, the court must satisfy itself that the exercise of personal jurisdiction comports with the forum state's long-arm statute. *See Proudfoot Co. World Headquarters L.P. v. Thayer*, 877 F.2d 912, 919 (11th Cir. 1989). *Second*, the court must ensure that the exercise of jurisdiction is consistent with the requirements of the Fourteenth Amendment's Due Process Clause. *See Posner v. Essex Ins. Co., Ltd.*, 178 F.3d 1209, 1214 (11th Cir. 1999). "Subjecting [a defendant] to jurisdiction in Florida comports with due process so long as 'minimum contacts' exist between [the defendant] and Florida and exercising jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* at 1220 (cleaned up).

Under Florida law, "[a] plaintiff seeking to obtain jurisdiction over a non-resident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction." *Id.* at 1214 (citation omitted). "[The] Plaintiff's burden in alleging personal jurisdiction is to plead sufficient material facts to establish the basis for exercise of such jurisdiction." *Future Tech. Today, Inc. v. OSF*

*Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000). If a plaintiff pleads sufficient "material facts" to support the exercise of personal jurisdiction, the burden then shifts to the defendant to challenge the plaintiff's allegations by affidavits or other competent evidence. *Id.* at 1249. "When a nonresident defendant raises a meritorious defense to personal jurisdiction through affidavits, documents or testimony," the plaintiff must establish the propriety of jurisdiction by affidavits, testimony, or other documents. *Am. Airlines, Inc. v. Despegar.com USA, Inc.*, 2014 WL 11880999, at *3 (S.D. Fla. May 14, 2014) (Altonaga, J.) (citations omitted). In other words, the "district court must accept the facts alleged in the complaint as true, to the extent that they are uncontroverted by the defendant's affidavits." *See Cable/Home Commc'n Corp.*, 902 F.2d at 855 (cleaned up). But, where "the parties' affidavit and deposition evidence conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Ibid.*

"As a general rule, when the court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether a claim was stated by the complaint." *Madara v. Hall*, 916 F.2d 1510, 1514 n.1 (11th Cir. 1990); *cf.* WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2d § 1351, 243–44; *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (holding that the district court erred in dismissing the case for failure to state a claim *before* addressing the defendant's personal-jurisdiction and venue challenges, because dismissal on the former ground would be *with* prejudice, while dismissal for either of the latter two would be *without*). "[C]ourts should address issues relating to personal jurisdiction before reaching the merits of a plaintiff's claim" because "[a] defendant that is not subject to the jurisdiction of the court cannot be bound by its rulings." *Rep. of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 940 (11th Cir. 1997). And "the fact that a dismissal for failure to state a claim is with prejudice whereas dismissal for lack of jurisdiction is without prejudice counsels against bypassing the jurisdictional issue." *Ibid.*

ANALYSIS

QIB contends that it isn't subject to personal jurisdiction in the United States. "In analyzing a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), we first determine whether the applicable statute confers jurisdiction over the defendant, and then determine whether the exercise of jurisdiction comports with due process." *Rep. of Panama*, 119 F.3d at 942; *see also SEC v. Marin*, 982 F.3d 1341, 1349 (11th Cir. 2020) (noting that the court must "determine whether the exercise of jurisdiction comports with due process"). "A plaintiff seeking to establish personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1350 (11th Cir. 2013) (cleaned up).

QIB offers three reasons for its view that Schrier hasn't met his burden here: (1) because he didn't properly serve QIB under the Anti-Terrorism Act, 18 U.S.C. § 2334(a) ("ATA"), *see* MTD at 3; (2) because he's failed to justify the exercise of personal jurisdiction under the Florida long-arm statute, *id.* at 3–6; and (3) because he's failed to justify the exercise of personal jurisdiction under the federal long-arm statute, *id.* at 6–11 (citing FED. R. CIV. P. 4(k)(2)). Schrier counters that he's "satisfied the three elements required for the Court to exercise personal jurisdiction[.]" Response at 1; *see also id.* at 1 (arguing that QIB was properly served under *both* Rule 4(f) *and* the ATA's nationwide-service provision), 1–5 (insisting that we can exercise personal jurisdiction under *both* the Florida long-arm statute *and* Rule 4(k)(2)), 5–11 (contending that the exercise of personal jurisdiction would comport with due process or, in the alternative, that—in this case—the exercise of personal jurisdiction would comport with the Fifth Amendment because it wouldn't be "capricious or fundamentally unfair").

We begin with the question of service.

## I.      Service of Process

"Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Cap. Int'l, Ltd. v. Rudolf Wolff & Co., Ltd.*, 484 U.S. 97, 104 (1987). In other words, "before a court may exercise personal jurisdiction over a defendant, there must be . . . a basis for the defendant's amenability to service of summons. Absent consent, this means there must be authorization for service of summons on the defendant." *Ibid.*; *see also Aetna Bus. Credit, Inc. v. Universal Décor & Interior Design, Inc.*, 635 F.2d 434, 435 (5th Cir. 1981) ("When service of process is challenged, [the plaintiff] must bear the burden of establishing its validity.");[11] *Reeves v. Wilbanks*, 542 F. App'x 741, 746 (11th Cir. 2013) (same).

Schrier tried to serve QIB in two different ways: *first*, in January 2020, via email to QIB's registered agent, the Global Payments Advisory Group ("GPAG"); and *second*, by FedEx pursuant to the Magistrate Judge's order allowing alternate service, *see* Notice of Service [ECF No. 98]. We've already determined that Schrier failed to effectuate proper service over QIB when it emailed the summons and complaint to GPAG, and QIB asks us to reaffirm that ruling here. *See* MTD at 3 (citing Sept. 29, 2020, MTD Hr'g Tr. [ECF No. 75] at 5:10–8:18). And, while QIB agrees that Schrier properly served it in Doha, it contends that this foreign service fails to establish personal jurisdiction over QIB under the ATA. *See* MTD at 3 n.1 ("Because Plaintiff elected to serve the summons outside the United States, which exceeds the territorial limitations of the ADA, he did not effect service *under the ATA* and is precluded from invoking the ATA as a statutory basis for personal jurisdiction." (emphasis added)). QIB is right on both counts.

---

[11] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### A. Service Under the ATA

Schrier has failed to perfect service under the ATA—which provides, in relevant part, as follows: "Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where *the defendant resides, is found, or has an agent*." 18 U.S.C. § 2334(a) (emphasis added). Under the ATA, then, Schrier could have served QIB "in any district where the defendant resides, is found, or has an agent." Since QIB doesn't reside in the United States and cannot be found here, Schrier's only avenue for ATA service was through QIB's U.S. agent, GPAG. And Schrier *does* argue—as he did in opposition to QIB's First MTD—that he properly served QIB under the ATA (and in the United States) through GPAG. *See* Response at 1.

As we've explained once before, however, Schrier *couldn't* serve QIB through GPAG because GPAG lacked authority to accept *this kind of service*—which is to say, service for this kind of case—on QIB's behalf. *See* Sept. 29, 2020, MTD Hr'g Tr. at 5:10–8:18; *see also* Order Granting MTD; Agent Appointment Agreement [ECF No. 163-1]. And we reiterate that conclusion today.

We based our prior decision on a plain reading of QIB's contract with GPAG. *See* Sept. 29, 2020, MTD Hr'g Tr. at 6:22–7:22. In that contract, QIB "appointed Global Payments Advisory Group . . . as its agent for service of process *only* for purposes set forth in the Certification for Purposes of Section 5318(k) of Title 31[.]" Agent Appointment Agreement at 1 (emphasis added). "When the terms of a contract are clear and unambiguous," as they are here, "the court must interpret that contract in accordance with its plain meaning." *Hall v. Sargeant*, 2020 WL 1536435, at *7 (S.D. Fla. Mar. 30, 2020) (Altman, J.) (citing *Rigel v. Nat'l Cas. Co.*, 76 So. 2d 285, 286 (Fla. 1954)). And the Agent Appointment Agreement is clear that GPAG is authorized to act as QIB's "agent for service of process

*only* for purposes set forth in the Certification for Purposes of Section 5318(k)[.]" Agent Appointment Agreement at 1 (emphasis added).

Section 5318(k), in turn, says:

(A) Subpoena of records.—

(i) In general.—Notwithstanding subsection (b), the Secretary of the Treasury or the Attorney General may issue a subpoena to any foreign bank that maintains a correspondent account in the United States and request any records relating to the correspondent account or any account at the foreign bank, including records maintained outside of the United States, that are the subject of—

(I) any investigation of a violation of a criminal law of the United States;

(II) any investigation of a violation of this subchapter;

(III) a civil forfeiture action; or

(IV) an investigation pursuant to section 5318A.

31 U.S.C. § 5318(k)(3)(A).

GPAG, in other words, can accept service on QIB's behalf *only if* the Secretary of the Treasury or the Attorney General of the United States subpoenas records in a criminal investigation, an investigation under § 5318 or 5318A, or a civil-forfeiture action. That's it. Notably absent is the scenario we have here: a private civil suit by an individual plaintiff against QIB. The Agent Appointment Agreement thus does *not* deputize GPAG to accept Schrier's service of process in our case. *See* Sept. 29, 2020, MTD Hr'g Tr. at 7:7–13 ("In other words, it's not true that GPAG was authorized to accept service for any kind of case. GPAG was only authorized to accept service for the kinds of cases listed in the contractual arrangement between QIB and GPAG. And that, of course, is only for situations of subpoenas or service that has been effectuated by either the Secretary of the Treasury or the Attorney General of the United States.").

And GPAG (it probably goes without saying) may not act beyond the scope of the authority QIB has bestowed upon it. *See, e.g., Ramos-Barrientos v. Bland*, 661 F.3d 587, 600 (11th Cir. 2011) ("[A]n

agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts[.]" (cleaned up)); *see also, e.g.*, *Nelson v. Swift*, 271 F.2d 504, 505 (D.C. Cir. 1959) ("According to the agent's undisputed affidavit the appellee had not authorized him, in writing or orally, to accept or receive service of process on her behalf. The District Court rightly quashed service."); 3 CORPUS JURIS SECUNDUM, AGENCY § 601 (updated June 2021) ("Evidence sufficient to establish an agency for one purpose does not tend to prove the existence of an agency for another entirely different purpose."). Schrier, in sum, has failed to perfect service on QIB under the ATA.

Against all this, Schrier points to an email chain he received in jurisdictional discovery, which (he says) "shows QIB authorized GPAG to accept the summons, thus creating the agency relation the Court found missing in its earlier ruling." Response at 1. But Schrier reads too much into this email, which discusses GPAG's *receipt* of the summons—and its decision to forward the summons to QIB— but stops short of establishing GPAG's *authority to accept* the summons. *See* GPAG Emails to QIB [ECF No. 170-2].

The emails start with a message from GPAG's Director of Agent Services, John Santopietro, to three QIB recipients (all with "@qib.com.qa" email addresses). This first email reads: "Dear Sirs, Attached for your immediate attention is a Summons from the United States District Court for the Southern District of Florida. Please confirm your complete street address so we may dispatch the original as international couriers will not deliver to a PO Box. Kindly acknowledge receipt of this email." *Id.* at 1. The message is followed by a series of "bounce-backs," which informed Mr. Santopietro that his email "couldn't be delivered to [the three @qib email addresses] because it exceeds the size limit." *Id.* at 2–6. So, Mr. Santopietro tried again—this time by breaking the summons into several smaller attachments. He wrote: "Dear Sirs, Attached for your immediate attention is a

Summons from the United States District Court for the Southern District of Florida. The summons is beiing [sic] sent to you in 6 files, the first three are included herein the remaining three will follow in a separate email. Also, please confirm your complete street address so we may dispatch the original as international couriers will not deliver to a PO Box." *Id.* at 7. He followed immediately with the other three PDFs, explaining: "Further to the below, attached are the three remaining files that completes [sic] the aforementioned summons. Kindly acknowledge receipt." *Ibid.*

   Mr. Santopietro sent these messages between 10:00 and 11:00 pm on the night of January 16, 2020. *Ibid.* The next day, January 17—having received no response—Mr. Santopietro tried again: "Dear Sirs, Further to the below, we have dispatched the originals via DHL Express, tracking number: 4718161206." Two days later, January 19, he asked someone at a different @qib email address to "kindly acknowledge receipt." *Id.* at 8. Finally, on January 21, Usman Gulzar at QIB answered: "Dear John, Reference to your email below. We look forward to hearing from you on the basis of urgency the exact date and time on which GPAG had received the summon [sic] in discussion on behalf of QIB. The sought information is of importance to us and or [sic] urgency. Look forward to hearing from you accordingly." *Id.* at 9. Mr. Santopietro promptly replied: "The Summons was delivered to us at approx. 9 PM on Thursday January 16th. Our initial email notice was sent at approx. 10:40 PM[.] According to DHL Express the original were [sic] received at your office yesterday, please confirm." *Id.* at 10.

   Schrier reads these emails as proof that "[GPAG] accepted and forwarded the summons to QIB[.]" Response at 10. As we've shown, however, the emails show only that GPAG (an agent authorized to accept service in *other* kinds of cases) received Schrier's summons and immediately forwarded it to QIB, which later confirmed receipt. *See* GPAG Emails to QIB at 9–10. But neither GPAG's *receipt* of the summons nor Mr. Santopietro's decision to forward the summons establishes that GPAG was *authorized* to accept this form of service on QIB's behalf. As the Supreme Court has

explained, "there must be *authorization* for service of summons on the defendant." *Omni Cap.*, 484 U.S. at 104 (emphasis added). And QIB's request for "the exact date and time on which GPAG had received the summon[s]," GPAG Emails to QIB at 9, evinces no such authorization. To the contrary, QIB's interest in this information suggests only that it wanted to know how much time it had to hire a lawyer and file a response in court—timelines triggered by the act of service. And it's no answer for Schrier to say—and, to his credit, he hasn't said this—that QIB *couldn't* have been concerned about timelines because it hasn't consented to service. A defendant can always choose, without waiving its service objections, to defend itself in federal court—as QIB has elected to do here. *See Pouyeh v. Pub. Health Tr. of Jackson Health Sys.*, 718 F. App'x 786, 790 (11th Cir. 2017) ("Here, the defendants objected to the sufficiency of service of process in their pre-answer motion to dismiss, which was their first response to Pouyeh's complaint. Accordingly, the defendants did not waive their objection to the sufficiency of process under Rule 12(h).").

Ultimately, Schrier bears the burden of proving that QIB authorized GPAG to accept service *in this kind of case. See Aetna*, 635 F.2d at 435 ("When service of process is challenged, [the plaintiff] must bear the burden of establishing its validity."). Since he hasn't met that burden here, we find no reason to deviate from our prior ruling that he's failed to effectuate proper service under the ATA.

### B. Service Under Rule 4(f)

But Schrier also served QIB under Rule 4(f)(3), which allows alternate forms of service "not prohibited by international agreement." FED. R. CIV. P. 4(f)(3). On Schrier's motion, the Magistrate Judge permitted Schrier to serve QIB via FedEx in Qatar. *See* Motion for an Order Allowing Alternate Service [ECF No. 98]; Order Granting in Part the Motion for Alternate Service [ECF No. 97] at 7 ("[T]he undersigned orders that Plaintiff re-attempt service via mail or FedEx. Should this attempt return as undeliverable, then Plaintiff shall effectuate service via email on both Defendant's local counsel and the email accounts of the banking officials mentioned during the hearing."). Schrier

complied with this order and served QIB with the summons and the (then-operative) FAC "in four separate envelopes, one each addressed to QIB, Sheikh Jassim bin Hamad bin Jassim bin Jaber al Thani (Chairman of the Board of Directors), Bassel Gamal (CEO), and Rakesh Sanghvi (Chief Risk Officer)." Notice of Service at 1. QIB doesn't challenge the sufficiency of this service here. *See generally* MTD. Instead, QIB argues only that service under Rule 4(f)(3) cannot establish personal jurisdiction under the ATA. *See id.* at 3 n.1 ("Because Plaintiff elected to serve the summons outside the United States, which exceeds the territorial limitations of the ATA, he did not effect service under the ATA and is precluded from invoking the ATA as a statutory basis for personal jurisdiction. Where the ATA authorizes nationwide service, as opposed to worldwide service, service of process must occur in the United States." (citations omitted)). Here, again, QIB gets it right.

## II.    Personal Jurisdiction

As we've said, QIB offers three reasons for its view that Schrier has failed to establish personal jurisdiction in this case: (1) because Schrier didn't properly serve QIB under the ATA, which (by its own terms) would've established jurisdiction, *see* MTD at 3; (2) because he's failed to establish personal jurisdiction under the Florida long-arm statute, *id.* at 3–6; and (3) because he's failed to establish personal jurisdiction under the federal long-arm statute, *id.* at 6–11 (citing FED. R. CIV. P. 4(k)(2)). We address each argument in turn.

### A.  Personal Jurisdiction Under the ATA

We start with the easy one: QIB is right when it says that, by serving it in Doha—rather than in the United States—Schrier failed to "effect[uate] service under the ATA and is precluded from invoking the ATA as a statutory basis for personal jurisdiction." MTD at 3 n.1. "When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction." *Rep. of Panama*, 119 F.3d at 942. "The ATA authorizes nationwide service of process to establish jurisdiction." *Stansell v. BGP, Inc.*, 2011 WL 1296881, at *3 (M.D. Fla. Mar. 31, 2011) (Moody, J.). And

the ATA provides, in relevant part, as follows: "Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent. Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). Under the ATA, then, Schrier could have served QIB "in any district where the defendant resides, is found, or has an agent," and personal jurisdiction would have been proper in that district. *See Rep. of Panama*, 119 F.3d at 942 ("When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction.").

But, as we've established, Schrier didn't do that. He only served QIB in Qatar—a place *outside* the United States. *See supra* at 18–19*; see also* Notice of Service. And we agree with one federal district judge who said that it would be "inappropriate . . . to effectively extend the territorial reach of a federal statute" where the statute "provides for nationwide service of process" and "does not authorize service outside the United States[.]" *Cascade Yarns, Inc. v. Knitting Fever, Inc.*, 2011 WL 1042578, at *8 (W.D. Wash. Mar. 18, 2011); *cf. Doe v. Unocal Corp.*, 27 F. Supp. 2d 1174, 1183–84 (C.D. Cal. 1998) ("[I]t would be inappropriate for a federal court to effectively extend the territorial reach of a federal statute by applying a national contacts test for personal jurisdiction where service is not effected pursuant to that federal statute . . . . RICO does not apply where, as here, the defendant is served outside of the United States."); *Wultz v. Islamic Rep. of Iran*, 755 F. Supp. 2d 1, 31–32 (D.D.C. Oct. 20, 2020) (finding jurisdiction under the ATA where the defendant "d[id] not argue that it was [not] served [ ] with process *within the United States*, and the docket sheet for th[e] case indicates that summons was issued" (emphasis added)).

Schrier, in short, cannot invoke the ATA as a basis for our exercise of personal jurisdiction over QIB. But this doesn't doom Schrier's efforts to establish personal jurisdiction over QIB some other way. Where, for instance, the plaintiff has established the elements of personal jurisdiction under

the state or federal long-arm statute, he may assert his ATA claims against that defendant—even
without proper service under the ATA. As one court has explained:

> Plaintiffs here opted to proceed under Rule 4(h)(2), which provides that service upon
> an association in a place not within any judicial district of the United States shall be
> accomplished in any manner prescribed by Rule 4(f) for service of individuals in
> foreign countries (other than personal delivery). . . . Consistent with Rule 4(f)(1) and
> the provisions of the Hague Convention incorporated thereby, plaintiffs served a copy
> of the summons and complaint, translated into Arabic, on the Director of the Courts
> of the State of Israel, which handles requests for service of process in the disputed
> West Bank territories. . . . In light of the Court's conclusions that Rule 4(k)(2) provides
> a basis for Hamas's amenability to service of summons for the ATA claim, and that
> the requirements of that Rule—including evidence of proper service and a
> constitutionally sufficient relationship between the defendant and the forum—have
> been met here, the Court may exercise personal jurisdiction over Hamas for purposes
> of the ATA claim. Furthermore, because Hamas has not responded to the duly served
> complaint within the time prescribed by Rule 12(a) of the Federal Rules of Civil
> Procedure, the Court will direct the Clerk to enter Hamas's default in this civil action
> on the ATA claim.

*Sisso v. Islamic Rep. of Iran*, 448 F. Supp. 2d 76, 88–90 (D.D.C. 2006); *see also Morris v. Khadr*, 415 F. Supp.
2d 1323, 1327 (D. Utah 2006) (engaging in a full personal-jurisdiction assessment under the federal
long-arm statute (Rule 4(k)(2)) because, while the plaintiffs' "complaint arises under the ATA," they
served the defendant, with the court's permission, "by publication under Rule 4(f) of the Federal Rules
of Civil Procedure"—not pursuant to the ATA).

We turn, then, to Schrier's contention that he's established personal jurisdiction over QIB
under both the Florida and federal long-arm statutes.

## B. The Florida Long-Arm Statute

We'll start with Florida. "A federal district court in Florida may exercise personal jurisdiction
over a nonresident defendant to the same extent that a Florida court may, so long as the exercise is
consistent with federal due process requirements." *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th
Cir. 2008). "Since the extent of the long-arm statute is governed by Florida law, federal courts are
required to construe it as would the Florida Supreme Court." *Cable/Home Commc'n*, 902 F.2d at 856.
"Florida's long-arm statute provides two ways in which a defendant may be subject to the jurisdiction

of the state's courts"—one general, the other specific. *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1312 (11th Cir. 2018). Schrier agrees that QIB isn't subject to *general* personal jurisdiction in Florida. *See* Response to First MTD at 4–5 ("Although the Court may not exercise *general* jurisdiction over QIB . . . looking at QIB's contacts with the entire nation confirms the Court has *specific* jurisdiction over QIB."); *see generally* Response (asking for us to exercise only *specific* personal jurisdiction over QIB).

Nor could he have suggested otherwise. There are, after all, no allegations that QIB "engages in substantial and not isolated activity with Florida"—the kind of significant in-state activity that would justify the exercise of general jurisdiction under Florida's long-arm statute. *Waite*, 901 F.3d at 1312. Schrier can prevail, then, only by showing that QIB is subject to *specific* personal jurisdiction in Florida. A "defendant is subject to *specific* personal jurisdiction—that is, jurisdiction over suits that arise out of or relate to a defendant's contacts with Florida—for conduct specifically enumerated in the statute." *Ibid.* As relevant here, the Florida long-arm statute authorizes the exercise of personal jurisdiction over a defendant who "[c]ommit[s] a tortious act within th[e] state." FLA. STAT. § 48.193(1)(a)(2); *see also* Response at 2 (proceeding only under this provision of the long-arm statute).

Schrier appears to concede that QIB has committed no tortious acts in Florida—and that the bank can be hauled into court here only because it conspired with the Nusra Front, which (Schrier says) *did* commit a tort here. *See* Response at 1–2 ("'Florida law construes the state's long-arm statute to reach all of the alleged participants in a civil conspiracy, at least one act in furtherance of which is committed in Florida.' . . . QIB is subject to jurisdiction here *because the Nusra Front would be*." (emphasis added)). And Schrier's right that, where a plaintiff "has successfully alleged a cause of action for conspiracy . . . , and if she has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of the state of Florida through its long-arm statute." *Wilcox v. Stout*, 637 So. 2d 335, 337

(Fla. 2d DCA 1994);[12] *see also Machtinger v. Inertial Airline Servs. Inc.*, 937 So. 2d 730, 735 (Fla. 3d DCA 2006) (noting, in a civil-conspiracy case against non-resident defendants: "The question is whether O'Donnell's fraudulent misrepresentations made in furtherance of the conspiracy constitute tortious acts committed within Florida for the purposes of long-arm jurisdiction. If they do, then Florida has personal jurisdiction over O'Donnell as well as all of the Machtinger defendants who conspired with him."). Simply put, "Florida courts may exercise personal jurisdiction over parties to a Florida civil conspiracy even if the alleged civil conspirator otherwise has no connection to the state." *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp. LLC*, 608 F. Supp. 2d 1349, 1354 (S.D. Fla. Mar. 31, 2009) (Hurley, J.). Under Florida law, then, "personal jurisdiction can be exercised over a non-resident defendant under the 'co-conspirator theory' if: (1) jurisdiction can, under the traditional tests discussed below, be asserted over a 'resident' defendant (*i.e.* one with sufficient ties to the state); (2) the plaintiff can demonstrate the existence of a conspiracy in which the non-resident defendant and the resident defendant participated; and (3) an overt act in furtherance of the conspiracy took place within the state." *Quail Cruises Ship Mgmt., Ltd. v. Agencia de Viagens CVC Tur Limitada*, 2011 WL 5057203, at *4 (S.D. Fla. Oct. 24, 2011) (Huck, J.) (citing *Platypus Wear Inc. v. Clarke Modet & Co., Inc.*, 515 F. Supp. 2d 1288, 1292 (Moreno, J.) (describing the same three-part test); and then citing *Hasenfus v. Secord*, 797 F. Supp. 958, 961 (S.D. Fla. 1989) (Atkins, J.) (same)).

As we've said, Schrier alleges—without actually pleading a cause of action for civil conspiracy—that QIB conspired with the Nusra Front and that the Nusra Front then committed the

---

[12] Here's what the court said in full: "We conclude that if appellant has successfully alleged a cause of action for conspiracy among appellees and Morse to commit tortious acts toward appellant, and if she has successfully alleged that any member of that conspiracy committed tortious acts in Florida in furtherance of that conspiracy, then all of the conspirators are subject to the jurisdiction of the state of Florida through its long-arm statute, section 48.193, which provides that any person, whether or not a resident of Florida, who personally or through an agent, commits a tortious act within Florida submits to the personal jurisdiction of the courts of Florida for any cause of action arising out of the tortious act committed in Florida." *Wilcox*, 637 So. at 337.

tort of conversion against him—in Florida—when it used his credit and debit cards (from Syria) to make two purchases in Florida.[13] *See* Response at 2. As a preliminary matter, Schrier's right that conversion is a tort under Florida law. *See, e.g.*, *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1270 (11th Cir. 2009) (describing conversion as a "tort [that] 'may occur where a person wrongfully refuses to relinquish property to which another has the right of possession'"); *Joseph v. Chanin*, 869 So. 2d 738, 740 (Fla. 4th DCA 2004) ("[T]he plaintiff alleged the defendant committed a tortious act in Florida by converting funds to which the plaintiff has a right of possession."). Still, for two reasons, his civil-conspiracy contentions fail.

*First*, Schrier has failed to show that the Nusra Front converted his funds *in Florida*. As we've explained, in order to exercise jurisdiction over QIB under a civil-conspiracy theory, Schrier would have to establish that Nusra operatives committed "a tortious act *within the state*." FLA. STAT. § 48.193(1)(a)(2) (emphasis added); *see also Machtinger*, 937 So. 2d at 735 ("The question is whether O'Donnell's fraudulent misrepresentations made in furtherance of the conspiracy constitute tortious acts *committed within Florida* for the purposes of long-arm jurisdiction. *If they do*, then Florida has personal jurisdiction over O'Donnell as well as all of the Machtinger defendants who conspired with him." (emphasis added)). Conversion under Florida law is "an act of dominion wrongfully asserted over another's property inconsistent with his ownership therein." *Mazer*, 556 F.3d at 1270 (quoting *Thomas v. Hertz Corp.*, 890 So. 2d 448, 449 (Fla. 3d DCA 2004)). "[T]o state a claim for conversion, one must allege facts sufficient to show ownership of the subject property and facts that the other party wrongfully asserted dominion of that property." *Edwards v. Landsman*, 51 So. 3d 1208, 1213 (Fla. 4th DCA 2011).

Schrier alleges that "the Nusra Front stole [his] debit and credit cards and forced him to turn over the PIN numbers and passwords to his online accounts." SAC ¶ 73. The "Nusra Front [then]

---

[13] We'll just assume that Schrier has successfully alleged that QIB conspired with the Nusra Front.

racked up charges to [his] accounts to buy dozens of items for thousands of dollars[.]" *Id.* ¶ 74. The "Nusra Front purchased the[se] goods from Syria," the "transactions were paid for using Mr. Schrier's U.S.-based credit card and bank accounts, and many of the sellers were based in the United States." *Id.* ¶¶ 77, 75. According to Schrier, "[t]wo transactions, for military-style sunglasses and window washer fluid, were with vendors in Florida within this district." *Id.* ¶ 75.

Unfortunately for Schrier, this sequence of events indicates that any wrongful conversion took place *outside* of Florida. "[T]he relevant act for personal jurisdiction purposes with regard to the tort of conversion is the initial wrongful deprivation." *Russo v. Fink*, 87 So. 3d 815, 818 (Fla. 4th DCA 2012). "A tort claim is deemed to have accrued where the last event necessary to make the defendant liable for the tort took place. As to the tort of conversion, that act constitutes the exercise of wrongful dominion and control over the property to the detriment of the rights of its actual owner." *Merkin v. PCA Health Plans of Fla., Inc.*, 855 So. 2d 137, 140 (Fla. 3d DCA 2003). With respect to the stolen debit and credit cards, then, the Nusra operatives committed the act of converting those cards in Syria, because that's where the Nusra Front took them and (thus) completed its "wrongful exercise of dominion and control" over them.

The question is a bit more complicated when it comes to the money the Nusra Front stole from Schrier's accounts—in particular, the money it used to buy sunglasses and window-washer fluid from vendors in Florida. Under Florida law, though, "[i]n the case of the depleting of a bank account in one jurisdiction and its transmission to another, th[e] wrongful act is necessarily deemed to have taken place where the defendant effects a withdrawal and . . . steals the money." *Envases Venezolanos, S.A. v. Collazo*, 559 So. 2d 651, 652 (Fla. 3d DCA 1990). "It is not, as the appellants would have it, in the place where the funds become accessible to the thieves—which occurred in this case, in Miami." *Ibid.*

In *Envases*, a Venezuelan corporation sued its managing agent (and others) for conversion, alleging that the agent had converted the company's funds when it directed a French bank to wire-transfer money from the plaintiff's corporate account (in Paris) to an account the agent controlled in Miami. *Ibid.* The plaintiff sued in Miami, arguing that personal jurisdiction was proper in Florida because the agent had wrongfully converted its funds in Miami—the place where the money ended up. *Ibid.* And that's basically the position Schrier has taken here—that the Nusra Front converted his money in Miami because that's where the money went (to buy sunglasses and window-washer fluid). Response at 2 ("The Nusra Front sole Schrier's money and used it to make purchases from two vendors in this district. 'The mere purchase of goods' may not by itself confer jurisdiction in Florida, as QIB claims, but committing conversion here suffices." (cleaned up)).

But the trial court in *Envases* dismissed the case under the doctrine of *forum non conveniens*. *Envases*, 559 So. 2d at 652. On appeal, the plaintiff contended that *forum non conveniens* was inapplicable because "the various claims contained in the complaint—arising out of the theft and conversion of the corporate bank accounts—accrued in Miami." *Ibid.* The Fourth DCA disagreed, reasoning that the "wrongful act is necessarily deemed to have taken place *where the defendant effects a withdrawal*," *ibid.*, because "the gist of a conversion is not the acquisition of the property of the wrongdoer, but the wrongful deprivation of a person of property to the possession of which he is entitled," *id.* at 652–53. And that wrongful deprivation, the court held, occurred "in Paris, where the defendants wrongfully asserted control over the accounts." *Id.* at 652.

So too here. The wrongful deprivation occurred wherever Schrier's bank accounts—whose monies were depleted—happened to be. And, while we don't know exactly where those accounts were, we *do* know that they were *not* in Florida because the SAC—which spans some 69 pages and includes over 430 detailed paragraphs—*never* alleges that these accounts were held in Florida. Instead, Schrier tells us only that the accounts were "U.S.-based." SAC ¶ 75. If these accounts had been in

Florida, Schrier—who's represented by experienced and competent counsel and whose SAC has provided an extremely detailed account of every aspect of this case—would have told us so. As it is, then, he's failed to allege that the Nusra Front committed "a tortious act within this state."

*Second*, Schrier's causes of action (his claims) don't *arise from* the alleged conversion. Florida's long-arm statute, recall, allows us to exercise personal jurisdiction over a person "for any cause of action *arising from* . . . committing a tortious act within this state." FLA. STAT. § 48.193(1)(a)(2). In its MTD, QIB pressed this point, noting: "The Florida long-arm statute [ ] requires that Plaintiff's lawsuit arise primarily out of an in-state act enumerated in the statute. Plaintiff's claims against QIB are based on his alleged kidnapping and detention by the Nusra Front in Syria, not the two alleged purchases from Florida vendors." MTD at 5. For reasons that aren't entirely clear, Schrier decided not to address this issue in his Response. *See generally* Response at 1–4 (discussing the Florida long-arm statute but not addressing QIB's argument that his claims don't "arise from" the conversion). And that's probably sufficient for us to find that Schrier has forfeited any response he might've had on this question. *See United States v. Campbell*, 26 F.4th 860, 873 (11th Cir. 2022) ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court sua sponte [only] in extraordinary circumstances."); *see also Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1319 (11th Cir. 2012) ("[T]he failure to make arguments and cite authorities in support of an issue [forfeits] it."); *In re Egidi*, 571 F.3d at 1163 ("Arguments not properly presented . . . are deemed [forfeited].").

In any case, we see no way of plausibly characterizing Schrier's claims as "arising from" the conversion (the only act he says occurred in Florida). The SAC, after all, asserts twelve causes of action against QIB: six violations of the ATA; two counts of aiding and abetting false imprisonment; two counts of aiding and abetting the intentional infliction of emotional distress; aiding and abetting battery; and aiding and abetting assault. *See* SAC ¶¶ 310–434. Schrier doesn't advance a claim for

conversion, and he never alleges that any of his twelve claims *arose from* any such conversion. He, on the contrary, claims that the Nusra Front converted his money *after* he was kidnapped. *Compare* SAC ¶ 42 ("The Nusra Front held Mr. Schrier captive for 211 days, from December 31, 2012 until Mr. Schrier's escape on July 29, 2013."), *with id.* ¶ 77 ("Between February and April 2013, the Nusra Front racked up charges to Mr. Schrier's accounts to buy dozens of items for thousands of dollars[.]"). And, while he avers that the items the Nusra Front bought in Florida "had obvious connections to the Nusra Front's terrorist activities," *id.* ¶ 74, he never suggests that they were used to further *his detention*. He's thus failed to allege that his claims against QIB "arose from" the conversion.

*       *       *

Schrier, in sum, has failed to establish that we can exercise personal jurisdiction over QIB under Florida's long-arm statute.

## C. Rule 4(k)(2)

Nor, finally, can Schrier establish personal jurisdiction over QIB under the *federal* long-arm statute (Rule 4(k)(2))—which provides, in relevant part, as follows:

> Federal Claim Outside State–Court Jurisdiction. For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if:
> (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and
> (B) exercising jurisdiction is consistent with the United States Constitution and laws.

"Rule 4(k)(2) operates as a national long-arm statute which permits a court to aggregate a foreign defendant's nationwide contacts for jurisdictional purposes[.]" *Weinstock v. Abu Marzook*, 2019 WL 1470245, at *2 (S.D. Fla. Apr. 3, 2019) (Scola, J.) (citing *Fraser v. Smith*, 594 F.3d 842, 848–49 (11th Cir. 2010)). "Rule 4(k)(2) was implemented to fill a lacuna in the enforcement of international law cases" where the defendant doesn't have sufficient minimum contacts with any one state. *Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1337 (S.D. Fla. 2016) (Moore, J.) (cleaned up). So, "in cases where a defendant is not amenable to the jurisdiction of any state's courts of general jurisdiction, Rule 4(k)(2)

28

allows a federal district court to exercise personal jurisdiction over a foreign defendant when (1) the claim at issue arises under federal law, and (2) exercising jurisdiction is consistent with the Constitution and laws of the United States." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1218 (11th Cir. 2009). "Thus, the applicable forum for purposes of Rule 4(k)(2) is the United States as a whole." *Ibid.* (cleaned up).

Before we can decide whether our exercise of jurisdiction in this case would be consistent with the Constitution and laws of the United States—our core inquiry—we must address three preliminary issues. The first is whether QIB even falls within the scope of Rule 4(k)(2)—*i.e.*, whether it's "not amenable to the jurisdiction of any state's courts of general jurisdiction." *Oldfield*, 558 F.3d at 1218. According to QIB, Schrier's "own allegations establish that Rule 4(k)(2) is inapplicable," MTD at 6, because (QIB says) the SAC identifies *only* contacts with the State of New York, *id.* at 6–7 ("Here, however, Plaintiff alleges that QIB has U.S. contacts only with New York.").[14]

But QIB cannot avoid jurisdiction under Rule 4(k)(2) without identifying a state where it is subject to personal jurisdiction. *See Oldfield*, 558 F.3d at 1218 n.22 ("A district court is not required to analyze the laws of all fifty states to ascertain whether any state court of general jurisdiction has jurisdiction over the defendant; rather if the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use

---

[14] This is a good time to note that Schrier asks us, in passing, to transfer his case to the Southern District of New York. *See* Response at 5. We won't do that. An aside in a responsive brief isn't the proper way to seek a transfer. If Schrier wanted to move to transfer, he could've (and should've) filed a motion. We'd be remiss, too, if we didn't add that this case has been progressing in our District for more than two-and-a-half years. During that time, as we've recounted: Schrier filed his first complaint; QIB moved to dismiss; Schrier responded; QIB replied; we held two hearings; we ruled on the motion to dismiss and gave Schrier a shot at jurisdictional discovery (plus a second go at service); Schrier filed an amended complaint; he re-served; the parties engaged in several months of discovery; Schrier filed a second amended complaint; QIB filed its MTD; and only then (nearly two years into this case) did Schrier decide it was time to request a transfer. If he'd really wanted a transfer, in short, he could (and should) have moved for one *much earlier*. We won't allow Schrier's team to restart a litigation that's been going on for years because his lawyers have only now come to regret the forum *they* selected.

Rule 4(k)(2)." (cleaned up)); *Weinstock*, 2019 WL 1470245, at *2 ("[T]o defeat the assertion of jurisdiction under Rule 4(k)(2), the defendant bears [the] burden to show that [it] *is* subject to jurisdiction in another state's court of general jurisdiction."). As Judge Easterbrook once explained:

> Constitutional analysis for each of the 50 states is eminently avoidable by allocating burdens sensibly. A defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there (personal jurisdiction, unlike federal subject-matter jurisdiction, is waivable). If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2). This procedure makes it unnecessary to traipse through the 50 states, asking whether each could entertain suit.

*ISI Int'l, Inc. v. Borden Larner Gervais, LLP*, 256 F.3d 548, 552 (7th Cir. 2001) (Easterbrook, J.).

And federal courts around the country have adopted Judge Easterbrook's reasoning. *See, e.g.*, *Barracos of Fla., Inc. v. Elmassian*, 2012 WL 1622988, at *6 (S.D. Fla. May 9, 2012) (Scola, J.) ("For Rule 4(k)(2) to apply, the Court must find that the defendant is not amenable to personal jurisdiction in *any* state's courts of general jurisdiction. . . . Because [the defendant] has not identified any other state where it might be subject to personal jurisdiction, this Court is authorized to assume that [the defendant] is not amenable to jurisdiction in the courts of any state, and it may proceed under Rule 4(k)(2)."); *Mwani v. bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005) ("We find [Judge Easterbrook's] resolution eminently sensible, and, like the Fifth Circuit, we adopt the Seventh Circuit's view that so long as a defendant does not concede to jurisdiction in another state, a court may use 4(k)(2) to confer jurisdiction.").[15] Since QIB hasn't consented to jurisdiction in any one state, therefore, we'll proceed to analyze the extent of its U.S.-based contacts under Rule 4(k)(2).

---

[15] *See also Maguire v. Hong Kong Int'l Aviation Leasing Co., Ltd.*, 2017 WL 5239500, at *4 (S.D. Fla. Feb. 15, 2017) (Cohn, J.) ("Because [the defendant] has not identified any other state where it might be subject to personal jurisdiction, the Court may assume that [the defendant] is not amenable to jurisdiction in the courts of any state and proceed under Rule 4(k)(2)."); *Jackson v. Grupo Industrial Hotelero, S.A.*, 2008 WL 4648999, at *7 (S.D. Fla. Oct. 20, 2008) (Huck, J.) ("The bulk of cases dealing with Rule 4(k)(2), on the issue of who bears the burden of demonstrating that no other state can exercise personal jurisdiction, hold that it is the *defendant* who must show that: either its contacts with

As we've hinted, Rule 4(k)(2) sets out two additional preliminary requirements: The plaintiff (1) must have asserted "a claim that arises under federal law" and (2) must have "serve[d] a summons or fil[ed] a waiver of service." Fed. R. Civ. P. 4(k)(2). Schrier has satisfied both elements here. As to the first, Schrier asserts six claims under the ATA, which authorizes "[a]ny national of the United States injured in his or her person . . . by reason of an act of international terrorism" to sue "in any appropriate district court of the United States[.]" 18 U.S.C. § 2333(a). The ATA vests "exclusive jurisdiction over an action brought under" the ATA in "[t]he district courts of the United States." *Id.* § 2338. With respect to the second element, as we've explained (*see supra* at 18–19), Schrier has, pursuant to the Magistrate Judge's Order Granting Alternate Service, "serve[d] a summons" on QIB in Doha.

Still, Schrier's 4(k)(2) contentions fail because he hasn't met the Rule's *final* element, which required him to show that our "exercise[e] [of] jurisdiction [over QIB] is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2)(B). "Jurisdiction 'consistent with the Constitution and laws of the United States' is that which comports with due process." *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000). In cases where the court is exercising personal jurisdiction under Rule 4(k)(2), "the applicable forum for the minimum contacts analysis is the United States."[16] *Ibid.* "In specific jurisdiction cases, we apply the three-part due process test,

---

the whole of the United States are constitutionally insufficient, or that there is an alternative state where jurisdiction would be proper. . . . [The] Defendants' counsel stated that he could not provide any such alternative forum. Therefore, finding that jurisdiction is not proper under [Florida's long-arm statute], and further finding no alternative forum provided by [the] Defendants, this Court determines that an analysis under Rule 4(k)(2) is proper.").

[16]     Schrier argues—in the alternative—that we needn't consider whether QIB has sufficient contacts with the United States *as a whole*. He maintains, instead, that "the exercise of jurisdiction under the ATA or Rule 4(k)(2) comports with the Fifth Amendment because it would not be arbitrary or fundamentally unfair." Response at 10. And (he continues) "[t]he Fifth Amendment due process clause should not require the same analysis as the Fourteenth Amendment due process clause." *Ibid.* In other words, he wants us to skip the "minimum contacts" analysis because Rule 4(k)(2)—unlike the state long-arm statutes—implicates the Fifth, rather than the Fourteenth, Amendment. *See id.* at 11 ("[T]he Fourteenth Amendment minimum contacts approach has no place in the Fifth Amendment

analysis."). Here, Schrier relies on Judge Jennifer W. Elrod's concurrence in *Douglas v. Nippon Yusen Kabushiki Kaisha*, 996 F.3d 289, 301 (5th Cir. 2021) (Elrod, J., concurring), which noted that "federalism concerns animate . . . the Supreme Court's jurisprudence on the jurisdictional limits of the Fourteenth Amendment," and added that those concerns "are irrelevant in the Fifth Amendment context." And, indeed, the Supreme Court has "le[ft] open the question [of] whether the Fifth Amendment imposes the same restrictions [as the Fourteenth Amendment does] on the exercise of personal jurisdiction by a federal court." *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1784 (2017).

The argument isn't without merit. *See NYSRPA v. Bruen*, 142 S. Ct. 2111, 2138 (2022) (observing that the American public's perception of individual rights changed between 1791, when the Fifth Amendment was ratified, and 1868, when the Fourteenth Amendment became law, and noting "an ongoing scholarly debate" about the extent to which judges should interpret individual rights protected by the latter *more* broadly than those we, as Americans, exercise only against the federal government under the former). But it's foreclosed here. And, to his credit, Schrier "recognizes the Eleventh Circuit has applied the minimum contacts analysis under the Fifth Amendment." Response at 11 (citing *Oldfield*, 558 F.3d at 1220); *cf. Durham v. LG Chem, Ltd.*, 2022 WL 274498, at *2–3 (11th Cir. Jan. 31, 2022) (rejecting the very same argument Schrier advances here and noting that, "where personal jurisdiction is established under federal law, the Fifth Amendment contains the relevant Due Process Clause, and we generally deem the applicable forum for minimum contacts purposes to be the United States" (cleaned up)). Just last month, in fact, the Eleventh Circuit reiterated that "courts should analyze personal jurisdiction under the Fifth Amendment using the same basic standards and tests that apply under the Fourteenth Amendment." *Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1308 (11th Cir. 2022).

And the Eleventh Circuit is not alone in doing so. No circuit has adopted Schrier's view. *See Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 235–36 (Aug. 16, 2022) (en banc) ("Every court that has considered this point agrees that the standards mirror each other."); *see also id.* at *8–9 ("Courts all apply the Fourteenth Amendment 'minimum contacts' standard in Fifth Amendment cases. This court and six other circuits apply Fourteenth Amendment due process analysis to determine personal jurisdiction in cases governed by the Fifth Amendment. . . . Furthermore, the Second, Sixth, Seventh, *Eleventh*, Federal, and D.C. Circuits all agree that no meaningful difference exists between the Fifth and Fourteenth Amendments' minimum contacts analyses." (emphasis added)); *id.* at *9 n.24 (collecting cases). Indeed, the concurrence Schrier cites is now a dissent. *See id.* at *18 –43 (Elrod, J., dissenting).

That's because the Fifth Circuit reheard *Douglass* en banc and concluded: "Seventy-six years ago, Justice Frankfurter opined that '[t]o suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection.' After considerable elaboration, this court confirms his intuition." *Id.* at *13 (citation omitted). As Judge Ho explained in his concurrence to the en banc opinion, a decision adopting Schrier's framework would create "logical difficulties" in light of the "Supreme Court's longstanding incorporation jurisprudence." *Id.* at *15 (Ho, J., concurring). "Under the doctrine of incorporation, the Supreme Court has repeatedly instructed that [courts] must interpret the Due Process Clause of the Fourteenth Amendment coextensively with various provisions of the Bill of Rights." *Ibid.* (Ho, J., concurring). "If Supreme Court precedent requires [courts] to apply the *same* standard of 'due process' to the states and federal government when it comes to *other* constitutional rights like the First and Second Amendment, what's the logic in applying *different* standards when it comes to due process itself?" *Id.* at *16 (Ho, J., concurring).

which examines: (1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities with the forum state, thus invoking the benefit of the forum state's law; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton Malletetier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013). "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Ibid.* The "relationship among the defendant, the forum, and the litigation is the *essential foundation*" of personal jurisdiction. *Helicopteros Nacionales de Colombia S.A. v. Hall*, 466 U.S. 408, 414 (1984) (emphasis added).

"[A] fundamental element of the specific jurisdiction calculus is that [the] plaintiff's claim must arise out of or relate to at least one of the defendant's contacts with the forum." *Louis Vuitton*, 736 F.3d at 1355 (cleaned up). "[F]or a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum." *Bristol-Myers*, 137 S. Ct. at 1781 (cleaned up). When there's no such connection, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the [forum]." *Ibid.* And what's needed "is a connection between the forum and the specific claims at issue." *Ibid.* The Supreme Court recently reaffirmed that "a strict causal relationship between the defendant's in-[forum] activity and the litigation" isn't required. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. ____, 141 S. Ct. 1017, 1026 (2021). But that "does not mean anything goes." *Ibid.* The "relationship among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction"—must still be "strong." *Id.* at 1028.[17]

---

[17]     Before *Ford*, the Eleventh Circuit "ha[d] held that a tort 'arises out of or relates' to the defendant's activities in a state only if the activity is a 'but-for' cause of the tort." *Waite*, 901 F.3d at 1314. That's no longer true. *See In re Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F. Supp. 3d 1192, 1204

The Eleventh Circuit has clarified that relatedness "entails a fact-sensitive inquiry . . . hewing closely to the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests." *Fraser*, 594 F.3d at 851 (cleaned up) (affirming the district court's dismissal for lack of personal jurisdiction of an action in which the plaintiffs' "injuries were not a sufficiently foreseeable consequence of their hotel's business relationship with [a boat-tour company] to satisfy the constitutional relatedness requirement"). In other words, "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980) (cleaned up). That's because the quantum of "foreseeability that is critical" to the analysis "is that the defendant's conduct and connection with the forum . . . are such that [it] should reasonably anticipate being haled into court" in the forum, *id.* at 297—here, the United States as a whole.

The relevant contacts in our case are six transactions that (Schrier claims) flowed through QIB's correspondent accounts in New York and ultimately reached either the Nusra Front or the Qatar Charity—which, recall, Schrier alleges supported Ahrar al-Sham. *See, e.g.*, SAC ¶ 4 (referring to

---

(S.D. Fla. June 30, 2021) (Rosenberg, J.) ("[T]he Eleventh Circuit's 'but-for' causation standard was rejected as a required showing [in *Ford*].")"); *see also Ford*, 141 S. Ct. at 1033 (Alito, J., concurring) ("*Ford*, however, asks us to adopt an unprecedented rule under which a defendant's contacts with the forum State must be proved to have been a but-for cause of the tort plaintiff's injury. The Court properly rejects that argument. . . ."); *cf. James Lee Constr., Inc. v. Gov't Emps. Ins. Co.*, 2021 WL 1139875, at *2 (D. Mont. Mar. 25, 2021) (holding that *Ford* overruled the Ninth Circuit's "but-for" test in specific-jurisdiction cases).

Unfortunately, while we now know what the standard *isn't* (but-for causation), it's a little unclear what the right standard *is. See Ford*, 141 S. Ct. at 1034 (Alito, J., concurring) ("But without any indication what those limits might be, I doubt that the lower courts will find that observation [that the phrase "relate to" "incorporates real limits"] terribly helpful."); *see also id.* at 1035 (Gorsuch, J., concurring) ("The majority promises that its new test 'does not mean anything goes,' but that hardly tells us what does."). And none of the Eleventh Circuit's recent cases discussing *Ford* tell us. *See Heredoros*, 43 F.4th at 1310–11 (citing *Ford* without telling us what the new standard is); *Iglesias v. Pernod Ricard*, 2022 WL 1815846, at *3 n.4 (11th Cir. June 3, 2022) (citing *Ford* only for the proposition that there are two kinds of personal jurisdiction—general and specific). We thus handle our Circuit's pre-*Ford* jurisprudence with great care—rejecting, on the one hand, the "but-for" standard, but taking stock, on the other, of the still-viable principles of fairness and foreseeability.

Qatar Charity as "a known Al-Qaeda funder and well-publicized supporter of Ahrar al-Sham"). Three of these transactions pre-dated Schrier's escape and three came after. *See* MTD at 9–10 (listing these six transactions); Response at 6–8 (discussing these six transactions). Schrier alleges that each of these transfers "supported the terrorists who kidnapped, tortured, and imprisoned [him and] relate to [his] ATA claims." *Id.* at 6–7. After *Ford*, as we've said, Schrier doesn't have to show that these transactions *caused* his kidnapping or captivity. 141 S. Ct. at 1026. But he *does* need to show "a relationship between the defendant's conduct within the forum and the cause of action." *Herederos*, 43 F.4th at 1311. Otherwise, his efforts to establish personal jurisdiction are "doom[ed.]" *Ibid.*

Schrier tries to connect QIB's correspondent accounts to his claims by arguing that "these transactions supported the Syrian terrorists that kidnapped and tortured him. . . . All funds augmented the Nusra Front and Ahrar al-Sham's resources, which enabled them to hold Schrier." Response at 7. We can dispose of the last three transactions without much difficulty. Those three transfers, as Schrier concedes, ran through QIB's accounts only *after* Schrier was released. *Compare* SAC ¶ 42 ("The Nusra Front held Mr. Schrier captive for 211 days, from December 31, 2012 until Mr. Schrier's escape on July 29, 2013."), *with* MTD at 9–10 ("Jurisdictional discovery identified three transactions *after* Plaintiff's alleged escape," including transfers on August 15, 2013, August 25, 2013, and November 1, 2013.); *see also* Response at 7 ("Under *Ford*, the transactions suffice for jurisdiction despite having settled *after* Schrier's escape." (emphasis added)). They thus may well have "augmented the Nusra Front and Ahrar al-Sham's resources," Response at 7, but they could not have "enabled [the terrorists] to hold Schrier," *ibid.*

And Schrier's reliance on the first three transactions fails because the relationship between those transactions and his claims is far "too attenuated." *Herederos de Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 535 F. Supp. 3d 1299, 1306 (S.D. Fla. Apr. 27, 2021) (Scola, J.), *aff'd* 43 F.4th 1303 (11th Cir. 2022). As to these three transactions, Schrier advances only the general allegation that some

"funds"—not *these specific funds*—flowed through the QIB accounts and went to support the Qatar Charity. *See* SAC ¶¶ 296–98 ("QIB also maintained eight bank accounts for Qatar Charity. Qatar Charity used these accounts to fund terrorist groups in Syria. Around the period of Mr. Schrier's captivity, QIB used its U.S. correspondent accounts to send funds to and receive funds from other foreign and Qatari banks on Qatar Charity's behalf."); *see also ibid. passim* (making no specific allegations about the purpose of these first three transactions or their relationship to Schrier's kidnapping and captivity).

Schrier (it's true) *does* aver that Qatar Charity had some documented connections to Islamist terror groups. *See, e.g., id.* ¶ 135 ("Starting around May 2013, al-Kabi's Madid campaign began using social media to solicit donations to fund Syrian militant Islamist groups fighting in the Syrian Civil War, including the Nusra Front."); *id.* ¶¶ 264–274 ("Qatar Charity funded Jamatul-ul-Mujahadeen Bangladesh, an Islamist terror organization. . . . Qatar Charity actively supported Nusra Front ally Ahrar al-Sham, the group that held Mr. Schrier 'in trust' for the Nusra Front from May 5 to June 20, 2013. . . . In late December 2012, the Syrian Islamic Front, a coalition of militant Islamist groups of which Ahrar al-Sham was the dominant member, made a video announcing its formation that demonstrates the links between Ahrar al-Sham and Qatar Charity . . . . The video [ ] shows Syrian Islamic Front fighters blowing up buildings, buses, and cars, and brandishing automatic weapons and rocket-propelled grenades. Following this montage, the video shows Syrian Islamic Front Members in front of what appears to be bags of food and boxes of supplies, holding a banner that reads 'Qatar Charity' and 'Syria Relief 2012,' including the Qatar Charity logo. . . . A narrator says, 'Thanks to the Qatar Charity foundation and to the foundations associated with it for the aid and assistance that reached [unintelligible].'").

But he never alleges (or shows) that *the three pre-escape transactions* he's identified here supported *either* the Qatar Charity *or* the two groups that held him (Nusra Front and Ahrar al-Sham). Indeed, the

only evidence we have in the record on what these three transactions funded is an affidavit (and some accompanying exhibits) QIB appended to its MTD, which unambiguously suggest that these transfers went to *legitimate* organizations. *See* QIB's Documents Concerning the First Transfer [ECF No. 169-2] (banking records showing that the October 1, 2012 transaction, routed through Standard Chartered Bank in New York, was sent to UNHCR (the United Nations High Commissioner for Refugees) in Switzerland for "aid for Burma people"); QIB's Documents Concerning the Second Transfer [ECF No. 169-3] (banking records showing that the April 24, 2013 transaction, routed through JPMorgan Chase Bank in New York, was sent to Public Relations Regional Conference in Doha, Qatar);[18] QIB's Documents Concerning the Third Transfer [ECF No. 169-4] (banking records showing that the July 8, 2013 transaction, routed through Deutsche Bank in New York, was sent to Woosim System Inc. for "payment for printer").

Remember that a defendant may rebut a plaintiff's allegations supporting personal jurisdiction through the submission of affidavits or other competent proof. *Internet Sols. Corp. v. Marshall*, 557 F.3d 1293, 1295 (11th Cir. 2009) ("The plaintiff bears the burden of making out a *prima facie* case for personal jurisdiction by presenting sufficient evidence to withstand a directed verdict motion. The defendant then must raise, through affidavits, documents or testimony, a meritorious challenge to personal jurisdiction." (cleaned up)). QIB has done precisely that: It's submitted documents that suggest the three pre-escape transactions have nothing to do with Schrier's claims.

When a defendant presents this kind of evidence, "the burden shifts to the plaintiff to prove jurisdiction by affidavits, testimony or documents." *Ibid.*; *see also Sculptchair, Inc. v. Century Arts, Ltd.*, 94

---

[18] While the banking records for the first and third transfers include descriptions of the transfer's purpose—*see* QIB's Documents Concerning the First Transfer; QIB's Documents Concerning the Third Transfer—the second does not. Still, QIB has proffered competent evidence showing that the transfer went to a legitimate entity, *see* QIB's Documents Concerning the Second Transfer, and Schrier has failed to meet his burden of showing, with competent proof of his own, that the recipient of this money was a terrorist front (much less that it was a terrorist front with ties to his captivity).

F.3d 623, 627 (11th Cir. 1996) (same). Schrier hasn't done that. Rather than support his allegations of personal jurisdiction with *evidence*, he's done so with argument. *See generally* Response at 6–10 (supporting his Rule 4(k)(2) arguments with citations to the SAC). But that's not enough at this stage of the jurisdictional analysis. *Cf. Internet Sols.*, 557 F.3d at 1295 (noting that, when the defendant raises "a meritorious challenge to personal jurisdiction[,] . . .the burden shifts to the plaintiff to *prove jurisdiction by affidavits, testimony or documents*" (emphasis added)). Because QIB has challenged our personal jurisdiction with competent evidence—all of which strongly suggests that the three transactions Schrier has identified have nothing to do with his captivity—Schrier had to parry with his own proof. Since he's failed to do that, he's left us with little choice but to dismiss his case.[19]

    Against all this, Schrier advances five arguments—all unavailing.

    *First*, Schrier says that the inferences he's drawn *in his brief* about the nefariousness of these transactions "are more plausible than QIB's, which would require the Court to accept that terrorism supporters would have brazenly announced their intent to finance terrorism in the memo line." Response at 7. We agree with Schrier that "the notion that transaction documents would say 'for Schrier's torture' or 'guns for the Nusra Front' is ludicrous" because "[i]ncluding such information would raise obvious red flags." *Ibid.* But we cannot simply exercise jurisdiction over a foreign bank because of three transactions that *don't* raise red flags. As much as we may sympathize with Schrier and his cause, we must—above all else—follow the law, which requires the plaintiff (at this stage) to rebut the defendant's evidence with competent proof of his own. As we've said, Schrier has pointed to no such proof. And, while we don't for a moment condone the wrongfulness of QIB's (alleged) *other* connections to terror, it's not as though its position *here* is entirely without its own set of equities.

---

[19] Schrier is right to point out that we must construe all conflicts in his favor. *See* Response at 11–12. But that's only when the evidence is in conflict. Since Schrier has produced precious little evidence of where these three transactions ended up—and given that QIB's evidence unambiguously indicates that all three funded legitimate organizations—we have no evidentiary conflict that must be resolved in Schrier's favor.

As the Eleventh Circuit has said, where there's a "tenuous relationship" between the injury and the contacts, a finding that the relatedness requirement has been satisfied "would not only contravene the fairness principles that permeate the jurisdictional due process analysis, but would also interpret the requirement so broadly as to render it virtually meaningless." *Oldfield*, 558 F.3d at 1223–24.

*Second*, Schrier points to three terrorism-related cases in which federal courts *have* exercised personal jurisdiction. *See* Response at 9–10 (citing *Mwani*, 417 F.3d 1; then citing *Morris*, 415 F. Supp. 2d 1323; and then citing *Wultz*, 755 F. Supp. 2d 1). According to Schrier, these cases stand for the proposition that "jurisdiction comports with due process because QIB knowingly support[ed] anti-American terrorist groups that targeted U.S. nationals." *Id.* at 9. But the facts of these three cases are very different from ours.

*Mwani* and *Morris* both involved claims against the terrorists themselves—not third-party institutions that provided routine financial services. In *Mwani*, Kenyan victims of the bombing of an American embassy in Nairobi sued Osama bin Laden and al Qaeda—which claimed responsibility for the attack. *See* 417 F.3d at 5–6. The court exercised personal jurisdiction in the case because the defendants (bin Laden and al Qaeda) had *extensive* contacts with the United States—including "the publication of fatwas in a newspaper distributed in the United States; the shipment to Virginia of the power supply for a cell phone that bin Laden used in Afghanistan; the scheduling of a bin Laden interview in Afghanistan through an agent in Washington, D.C.; and the transmission of bin Laden's views to the District [of Columbia] via interviews on CNN and ABC." *Id.* at 12. On top of all that, the plaintiffs also alleged—and, unlike here, the defendants *never* contested—that bin Laden and al Qaeda "orchestrated" multiple terrorist attacks on American soil, including the September 11th attacks, the 1993 World Trade Center bombing, and the foiled plots to bomb the United Nations, Federal Plaza, and the Lincoln and Holland Tunnels in New York City. *Id.* at 13. Finally, the plaintiffs

supported these allegations with record *evidence*—none of which the defendants (who obviously failed to appear) rebutted with proof of their own. *See id.* at 13 n.12 (listing some of this evidence).

In *Morris*, a U.S. Army soldier wounded in Afghanistan and the family of another soldier killed in the same attack sued a Canadian citizen who was a long-time member of al Qaeda. *See* 415 F. Supp. 2d at 1326–27. The court exercised personal jurisdiction over the defendant because "[t]errorist attacks require more than a triggerman," and the "defendant's conduct giving rise to [the victims'] injuries include[d] . . . *personal* participation in al Qaeda's terrorist agenda, not just an attack." *Id.* at 1336 (emphasis added). The defendant's ties to al Qaeda were extensive: He "actively participated in and helped plan al Qaeda's terrorist agenda." *Ibid.* He was an al Qaeda leader, installed by Osama bin Laden into several high-ranking positions, and "he provided financial support and personnel assistance to help the group achieve its international terrorism objectives." *Id.* at 1327. And the plaintiffs had shown, *with competent evidence*, a direct connection between the defendant and the attack: The defendant had encouraged his own son to join al Qaeda—and that son then participated in the attack that injured one plaintiff and killed the other. *Ibid.* Although the defendant lacked other contacts with the United States, the court found that the attack—which killed an American citizen—was sufficient, standing alone, to exercise personal jurisdiction over the defendant based on the "effects doctrine." *Id.* at 1335–36 (citing *GTE New Media Servs. Inc. v. BellSouth Corp.*, 119 F.3d 1343, 1349 (D.D.C. 2000) ("[T]he effects doctrine . . . holds that jurisdiction may attach if the defendant's conduct is aimed at or has an effect in the forum state." (cleaned up)).

Specifically, the court reasoned that its exercise of personal jurisdiction was appropriate because "injury in the United States undeniably is a foreseeable effect of a terrorist attack purposefully directed at this country's citizens, [and] terrorism inherently is the sort of conduct and connection with the United States that should cause a foreign terrorist to reasonably anticipate being haled into court here." *Ibid.* (cleaned up). Finally, unlike here, the defendant never appeared in court and never

rebutted any of the plaintiffs' assertions with competent proof. *Id.* at 1332. The court thus justifiably found that the plaintiffs had met their burden to "make a prima facie showing of [the] [d]efendant's *personal and direct* participation in the *conduct giving rise* to [the] [p]laintiff's injuries." *Id.* at 1336 (first emphasis added).

Our case (it almost goes without saying) is totally different. Schrier is suing a Qatari bank, not the terrorists who injured him; he's identified only three routine financial transactions that preceded his escape, not the dozen or more acts of terrorism the *Mwani* defendants had indisputably directed at the United States or the murderous attack the defendant, through his son, had launched against the U.S. Army; QIB has shown, with competent evidence, that even these three transactions had nothing to do with terrorism generally—or Schrier's captivity specifically (whereas the *Mwani* and *Morris* defendants never showed up to rebut anything); and Schrier has failed to parry QIB's evidence with any proof of his own (unlike the *Mwani* and *Morris* plaintiffs, who supplemented their allegations with extremely inculpatory evidence of the defendants' U.S.-directed activities).

Schrier's reliance on *Wultz* fares no better.[20] In *Wultz*, the estate of an American citizen who was killed in a suicide bombing in Tel Aviv sued the Bank of China for facilitating certain wire transfers to the terrorist organization that carried out the bombing. 755 F. Supp. 2d at 18–20. But the court exercised personal jurisdiction in that case because the bank's minimum contacts with the United States were *so* extensive that they "support[ed] a finding of *general* personal jurisdiction." *Id.* at 33 (emphasis added).[21] The Bank of China had physical branches in California and New York, did

---

[20] In its Reply, QIB plainly misrepresents this case. *See* Reply at 5. It describes the case as "finding jurisdiction over Osama bin Laden and al-Qaeda for *directly* orchestrating the attack." *Ibid.* That description, though, applies to *Mwani*, not *Wultz*.

[21] The court's decision in this regard is no longer viable after the Supreme Court held in *Daimler AG v. Bauman*, 571 U.S. 117 (2014), that a federal court could exercise general jurisdiction over a corporation *only* where the corporation's "affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State." *Id.* at 138–39 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)).

extensive business throughout the United States, and held significant assets throughout the country. *Ibid.* In arriving at its conclusion, the court (notably) *contrasted* the Chinese bank's *extensive* U.S. contacts with a series of financial contacts the Eleventh Circuit had found *insufficient* to support the exercise of general jurisdiction in *Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 892 (11th Cir. 1983). *See Wultz*, 755 F. Supp. 2d at 33–34 (distinguishing *Oriental Imports* because, in that case, "a foreign bank . . . merely engaged in a correspondent relationship with banks in the forum. Such a relationship provided insufficiently minimum contacts with the forum by the foreign bank[.]"). In *Oriental Imports*, the Eleventh Circuit had held that, under Florida's long-arm statute, "the maintenance of a correspondent banking relationship alone is not sufficient to confer personal jurisdiction over a foreign bank." 701 F.2d at 892 (discussing general jurisdiction).

Despite electing to exercise *general* personal jurisdiction over the Bank of China, the court went on to address whether it could also exercise *specific* personal jurisdiction in the case. At this step of its analysis, the court held that "the alleged jurisdictional fact that BOC *knowingly* performed a wire transfer for the P[alestinian] I[slamic] J[ihad] through one of its U.S. branches supports a finding of specific personal jurisdiction." *Wultz*, 755 F. Supp. 2d at 34. The court stressed the importance of *knowledge* here—emphasizing that, in the absence of allegations "that it knew or had reason to believe that the monies it was processing through the bank would be used to carry out terrorist attacks on civilian targets, the mere provision of routine banking services that benefitted a terrorist organization in some general, nondescript manner will not support a finding of specific personal jurisdiction based on the contacts created by such provision." *Ibid.* (cleaned up). But, the court said, the plaintiffs had done enough to plead the bank's knowledge by alleging that Israeli officials had told the Chinese government, which in turn had notified the Bank of China, that the transfers it was processing were enabling the Islamic Jihad's terrorist activities. *Ibid.*

In so holding, the court relied heavily on an earlier case, *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456 (S.D.N.Y. 2010). *See Wultz*, 755 F. Supp. 2d at 34. The court there had found that the plaintiffs' allegations of "noncompliance with banking laws and industry standards will not alone render a bank liable for the violent attacks committed by a terrorist organization who benefitted, in some general, nondescript manner, from the monies passing through the bank during the performance of routine banking services." 718 F. Supp. 2d at 489. The *Sept. 11* Court agreed to exercise specific personal jurisdiction over Dubai Islamic Bank because the complaint included a long litany of allegations suggesting that the bank was knowingly laundering al Qaeda's money. *Id.* at 489. Specifically, the plaintiffs alleged that, even before 9/11, "the United States government announced that [the bank] was laundering money for Osama bin Laden," and that U.S. intelligence officials collected evidence indicating that Osama bin Laden had formed relationships with the bank "with the approval of officials who control the bank." *Id.* at 488–89. Even after the U.S. Government acted to end the banking services it believed the Dubai Islamic Bank was performing for bin Laden and al Qaeda, "DIB allegedly continued to provide banking and other financial services directly to Osama bin Laden and al Qaeda, in violation of accepted international banking standards." *Id.* at 489. And, the court added, the relationship between the bank's services to al Qaeda and the events giving rise to the plaintiffs' claims (the September 11th attacks) was unmistakable: "[The] plaintiffs allege[d] that the bank account of Osama bin Laden's Chief Financial Officer was the source of thousands of dollars of money transfers from [the bank] to two of the hijackers. The sole purpose of those fund transfers was allegedly to pay for the hijacker's training, including flight lessons, and other expenses incurred in preparing for the 9/11 terrorist attacks." *Id.* at 489. Notably, the bank offered *no argument* (or evidence) to the contrary. *Id.* at 490 ("DIB has made no arguments relating to the reasonableness of exercising jurisdiction over it.").

43

Again, our case is very different. For one thing, there's no dispute that our bank's U.S. contacts aren't—as they were in *Wultz*—nearly extensive enough for us to exercise general personal jurisdiction over QIB. And there's no evidence that, through the three fund transfers Schrier relies on here, QIB was *knowingly* funding the groups that held him hostage. For another, there's no evidence—as there was in the *Sept. 11* case—that QIB directly (or even indirectly) funded two (or, frankly, any) of the men who held Schrier captive. In *Sept. 11*, recall, the bank had funneled thousands of dollars to two of the 9/11 hijackers—who then participated in the 9/11 attacks. These four cases, then—*Mwani*, *Morris*, *Wultz*, and *Sept. 11*—cannot save Schrier's claims.

*Third*, Schrier says he's "also alleged a conspiracy between QIB and the terrorists that held him hostage, and the Court may assert conspiracy jurisdiction consistent with due process." Response at 8. And, he adds, if we were to exercise this kind of conspiracy jurisdiction, we could consider all the money the Nusra Front converted from his accounts to buy goods across the United States—not just in Florida. *Id.* at 9. "Aggregating all those torts from across the country," he continues, "supports the exercise of jurisdiction." *Ibid.*

But "Rule 4(k)(2) does not permit the exercise of conspiracy-based personal jurisdiction." *Oueiss v. Saud*, 2022 WL 1311114, at *19 (S.D. Fla. Mar. 29, 2022) (Moore, J.); *see also Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *5 n.8 (D.D.C. Mar. 19, 2019) ("[The] Plaintiffs offer no authority for the proposition that courts may assert conspiracy jurisdiction under Rule 4(k)(2). The cases upon which [the] plaintiffs rely have permitted such a theory only under state long-arm statutes."). And this appears to be the general view among the federal courts. *See, e.g.*, *In re Platinum and Palladium Antitrust Litig.*, 2017 WL 1169626, at *49 (S.D.N.Y. Mar. 28, 2017) (refusing to apply conspiracy-based jurisdiction under Rule 4(k)(2)); *In re Aluminum Warehousing Antitrust Litig.*, 2015 WL 892255, at *5 (S.D.N.Y. Mar. 3, 2015) (rejecting the plaintiffs' view "that Rule 4(k)(2) permits courts to exercise personal jurisdiction over a defendant on the basis of a conspiracy" and holding that "[t]he rules and

doctrines applicable to personal jurisdiction are sufficient without the extension of the law to a separate and certainly nebulous 'conspiracy jurisdiction' doctrine"); *Laydon v. Mizuho Bank, Ltd.*, 2015 WL 151535, at *3 (S.D.N.Y. Mar. 31, 2015) ("Courts have been increasingly reluctant to extend this theory of jurisdiction beyond the context of New York's long-arm statute."); *Tymoshenko v. Firtash*, 2013 WL 1234943, at *4 (S.D.N.Y. Mar. 27, 2013) (refusing to consider the co-conspirators' U.S. contacts for the purpose of establishing personal jurisdiction over a foreign defendant and observing that, "although whether a plaintiff can establish personal jurisdiction over a defendant pursuant to Rule 4(k)(2) through the imputation of contacts of that defendant's putative co-conspirators with the United States has not been decisively addressed, the use of this conspiracy theory has been widely criticized by courts and scholars." (cleaned up)); Ann Althouse, *The Use of Conspiracy Theory to Establish in Personam Jurisdiction: A Due Process Analysis*, 52 FORDHAM L. REV. 234, 252 (1983) ("Indeed, the attenuation involved in attributing one person's jurisdictional contacts to another should inspire increased vigilance. In *Rush v. Savchuk*, [440 U.S. 320 (1980)], the Supreme Court found 'plainly unconstitutional' the state court's attribution of an insurer's contacts to its insured. The Court stated that 'the parties' relationships with each other may be significant in evaluating their ties to the forum. The requirements of *International Shoe*, however, must be met *as to each defendant* over whom a state court exercises jurisdiction.' [*Rush*, 440 U.S. at 332]." (emphasis added)).

It's true that the trend *may* be starting to change. In *Rudersdal v. Harris*, 2022 WL 263568, at *10 (S.D.N.Y. Jan. 28, 2022), the court noted that "some district courts (including this one) and scholars may have qualms about the ability of a conspiracy theory to satisfy due process[.]" It also recognized that "courts have raised concerns that using the conspiracy theory of jurisdiction in the Rule 4(k)(2) context would in effect require the court to rule on the merits of whether the conspiracy existed." *Id.* at 11. (cleaned up). And the court was clear that it "shares those concerns." *Ibid.* Still, in "dicta," the court "f[ound] it impossible to conclude that conspiracy jurisdiction is inconsistent with

the Constitution given the Second Circuit's holding in *Schwab [et al., v. Bank of Am., Corp., et al.*, 883 F.3d 68 (2018)]." But *Schwab* was a case about the California long-arm statute—not Rule 4(k)(2). And *Schwab*, in turn, relied on a Fourth Circuit case, *Unspam Technologies, Inc. v. Chernuk*, 716 F.3d 322 (4th Cir. 2013), which likewise applied a conspiracy theory of jurisdiction, not to Rule 4(k)(2), but to the Virginia long-arm statute. The point, as one Second Circuit judge has written, is that "[t]he Second Circuit has not 'conclusively answered' whether *Schwab*'s standard for finding 'minimum contacts' under a conspiracy-based jurisdiction theory can apply to cases involving Rule 4(k)(2)." *Biocad JCS v. F. Hoffmann-La Roche Ltd.*, 2022 WL 268102, at *7 n.6 (S.D.N.Y. Jan. 28, 2022) (Sullivan, Circuit J.). No federal court in the country, in other words, has *ever* applied a conspiracy-based theory of jurisdiction under Rule 4(k)(2).

We can see both sides of this argument: On the one hand, *Schwab* and *Unspam* held that a defendant who has no contacts with a state—but who conspires with another who does—can, consistent with due process, be haled into court in that state. And there's something alluring about this view. Why, after all, would we shield from liability a defendant who, through another, directs harmful activities towards our citizens? And especially in a case like ours, the inclination to hook the bad actor in, as it were, by whatever means, must be very strong indeed. On the other hand, we're constrained to a substantial degree by the Supreme Court's (relatively recent) admonition that, to comport with due process, a defendant's relationship with the forum "must arise out of contacts that the defendant *himself* creates with the forum[.]" *Walden v. Fiore*, 517 U.S. 277, 284 (2014) (cleaned up & emphasis in original) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) ("Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." (emphasis in original))). Indeed, on this issue the Supreme Court has been quite clear: "Due process requires that a defendant be haled into court in a forum State based on *his own affiliation* with the State, not based on the 'random, fortuitous, or

attenuated' contacts he makes by interacting with other persons affiliated with the State." *Id.* at 286 (emphasis added) (quoting *Burger King*, 471 U.S. at 475). We're not, in short, writing on a blank slate. Given that just about every other federal court to have addressed this issue has concluded that conspiracy-based jurisdiction is inconsistent with the language of Rule 4(k)(2)—and in light of the Supreme Court's clear guidance on what due process in this context requires—we find that Rule 4(k)(2) doesn't countenance a conspiracy-based theory of personal jurisdiction.

And, for one other reason, we think this conclusion makes sense. Rule 4(k)(2) doesn't—at least on its face—appear to allow for the exercise of personal jurisdiction over a defendant based *only* on a conspirator's contacts with the United States. Instead, the Rule provides that, "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a *defendant* if: (A) *the defendant* is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." FED. R. CIV. P. 4(k)(2) (emphases added). By its own terms, in other words, the Rule unambiguously directs its focus towards *the defendant*—without any regard for the contacts of others. And this is in contradistinction to, for instance, the Florida long-arm statute, which (as we've said) *does* take stock of a conspirator's Florida-based activities. *See* FLA. STAT. § 48.193(1)(a) (A person, . . . who *personally or through an agent* does any of the acts enumerated in this subsection thereby submits himself or herself . . . to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts . . . ." (emphasis added)). We thus do not read Rule 4(k)(2) as permitting the kind of conspiracy-based jurisdiction Schrier advocates for here.

*Fourth*, Schrier contends that the Supreme Court's decision in *Ford* "forecloses" QIB's argument that the post-escape transactions are irrelevant. Response at 7. But *Ford* did no such thing. *Ford*, on the contrary, was clear that, while a plaintiff needn't show "a strict causal relationship" between the defendant's forum-based contacts and the claim, he must still establish that his claim is

"related to" those contacts. *Ford*, 141 S. Ct. at 1026. Indeed, the Court went out of its way to clarify that its holding "does not mean anything goes." *Ibid.* The relationship, *Ford* held, "among the defendant, the forum, and the litigation—the essential foundation of specific jurisdiction"—must still be "strong." *Id.* at 1028. And, as a matter of simple logic, transactions that post-date Schrier's escape cannot be "related to" his captivity—and their relationship to his kidnapping and detention isn't "strong."

*Fifth*, Schrier points to the Seventh Circuit's decision in *Boim v. Holy Land Foundation*, 549 F.3d 685, 698–99 (7th Cir. 2008), for his view that a bank's transactions with a terrorist organization can be "related to" a plaintiff's injuries at the hands of that organization because "money is fungible," Response at 7. In *Boim*, the Seventh Circuit held that "a donation to a terrorist group that targets Americans outside the United States may violate section 2333," *id.* at 690, *if* the donor both "provid[ed] material support" to the terrorists and "kn[ew] that the money would be used in preparation for or in carrying out the killing or attempted killing of, conspiring to kill, or inflicting bodily injury on, an American citizen abroad," *id.* at 691. In saying so, however, the court observed that a terrorist group that receives a donation to its social-services program can then redistribute its preexisting funds towards its soldiers in the field. *See id.* at 698. That's, of course, true. But, for all the reasons we've gone over, it doesn't help Schrier here. To reiterate: With respect to the first three transactions, QIB has shown, with competent proof, that these transactions funded, not the social-services arm of a known terrorist organization (as was the case in *Boim*), but legitimate organizations that, so far as we can tell, have nothing to do with terrorism. *See* QIB's Documents Concerning the First Transfer; QIB's Documents Concerning the Second Transfer; QIB's Documents Concerning the Third Transfer. And the latter three transfers were settled only *after* Schrier had escaped and thus (contra *Boim*) could *not* have funded the terrorists who injured him.

*     *     *

We cannot think of a more difficult set of facts to read about—nor can we begin to imagine what it must have been like to live through the harrowing events Mr. Schrier and his lawyers have here recounted. We hesitate, too, to add to Mr. Schrier's troubles. But, as federal judges, we swore an oath to uphold the law—no matter how difficult or seemingly unfair the result. Sometimes the facts—and the law—happen to coincide with the judge's view of what a fair (or a just) outcome might look like. Other times, though, we must stiffen our backs and take solace in the abiding truism—that a democracy is served best when its judges apply the law, however unpleasant the outcome. After careful review, we **ORDER and ADJUDGE** that QIB's Motion to Dismiss [ECF No. 156] is **GRANTED**.[22]

**DONE AND ORDERED** in the Southern District of Florida, this 30th day of September 2022.



**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

---

[22] Because Schrier has failed to show that QIB's contacts with the United States are "related" to his claims, we need not (and do not) decide whether "the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton*, 736 F.3d at 1355. And, for similar reasons, we won't address QIB's separate contention that Schrier's claims fail on the merits. *See Herederos*, 43 F.4th at 1313 n.5 ("[The defendant] also contends that [the plaintiff] failed to state a claim, but because we hold that the court lacked personal jurisdiction, we don't address the merits.").